UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re: S-Tek 1, LLC,  No. 20-12241-j11

Debtor.

# MEMORANDUM OPINION REGARDING MOTION FOR USE OF CASH COLLATERAL ON AN INTERIM EMERGENCY BASIS PENDING FINAL HEARING

The Court held a preliminary hearing on December 9, 2020 consistent with Federal Rule of Bankruptcy Procedure 4001(b)(2) on Debtor's Emergency Motion for Authority to Use Cash Collateral for the Period from December 2, 2020 through March 31, 2021 and Request for Emergency Hearing ("Motion for Use of Cash Collateral" – Doc. 16) and the objections of Surv-Tek, Inc. ("Surv-Tek") thereto, and took the matter under advisement. Surv-Tek objected to Debtor's use of cash collateral, arguing among other things, that, pre-petition, a state court ordered Debtor to cease operations and Debtor should not be permitted to use cash collateral to enable it to continue operations in violation of the state court's order. Doc. 19.

The Court held a preliminary evidentiary hearing on the matter on December 9, 2020, less than 24 hours after the Motion for Use of Cash Collateral was filed. *See* Fed. R. Bankr. P. 4001(b)(2). Debtor has a payroll due on December 11, 2020. Debtor presented evidence at the hearing in the form of witnesses and exhibits. Surv-Tek cross-examined Debtor's witnesses and put into evidence its pre-petition agreement with Debtor and a state court order. At the conclusion of the hearing, the Court took the matter under advisement, and gave the parties an opportunity to file a list of points and authorities by noon of the next day, which they both did. About an hour after the lists of points and authorities were due, at 1:06 p.m. on December 10, 2020, Debtor filed a notice of removal by which it removed to bankruptcy court the state court action in which the state court ordered Debtor to cease operations.

For the reasons explained below, the Court will grant Debtor emergency interim relief to use cash collateral from December 2, 2020 through the date of the final hearing on the Motion for Use of Cash Collateral (the "Interim Period") to the extent necessary to avoid immediate and irreparable harm.

**FINDINGS OF FACT**

Debtor is a limited liability company providing commercial and residential land surveying and platting services in New Mexico. It employs approximately 15 employees. In December 2018, S-Tek entered into an agreement (the "Purchase Agreement") with Surv-Tek whereby S-Tek purchased all or a substantial portion of the assets of Surv-Tek. S-Tek also executed a promissory note (the "Note") payable to Surv-Tek for approximately $1,550,000.[1] The Note provides for monthly payments of $16,440.15. Exh. 2. As part of the sale, S-Tek and Surv-Tek executed a "Non-Compete Agreement" in which Surv-Tek agreed not to compete[2] with S-Tek for five years after the date of sale. Exh 3. The Non-Compete Agreement also provided that, in the event of uncured default on the Note by S-Tek, the Non-Compete Agreement's provisions preventing Surv-Tek from providing surveying services would "terminate automatically." *Id.* Moreover, after an uncured default, S-Tek would be barred from providing commercial or residential surveying services in in the State of New Mexico if Surv-Tek elected to conduct a surveying business in New Mexico. *Id.*

In July 2019, S-Tek sued Surv-Tek and others in the Second Judicial District Court of New Mexico (the "State Court") for fraud, negligent misrepresentation, material breach of contract, breach of contract, breach of good faith and fair dealing, equitable recovery, and

---

[1] Debtor stated on Schedule D that Surv-Tek has a secured claim in the amount of $1,535,000.00.
[2] The Non-Compete Agreement defined "competition" in part as "provid[ing] or sell[ing] surveying work for commercial or residential uses . . . in the state of New Mexico." Exh. 3.

violation of the UCC. The action (hereafter, the "State Court Action") is styled *S -Tek 1, LLC v. Surv-Tek, Inc.* and numbered D-202-CV-2019-05359. Exh. 2. Surv-Tek answered the complaint and counter-claimed for S-Tek's failure to timely pay the Note, among other things. *Id.* The State Court found that, as of October 2020, the amount Debtor was in arrears in its obligations to Surv-Tek was "$180,841.70, which consists of ten (10) past due monthly installments of $16,440.15 each, plus ten (10) monthly late fees of $1,644.02 each, for the period beginning January 1, 2020 through November 1, 2020." *Id.*

In October 2020, the State Court held a hearing on Surv-Tek's motion to enjoin competition by S-Tek. *Id.* In the October 21, 2020 order resulting from that hearing (the "State Court Order"), the State Court ordered S-Tek to "come current on all indebtedness due and owing under the . . . Note" by 5 p.m. on November 2, 2020 (the "Deadline to Cure"). *Id.* It further ordered,

> B. In the event S-Tek does not comply with the Deadline to Cure, it (and its owners Randy Asselin and Christopher Castillo) must immediately abide by all restrictions and obligations imposed upon them under the subject Non[-C]ompete Agreement, including, without limitation, to immediately cease and desist from engaging in any competition with Surv-Tek, and must relinquish any use or claim to the domain/website known as www.survtek.com, the tradename known as "Surv-Tek", "SurvTek" or "Survtek" or any similar variation thereof, the Surv-Tek logo, and the telephone number (505) 897-3366.

*Id.* The State Court Order also provided that, even if the amount in arrears was timely paid, Debtor must abide by the Non-Compete Agreement if it failed to pay $16,440.15 monthly thereafter.

S-Tek did not pay the amount in arrears by November 2, 2020. On November 5, 2020, S-Tek and Surv-Tek engaged in mediation, during which Surv-Tek rejected S-Tek's tender of

3

$180,841.70.[3] No agreement was reached as a result of mediation. Surv-Tek has elected to conduct a surveying business in New Mexico. If S-Tek stops providing commercial or residential surveying services in in the State of New Mexico, it would immediately stop performing all of is surveying jobs in progress, cease all other operations, and layoff its employees.

On December 2, 2020, Debtor filed its voluntary chapter 11 petition electing treatment under subchapter V of chapter 11. Doc. 1.

For purposes of granting Debtor use of cash collateral on an emergency basis during the Interim Period pending a final hearing, the Court finds the replacement lien and other adequate protection granted in the separate order the Court will enter authorizing use of cash collateral during the Interim Period provides adequate protection for such use.

S-Tek proposes to pay its 15 employees approximately $70,400 through December 30, 2020. This figure represents an average gross pay of $4,693.33 per employee over two pay periods. S-Tek's staff includes survey technicians, crew chiefs, a general manager, drafters, and a licensed surveyor. None of the staff are paid the statutory minimum wage because recruiting and hiring qualified employees is difficult. In addition, the demand for surveying services is currently high, causing a substantial amount spent on overtime pay, which is reflected in the budget. Under these circumstances, the proposed budget for personnel costs is not excessive, and the amounts requested in the budget to meet payroll expenses during the Interim Period is reasonable. Debtor will suffer immediate and irreparable harm it if is not able to pay its employees and its other operating expenses during the Interim Period.

---

[3] Mr. Asselin testified that Debtor had the funds available from a new investor to cure the default. The Court need not, and does not, make any finding regarding whether the funds necessary to cure the default were in fact available to Debtor.

Without the use of cash collateral, Debtor will not be able to operate. S-Tek's budget for the Interim Period includes funds for printing out plats, purchasing supplies for surveys, office rent and utilities, fees related to platting services, and vehicle and fuel expenses associated with conducting surveys around the state, which are its core business. Debtor's monthly expenses for consumables, such as laths and office supplies, and its printing expenses, vary depending on the amount of work Debtor performs. Debtor's cessation of operations would cause immediate and irreparable harm to the estate.

## DISCUSSION

Surv-Tek's primary objection to the Motion for Use of Cash Collateral is that the *Rooker-Feldman* doctrine bars this Court from granting the requested relief. Surv-Tek reasons that authorizing Debtor to use cash collateral to operate its business would enable Debtor to continue its operate in violation of the State Court Order. Debtor counters that despite the *Rooker-Feldman* doctrine, this Court should exercise its equitable powers to allow Debtor to use cash collateral even though the cease and desist provisions of the State Court Order became effective November 2, 2020 at 5:00 p.m. Alternatively, Debtor asserts that it substantially complied with the State Court Order by offering to tender the delinquent amount at a mediation held November 5, 2020.[4]

---

[4] As noted above, after the final hearing on the Motion for Use of Cash Collateral, Debtor removed the State Court Action to this Court. *See* Adversary No. 20-1074-j. Debtor's list of points and authorities filed after the hearing cites cases for the proposition that *Rooker-Feldman* no longer applies to the State Court Order after removal. Surv-Tek has not had an opportunity to respond to this argument. The Court makes no determination in this Memorandum Opinion whether *Rooker-Feldman* applies to the removed proceeding. As explained below, regardless of whether *Rooker-Feldman* applies to actions removed from state court to bankruptcy court, *Rooker-Feldman* does not apply to prevent this Court from granting Debtor authority to use cash collateral during the Interim Period.

*The Applicability of the Rooker-Feldman Doctrine*

"The *Rooker-Feldman* doctrine precludes a losing party in state court who complains of injury caused by the state-court judgment from bringing a case seeking review and rejection of that judgment in federal court." *In re Miller*, 666 F.3d 1255, 1261 (10th Cir. 2012) (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291-92 (2005)). Debtor argues that its substantial compliance with the State Court Order and Surv-Tek's bad faith participation in a settlement mediation excuses Debtor from strictly complying with the terms of the State Court Order.[5] Debtor invites the Court to do what the *Rooker-Feldman* doctrine prohibits. The *Rooker-Feldman* doctrine precludes the Court from reviewing on the merits, modifying, or setting aside a state court judgment. *See Mayotte v. U.S. Bank Nat'l Ass'n, as Tr. for Structured Asset Inv. Loan Tr. Mortg. Pass-Through Certificates, Series 2006-4*, 880 F.3d 1169, 1174 (10th Cir. 2018) ("What *is* prohibited under *Rooker-Feldman* is a federal action that tries to *modify* or *set aside* a state-court judgment because the state proceedings should not have led to that judgment.") (emphasis in original); *Charchenko v. City of Stillwater*, 47 F.3d 981, 983 (8th Cir. 1995) ("*Rooker-Feldman* precludes a federal action if the relief requested in the federal action would effectively reverse the state court decision or void its ruling.") (citing *Landers Seed Co. v. Champaign Nat'l Bank*, 15 F.3d 729, 732 (7th Cir. 1994)). By asking the Court to consider whether Debtor substantially complied with the State Court Order by attempting to pay the delinquency at the mediation, Debtor impermissibly requests the Court to reconsider the provision in the State Court Order requiring a cure payment by November 2, 2020 at 5:00 p.m.. Similarly, the Court cannot simply rely on its equitable powers under 11 U.S.C. § 105 to ignore a

---

[5] The Court makes no findings regarding whether Surv-Tek participated in the mediation in bad faith or whether Debtor substantially complied with the State Court Order.

prior state court judgment. *See In re Scrivner*, 535 F.3d 1258, 1263 (10th Cir. 2008) ("We have repeatedly emphasized, . . . that a bankruptcy court may not exercise its 'broad equitable powers' under § 105(a) 'in a manner that is inconsistent with the other, more specific provisions of the [Bankruptcy] Code.'") (quoting *In re Frieouf*, 938 F.2d 1099, 1103 n.4 (10th Cir. 1991)).[6]

However, "*Rooker-Feldman* and its progeny do 'not deprive a federal court of jurisdiction to hear a claim just because it could result in a judgment inconsistent with a state-court judgment.'" *In re Bednar*, No. AP 18-01096, 2019 WL 3928844, at *7 (10th Cir. BAP Aug. 20, 2019) (quoting *Mayotte,* 800 F.3d at 1174).

Although *Rooker- Feldman* prevents federal courts from in effect acting as an appellate court to review the merits of or to modify a state court judgment or order, it does not apply to override the authority of bankruptcy courts to apply provisions of the Bankruptcy Code that affect state court judgments. As observed by the Ninth Circuit, "[t]he *Rooker-Feldman* doctrine has little or no application to bankruptcy proceedings that invoke substantive rights under the Bankruptcy Code, or that, by their very nature, could arise only in the context of a federal bankruptcy case." *In re Sasson*, 424 F.3d 864, 871 (9th Cir. 2005) (citing *Gruntz v. County of Los Angeles (In re Gruntz)*, 202 F.3d 1074, 1079 (9th Cir. 2000) (en banc)).

For example, *Rooker-Feldman* does not prevent bankruptcy courts from modifying contractual obligations that have been reduced to judgment in state court, avoiding liens found to be valid and enforceable in a state court judgment, or discharging debts upon which a state court

---

[6] *See also In re Saxby's Coffee Worldwide, LLC*, 436 B.R. 331, 337 (Bankr. E.D. Pa. 2010), *as amended* (Sept. 24, 2010) ("To the extent that the [d]ebtor's request that this court exercise its § 105(a) powers is grounded in the premise that equity requires the nullification of what the [d]ebtor perceives as erroneous and unjust state court judgments . . . , the request is wholly insupportable.").

7

Case 20-12241-j11    Doc 28    Filed 12/11/20    Entered 12/11/20 10:11:33 Page 7 of 14

judgment is based, pursuant to provisions of the Bankruptcy Code.[7] Nor does *Rooker-Feldman* require enforcement of state court judgments or orders where enforcement of the judgment or order is subject to the automatic stay imposed by Bankruptcy Code § 362(a)(2)[8] upon commencement of a bankruptcy case.[9]

      Common examples of the application of these principles are found in chapter 11 bankruptcy cases filed to stop a foreclosure sale scheduled pursuant to a state court foreclosure judgment and in chapter 13 bankruptcy cases filed to stop a wage garnishment ordered by a state court. In these cases, the automatic stay prevents sale of the debtor's property or garnishment of the debtor's wages, notwithstanding a state court judgment that liquidates the amount of debt owed, requires immediate payment in full, and orders property sold or wages garnished. Further, bankruptcy courts can order the restructuring of debt repayment or even reduce the amount of the debt secured by a lien, notwithstanding entry of correctly decided state court judgments to the contrary.

---

[7] *See Gruntz*, 202 F.3d at 1079 ("In apparent contradiction to the *Rooker–Feldman* theory, bankruptcy courts are empowered to avoid state judgments, *see, e.g.,* 11 U.S.C. §§ 544, 547, 548, 549; to modify them, *see, e.g.,* 11 U.S.C. §§ 1129, 1325; and to discharge them, *see, e.g.,* 11 U.S.C. §§ 727, 1141, 1328. By statute, a post-petition state judgment is not binding on the bankruptcy court to establish the amount of a debt for bankruptcy purposes.") (citing 11 U.S.C. § 109(e) and *Slack v. Wilshire Ins. Co. (In re Slack),* 187 F.3d 1070, 1073 (9th Cir.1999), *as amended* 1999 WL 694990 (Sept. 9, 1999)1999 WL 694990 (Sept. 9, 1999)).

[8] 11 U.S.C. § 362(a)(2). All future references to "Code," "Section," and "§" are to the Bankruptcy Code, Title 11 of the United States Code.

[9] *In re Clarke,* 373 B.R. 769, 771 (Bankr. S.D. Fla. 2006), ("[T]he *Rooker–Feldman* doctrine does not abrogate the bankruptcy court's authority to enforce the automatic stay.") (citing *Gruntz*, 202 F.3d at 1083); *see also* 1 Collier on Bankruptcy ¶ 3.02[9] (Richard Levin & Henry J. Sommer eds., 16th ed.) ("The cases are unanimous that as a general matter Rooker-Feldman is applicable in bankruptcy courts. However, the doctrine does not apply when substantive powers (such as the avoiding powers) under the Bankruptcy Code are invoked, even though many of those powers have as their primary purpose the undoing of state court judgments.").

In the case before the Court, the State Court Order requiring Debtor to comply with the Non-Compete Agreement as a result of Debtor's uncured default would effectively shut down all of Debtor's operations. Enforcement of the State Court Order is subject to the automatic stay. Bankruptcy Code § 362(a)(2) provides that with exceptions not applicable here, the commencement of a bankruptcy case "operates as a stay, applicable to all entities, of . . . the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title." The State Court Order falls within this provision. It was entered before the commencement of the bankruptcy case, and enforcement of the State Court Order would be against Debtor and would affect property of the bankruptcy estate.

In addition, the provision in the Non-Compete Agreement requiring Debtor not to compete with Surv-Tek is a contractual remedy for Surv-Tek upon Debtor's uncured default under the Note. Chapter 11 is designed, in part, to modify not only contractual obligations but also the exercise of remedies available to creditors upon a debtor's prepetition default. *Rooker-Feldman* does not operate to prevent the Court from doing so where permitted by the Bankruptcy Code.

*Use of Cash Collateral*

Having determined that the *Rooker-Feldman* doctrine does not apply to the Court's determination of whether to authorize Debtor to use cash collateral, the Court will consider whether Debtor may use cash collateral as proposed pending the final hearing on the Motion for Use of Cash Collateral. A debtor may use cash collateral[10] without the creditor's consent

---

[10] Section 363(a) defines "cash collateral" as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a

9

Case 20-12241-j11    Doc 28    Filed 12/11/20    Entered 12/11/20 10:11:33 Page 9 of 14

provided the Court determines that the creditor whose interest is secured by cash collateral is adequately protected. *See* §§ 363(c)(2) and (e); 3 Collier on Bankruptcy ¶ 363.03[4] (Richard Levin & Henry J. Sommer eds., 16th ed.) ("In the absence of the creditor's consent, the trustee [or debtor in possession] may use cash collateral only with the approval of the court, which requires adequate protection of the adverse interest."); *In re Buzzworm, Inc.*, 178 B.R. 503, 511 (Bankr. D. Colo. 1994) ("[A] secured creditor is always entitled to 'adequate protection' of its lien claim if it allows, or is compelled by Court order to allow, a debtor to use its cash collateral."). Adequate protection may take the form of periodic cash payments, a replacement lien to the extent of the decrease in the value of the creditor's interest in cash collateral, or other relief that results in the "indubitable equivalent" of the creditor's security interest in cash collateral. §§ 361(1), (2), and (3). "Where a debtor desires to use cash collateral, a court must determine the value of the creditor's interest in the cash collateral and whether debtor's proposed use of cash collateral would impair that interest, and to what extent adequate protection is required." *In re Gallegos Research Group, Corp.*, 193 B.R. 577, 584 (Bankr. D. Colo. 1995) (citing *Martin v. U.S. Commodity Credit Corp. (In re Martin)*, 761 F.2d 472, 476-77(8th Cir. 1985)). "[C]ourts have considered 'adequate protection' a concept which is to be decided flexibly on the proverbial 'case-by-case' basis." *In re Podzemny*, No. 09-14226-J11, 2011 WL 576591, at *4 (Bankr. D.N.M. Feb. 8, 2011) (quoting *MBank Dallas, N.A., v. O'Connor (In re O'Connor),* 808 F .2d 1393, 1396-97 (10th Cir.1987)). "The party requesting court approval to use cash collateral over a secured creditor's objection must prove there is adequate protection for that creditor." *In re Podzemny*, 2011 WL 576591, at *4. Under Rule 4001(b)(2), after a

---

security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title."

preliminary hearing on a motion for permission to use cash collateral, "the court may authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." The final hearing on Debtor's motion is set for January 5, 2021.

Surv-Tek asserts that Debtor should not be allowed to use cash collateral to pay the wages, salary, or other compensation to its principals, Randy Asselin and Christopher Castillo, because the State Court Order enjoins them from engaging in competition with Surv-Tek. As explained above, the *Rooker-Feldman* doctrine does not prevent the operation of the automatic stay on the enforcement of the State Court Order. Thus, authorizing Debtor to use cash collateral to pay wages to its principals for work performed for Debtor does not negate the State Court Order. Surv-Tek also complains that Randy Asselin and Christopher Castillo should not be compensated because they are indebted to Debtor. Debtor's principals obtained loans from Debtor when Debtor first began operating. That these loans remain payable does not mean that Debtor's principals should not be paid for their ongoing post-petition work.

The Court will allow use of cash collateral during the Interim Period to pay non-insider employees for services rendered within the two-week period preceding the Petition Date to avoid immediate and irreparable harm to the estate. The Court has such authority under §§ 105(a) and 507(a)(4) to prevent harm to the estate. *See In re CEI Roofing Inc*., 315 B.R. 50, 61 (Bankr. N.D. Tex. 2004). There is a greater risk of non-insider employees quitting if they are not paid their full wages than insider employees. Such ruling is without prejudice to Debtor requesting further use of cash collateral to pay insider or non-insider employees for services rendered pre-petition. The Court will allow use of cash collateral to pay post-petition wages to Debtor's principals and its other employees.

Next, Surv-Tek objects to Debtor' use of cash collateral because it does not provide for regular debt service payments to Surv-Tek. A debtor is not required to pay ongoing debt service as a condition to use of cash collateral provided the creditor's interest in cash collateral is adequately protected. *See* § 361(1) (requiring adequate protection of cash or periodic cash payments to the extent use of cash collateral "results in a decrease in the value of" the creditor's interest in cash collateral). To that end, Surv-Tek asserts that the proposed adequate protection is illusory and inadequate. Debtor proposes to pay adequate protection to the extent the combination of cash and accounts receivable falls below $181,000 for two consecutive months. The proposal is more appropriately considered at the final hearing on the cash collateral motion than in the context of this request for emergency, interim relief because two consecutive months will not elapse during the Interim Period. Based on the evidence, for purposes of granting Debtor use of cash collateral on an interim, emergency basis pending a final hearing, the Court has determined that a replacement lien and other adequate protection granted in the separate order the Court will enter authorizing use of cash collateral during the Interim Period provides adequate protection for use of cash collateral during that period.

Surv-Tek makes four additional objections to Debtor's use of cash collateral: 1) Debtor's payroll expenses are inflated and unnecessary; 2) Debtor's use of cash collateral will not preserve the assets of the estate; 3) Debtor's continued operation is creating confusion among the public as there are now two businesses using the Surv-Tek name and trademark; and 4) Debtor has "no realistic prospect of reorganization due to the State Court Order enjoining its continued operations" and therefore, "should not be granted emergency use of any cash collateral."

The Court has determined that (a) the proposed budget for personnel costs is not excessive; (b) the amounts requested in the budget to meet payroll expenses on an emergency,

12

interim basis pending a final hearing, is reasonable; and (c) Debtor will suffer immediate and irreparable harm if it is not able to pay its employees or pay other expenses necessary to operate its business during the Interim Period. Therefore, the first two objections are overruled.

The evidence before the Court does not demonstrate that the public is "confused" because both Debtor and Surv-Tek are operating. Further, as discussed above, the enforcement of the State Court Order is stayed, and Debtor may continue to operate. And in any event, potential confusion of the public by Debtor and Surv-Tek operating two businesses with similar name is not a significant factor here in determining whether Debtor's use of cash collateral during the Interim Period should be permitted. Therefore, the third objection is overruled.

Finally, because the Court has determined that the automatic stay operates to prevent enforcement of the State Court Order, the existence of the State Court Order does not preclude Debtor's reorganization under chapter 11. Whether Debtor has a realistic prospect of reorganizing is not something the Court need consider to rule on the emergency cash collateral motion. Therefore, the fourth objection is overruled.

CONCLUSION

Based on the foregoing, the Court will grant the Motion for Use of Cash Collateral on an interim, emergency basis pending a final hearing, to the extent provided in the separate order the Court will enter consistent with this Memorandum Opinion. The *Rooker-Feldman* doctrine does not bar the Court from ruling on Debtor's request for use of cash collateral because such a ruling does not modify or reverse the State Court Order; rather, the automatic stay prevents its enforcement. Debtor's use of cash collateral for the interim emergency period is necessary to prevent immediate and irreparable harm to the estate pending the final hearing on January 5, 2021.

The Court will enter a separate order consistent with this Memorandum Opinion.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: December 11, 2020

COPY TO:

Nephi Hardman
Attorney for Debtor
Nephi D. Hardman Attorney at Law, LLC
9400 Holly Ave NE Bldg 4
Albuquerque, NM 87122

Ryan Kluthe
Attorney for Surv-Tek, Inc.
Aldridge, Hammar, Wexler & Bradley, P.A
1212 Pennsylvania
Albuquerque, NM 87110

Patrick Malloy, III
Subchapter V Trustee
Patrick J. Malloy, III, Trustee
401 S. Boston Ave, Ste 500
Tulsa, OK 74103

Jaime A. Pena
Office of the U.S. Trustee
P.O. Box 608
Albuquerque, NM 87103-0608