UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:   S-Tek 1, LLC,                                              No. 20-12241-j11

Debtor.

**MEMORANDUM OPINION**

Before the Court is creditor Surv-Tek, Inc.'s ("Surv-Tek") Second Amended Motion to

Dismiss Chapter 11 Case Pursuant to Bankruptcy Code [11 U.S.C. §] 1112(b)[1] (the "Motion to

Dismiss"). Doc. 176. S-Tek 1, LLC ("Debtor") responded to the Motion to Dismiss. Doc. 185.

The Court held a final evidentiary hearing on the Motion to Dismiss on July 23, 2021. The

parties and counsel who appeared at the hearing are noted in the record.

In the Motion to Dismiss, Surv-Tek asserts that Debtor's bankruptcy petition must be

dismissed because 1) Debtor filed the petition in bad faith merely to gain a strategic litigation

advantage, 2) Debtor's proposed plan is not confirmable on its face, and 3) Debtor's principal

has falsely testified, demonstrating Debtor's bad faith in pursuing this bankruptcy case. The

Court will deny the Motion to Dismiss.

---

[1] All future references to "Code," "Section," and "§" are to the Bankruptcy Code, Title 11 of the
United States Code, unless otherwise indicated.

# FINDINGS OF FACT[2, 3]

## A.  The Debtor and its Acquisition of its Business from Surv-Tek, Inc.

Debtor is a limited-liability company providing commercial and residential land surveying and platting services in New Mexico. Ex. 1. Randy Asselin and Christopher Castillo are the only members; Mr. Asselin is the managing member. Debtor employs approximately 15 employees.

In December 2018, Surv-Tek and Debtor entered into an agreement (the "Closing Agreement") whereby Debtor purchased substantially all of the assets of Surv-Tek.[4] The parties to the Closing Agreement are Surv-Tek, Inc., as seller, and its sole shareholders Russ Hugg and Robbie Hugg, and S-Tek, as purchaser. Ex. 9. Under the Closing Agreement, Debtor purchased "all the assets and properties of [Surv-Tek] (i) including its name, business and goodwill, (ii) including all of the assets and properties listed on [Surv-Tek's] schedule of enumerated assets attached to [the Closing Agreement]. . . but excluding [Surv-Tek's] retained assets." *Id.* In addition to furniture, fixtures, equipment, computers, and trucks and vehicles, the Schedule of Transferred Assets attached to the Closing Agreement includes the rights in and use of Surv-Tek's phone number and fax number. *Id.* Surv-Tek's retained assets include Surv-Tek's "cash and accounts receivable for work completed prior to [c]losing." *Id.* Debtor assumed certain

---

[2] The Court takes judicial notice of the docket and the claims register, and the documents therein, in this bankruptcy case and of the docket and documents therein in related Adversary Proceeding 20-1074. *See* Fed. R. Evid. 201(b)(2) and (c); *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may *sua sponte* take judicial notice of its own docket), *abrogated on other grounds by McGregor v. Gibson*, 248 F.3d 946 (10th Cir. 2001); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1997) ("[T]he bankruptcy court appropriately took judicial notice of its own docket . . . .").

[3] To the extent the Facts section of this Memorandum Opinion includes conclusions of law, such conclusions are incorporated by reference into the Discussion, and to the extent the Discussion section contains findings of fact, such findings are incorporated by reference into the Facts section.

[4] The Closing Agreement replaced and superseded an earlier purchase and sale agreement between the parties called an Offer for Purchase and Sale of Assets, Earnest Money Receipt and Agreement.

liabilities of Surv-Tek. Debtor did not assume the liabilities of Surv-Tek delineated in the Closing Agreement as "Company Retained Liabilities." *Id.*

The purchase price for the assets was $1,800,000, of which $250,000 was payable as a cash down payment and $1,550,000 was payable in accordance with a promissory note to be executed at closing.

As contemplated by the Closing Agreement, at closing Debtor made the cash down payment and executed a promissory note (the "Note") payable to Surv-Tek in the original principal amount of $1,550,000. Ex. 9. Under the terms of the Note, Debtor agreed to pay $16,440.15 per month to Surv-Tek from April 1, 2019 until the maturity date of April 1, 2029, at which time the entire balance was due in full unless due sooner as a result of acceleration of the amount due under the Note following a default. Debtor granted Surv-Tek a security interest in certain assets as collateral for the indebtedness under the Note, including Debtor's goods, furniture, equipment, inventory, contract rights, general intangibles, accounts, and accounts receivable. *Id.* The security interest also includes after-acquired property and proceeds. *Id.* In Debtor's schedules, it stated that the value of the collateral securing the debt is $350,000.

The Closing Agreement memorialized an asset sale, not a stock sale. S-Tek, a limited-liability company, neither purchased Surv-Tek stock nor sold or transferred any stock or other securities in the transaction. After the sale, Russ Hugg and Robbie Hugg retained all the stock of Surv-Tek, Inc.

Christopher Castillo, one of Debtor's principals, understood from marketing materials for the sale that the Huggs were selling their business, Surv-Tek, Inc., not just the assets of the business. When they signed the Note on behalf of Debtor, Mr. Castillo and Mr. Asselin understood that they were purchasing the entire business of Surv-Tek, Inc.

**B. The State Court Litigation and Adversary Proceeding No. 20-1074**

In July 2019, Debtor sued Surv-Tek, Russ Hugg, Robbie Hugg, and STIF, LLC in the Second Judicial District Court of New Mexico (the "State Court") alleging fraud, negligent misrepresentation, material breach of contract, breach of contract, breach of good faith and fair dealing, equitable recovery, and violation of the Uniform Commercial Code. *See* AP 20-1074. That action (the "State Court Action") was styled *S-Tek 1, LLC v. Surv-Tek, Inc.,* D-202-CV-2019-05359. *Id.* Surv-Tek answered the complaint and counter-claimed, alleging that Debtor failed to timely pay the Note, among other things. *Id.*

The State Court entered two orders relevant to the Motion to Dismiss. In the first order, entered October 2, 2020, the State Court found that Debtor had violated its orders to provide proof of insurance and financial statements to Surv-Tek. Ex. 9, pg. 308. The State Court fixed a deadline of October 7, 2020 for Debtor to come into compliance with its prior order and ordered that Debtor would "be sanctioned the sum of $250.00 per day for each day that it fails to be in compliance with the" court's orders to provide such information after a cure period.

In the second order, entered on October 21, 2020, the State Court ordered Debtor to "come current on all indebtedness due and owing under the . . . Note" in the amount of $180,841.70 by 5 p.m. on November 2, 2020 and pay $16,440.15 per month thereafter, or cease operating in competition with Surv-Tek and using the telephone number and website purchased from Surv-Tek. Ex. 9, pg. 310. Debtor did not pay $180,841.70 by November 2, 2020 and did not cease its operations. Debtor and Surv-Tek then engaged in mediation but no agreement was reached.[5] Debtor filed a motion asking the State Court to reconsider the second order on

---

[5] The Court bases findings regarding the terms of the parties' non-compete agreement and attempts to mediate on evidence presented at the hearing on Debtor's motion seeking authority to use cash collateral in the first calendar quarter of 2021.

October 23, 2020 and briefing on the motion for reconsideration was complete on December 1, 2020. Debtor subsequently removed the State Court Action to this Court, initiating Adversary Proceeding 20-1074.

### C. The Bankruptcy Petition, Schedules, Claims, and the Plan

Debtor filed a voluntary petition (the "Petition") under chapter 11 of the Bankruptcy Code on December 2, 2020 (the "Petition Date") and elected treatment under subchapter V. As of the Petition Date, Debtor had $33,013.58 in cash and $203,429.01 in accounts receivable.[6]

On Schedule E/F, Debtor listed priority unsecured debts to the Internal Revenue Service ($33,910) and the New Mexico Taxation and Revenue Department ($37,492) and non-priority unsecured debts totaling $644,481 to American Express ($15,275), Citibank, N.A. ($12,987), two law firms (Blackgarden Law and Guebert Gentile & Piazza – totaling $28,003)), New Mexico Community Development Loan Fund ($97,486), Ready Capital Corp. ($135,000), and STIF, LLC ($356,000 – scheduled as contingent, unliquidated and disputed). Debtor also listed a debt to Surv-Tek of $1,535,000, scheduled as contingent, unliquidated, and disputed, and stated that the value of the collateral securing the debt is $350,000. Surv-Tek was the only creditor listed with a secured claim. Doc. 1.

Debtor did not schedule Salls Brothers Construction ("Salls Brothers") as holding a disputed claim its initial Schedule E/F because, according to Mr. Asselin as discussed further below, he had not verified to his satisfaction that the claim arose due to a mistake by S-Tek. Ex. 10, pg. 383. Before Surv-Tek filed its Second Amended Motion to Dismiss, Debtor amended

---

[6] These findings as to Debtor's cash and accounts receivable as of the Petition Date are derived from the Court's findings of fact in an order authorizing use of cash collateral entered on June 4, 2021. Doc. 152.

Schedule E/F on June 11, 2021 to include a disputed, unsecured, unliquidated debt of $68,000 to Salls Brothers. Ex. C.

Surv-Tek filed a proof of claim and amended proof of claim (the "Surv-Tek Claim") for $1,768,941.83 based on Debtor's alleged breach of the terms of the Note, asserting that the entire amount of the claim is secured by Debtor's assets. Claim 6-2. Surv-Tek also filed a proof of claim for $82,898.30 for breach of a lease agreement between STIF, LLC and S-Tek. Claim 7-1, part 3, pg. 24.[7]

Debtor filed a Chapter 11 Small Business Subchapter V Plan of Reorganization (the "Plan") in March 2021. Doc. 96. In the Plan, Debtor classifies Surv-Tek's claim in Class 3 and Class 5. Surv-Tek is the only claimant in those classes. Under Class 3, Debtor proposes:

> Debtor will pay the secured claim of Surv-Tek, in an amount to be adjudicated, in equal monthly installments between the Initial Distribution Date and April 1, 2029. Surv-Tek's secured claim shall be the lesser of (a) the value of the collateral securing such claim or (b) the amount that the Court ultimately rules [Debtor] owes to Surv-Tek. Any amount of Surv-Tek's secured claim that is attributable to principal owed under the Surv-Tek Note shall accrue interest at 5% per annum from the Petition Date. Surv-Tek shall retain its lien in its collateral to the extent of its secured claim amount.

Under Class 5, Debtor proposes:

> If the Court rules that the claim of Surv-Tek exceeds the value of the collateral pledged to secure such claim, then the remaining claim of Surv-Tek shall [be treated in Class 5 and will] be subordinated pursuant to 11 U.S.C. § 510(b) and shall receive no distribution." Ex. 1.

Filed as exhibits to the Plan are three sets of five-year projections of Debtor's revenue and expenses. Ex. 2. The three projections assume that the amount of Surv-Tek's secured claim is either $100,000, $365,000, or $600,000 and assume a revenue growth rate of either 2% or 4%. *Id.* The Plan does not address how the unsecured portion of Surv-Tek's claim will be treated if

---

[7] Although Surv-Tek filed the claim in its own name, the claim is held by its affiliate STIF, LLC.

the Court does not permit subordination of that portion under § 510(b) or if Surv-Tek elects treatment of its claim under § 1111(b)(2).

The Court has not fixed a date for a hearing on confirmation of Debtor's Plan. With the consent of Surv-Tek and Debtor, the Court has deferred the confirmation hearing pending adjudication of Adversary Proceeding 20-1074.

### D. Mr. Asselin's Testimony About Debtor's Receivables

Mr. Asselin is the managing member of Debtor. In that role, he is responsible for strategic decisions and allocation of resources and oversees Debtor's day-to-day operations. Debtor provides services for construction companies, developers, and individuals who own homes or property. Debtor's billing practices differ for different types of clients and types of work. These different practices may be reflected on Debtor's accounts receivable aging reports ("AR Aging Reports"). At a hearing on Debtor's motion for authority to use cash collateral on May 28, 2021 (the "May 28 Hearing"), Mr. Asselin, having been sworn in by the Court, testified about Debtor's invoicing practices, as well as specific receivables shown on Debtor's monthly operating reports. He testified that "typically" a receivable on an AR Aging Report means that the customer was invoiced for the receivable. Ex. 10, pg. 383.

Based on the evidence at the May 28 Hearing, the Court found that Mr. Asselin's statement that receivables typically reflect invoices sent to customers was not entirely correct because Debtor used the invoicing systems to track work and projects in addition to billing customers and included receivables on its AR Aging Reports filed with the Court based on invoices not sent to customers. This dubious practice resulted in several anomalies in the AR Aging Reports that made the AR Aging Reports unreliable for determining Debtor's financial

position. Reliability issues pertaining to Debtor's AR Aging Reports filed prior to the May 28 Hearing include:

1.  Initially Reporting Receivables as Aged 31-60 (Not 1-30)

Debtor's January 2021 AR Aging Report showed a receivable from Gina Gaspar as aged 31-60 days even though the same receivable was not reflected as current in the December 2020 AR Aging Report. In other words, the receivable never appeared on an AR Aging Report as current (aged 1 to 30 days). *Id.* Debtor's AR Aging Reports also show instances of the same receivable aged as current (aged 1 to 30 days) in successive AR Aging Reports. *Id.*

The pattern of reporting of receivables for the first time as aged 31-60 may have resulted when an individual client contracts for platting or other services for which Debtor generated a "mock invoice" on the date that an agreement for services is signed and later entered the "mock invoice" into QuickBooks to generate an invoice. *Id.* Depending on the time between creation of the "mock invoice" and generation of the invoice by QuickBooks, the amount owed may appear as past due the first time it appears on the AR Aging Report. *Id.*

Debtor's bookkeeper testified that she generated AR Aging Reports for internal tracking purposes and did not think about how the AR Aging Reports would be used to measure Debtor's compliance with adequate protection requirements the Court imposed under previous cash collateral orders. *Id.*

2.  Not Aging Receivables

In some cases, Debtor works with a client to bill according to the contract for services, which may require Debtor to bill the client by type of work or by milestone achieved. On the AR Aging Reports, Debtor sometimes did not age a receivable reflected in an AR Aging Report due to a delay in the entry of the invoice supporting the receivable because Debtor has not finished

setting up its billing processes for the project. *Id.* For example, the AR Aging Reports for the months of January, February, and March 2021 showed the same amount owing from Enterprise Builders each month without aging the receivable from month to month, and an amount owing in April 2021 as aged 1-30 days that was not reflected as current in March 2021. Debtor's bookkeeper explained that she did not age the Enterprise Builders receivable because she was learning how to bill Enterprise Builders in January and February and Debtor would not charge penalties or interest for the time that the invoice system was being set up. *Id.* Receivables for QA Engineering followed a similar pattern.

       3.   <u>Not Issuing Invoices for Certain Work</u>

For certain work, Debtor issues purchase orders for small surveying jobs under service contracts between Debtor and the customer and requests payment for the work electronically after the work is completed. *See* July 2021 Cash Collateral Report, at 2, Doc. 230.

Surv-Tek's counsel questioned Mr. Asselin at length about Debtor's receivables at the May 28 Hearing. Asked why there was a receivable of $26,299.93 for Enterprise Builders on the January 2021 AR Aging Report, Mr. Asselin testified that Debtor "started picking up work [for Enterprise Builders]–I'm thinking we started picking up work around January, around there. It could have been late December, but I'm thinking it's about then. I don't have an exact date as to when we sent our first crew to do any work for them. I don't have an exact week." Ex. 10, pg. 371.

Questioned about QA Engineering receivables, Mr. Asselin acknowledged that the same amount was shown as current for February, March, and April 2021, which suggested that Debtor had invoiced QA Engineering three times. Ex. 10, pg. 365.

In the order resulting from the May 28 Hearing, the Court found that Debtor's reporting of receivables for the first time as aged 31-60 and of the same receivable in successive AR Aging Reports as current was not the result of fraud or willful misconduct, nor was it done so Debtor could avoid making adequate protection payments to Surv-Tek. Doc. 152. The Court further found that Debtor acted in good faith in its billing and reporting practices even though the practices did not always conform to ordinary business practices for recording receivables and skewed the actual amount of receivables outstanding at month end reflected in certain AR Aging Reports.

Because Debtor's invoicing practices rendered the AR Aging Reports unreliable for purposes of monitoring Debtor's use of cash collateral, the Court ordered Debtor to include in future AR Aging Reports only those receivables (which the Court called "Eligible Receivables") (i) for which Debtor has issued an invoice to the customer, and (ii) for amounts due to be paid by the customer to Debtor for work Debtor has performed. The Court also required Debtor to review AR Aging Reports for January through May 2021 and adjust them in accordance with the Court's order. In addition, the Court established a procedure under which Surv-Tek could designate up to ten receivables each month for review by Debtor's certified public accountant to determine whether designated receivables are Eligible Receivables. Doc. 152. Debtor has complied with this order.

After the May 28 Hearing, Surv-Tek issued subpoenas to Enterprise Builders, QA Engineering, and Hakes Brothers Construction seeking all invoices from Debtor since the Petition Date.

In response to Surv-Tek's subpoena, Enterprise Builders produced only two invoices, which contrasted with receivables from Enterprise Builders shown on the AR Aging Reports for

January, February, and March 2021. Both invoices were dated April 19, 2021. Ex. 11. Invoice 5250, which relates to job number 2020020.004, is accompanied by a cover sheet, apparently created by Enterprise Builders, stating that the "Pay App Period" associated with invoice 5250 is from February 2021 to April 2021. *Id.* The cover sheet accompanying invoice 5255, which is associated with job number 2021008, shows the "Pay App Period" as March 2021 to April 2021. *Id.*

The invoices provided by Enterprise Builders are consistent with Mr. Asselin's testimony at the May 28 Hearing. Mr. Asselin's statement that Debtor "started picking up work in January" is consistent with his testimony at the hearing on the Motion to Dismiss that Debtor began negotiating with Enterprise Builders in January for work to begin the next month. That testimony is also consistent with the bookkeeper's testimony that she created an invoice in January 2021 for internal tracking purposes for the Enterprise Builders contract, which was not sent to Enterprise Builders but appeared on AR Aging Reports. Based on these facts, coupled with the fact that Mr. Asselin was not closely involved with Debtor's billing processes at that time, the Court finds that Mr. Asselin's testimony on this point at the May 28 Hearing was not willfully false.

Although Debtor reported receivables from QA Engineering in February, March, and April 2021, QA Engineering produced, in response to Surv-Tek's subpoena, only one invoice from Debtor, which was dated April 19, 2021. Ex. 12. Attached to the invoice is a notice by QA Engineering that the invoice was not paid in full because a non-taxable transaction certificate ("NTTC") had been sent to Debtor on February 9, 2021. Ex. 12. There is no other evidence before the Court about Debtor's contract with QA Engineering or the contract's invoicing requirements.

Debtor's AR Aging Report for April 2021 showed current Hakes Brothers Construction receivables of $18,330.00, as well as aged receivables suggesting multiple invoices to Hakes Brothers Construction over the previous 90 days. Ex 8.

In response to Surv-Tek's subpoena, Hakes Brothers Construction provided a document titled "Vendor History Hardcopy" (the "Vendor History"). Ex. 13. Surv-Tek did not present testimony by a representative of Hakes Brothers Construction to explain the Vendor History, which appears to be a record of "Debtor, LLC DBA Surv-Tek" invoices from May 13, 2020 to June 7, 2021. *Id.* One column on the Vendor History is entitled "Balance" and shows a zero for each line associated with an invoice number from January 2021 through April 2021, the period in which Debtor shows aging receivables. *Id.* In contrast, for invoices dated from June 4, 2021 through June 7, 2021, the total amount shown in the "Balance" column is $7,745.00. *Id.*

Debtor does not send hard copy invoices to this customer. Instead, Debtor uses Hakes Brothers Construction's online system to request payment for work completed. Under these circumstances, it is not clear how to interpret the Vendor History and what it demonstrates, if anything, about Debtor's invoicing history. Based on the foregoing facts, the Court finds that Hakes Brothers Construction receivables on Debtor's AR Aging Report are not necessarily inconsistent with the Vendor History.

The Court found in its June 4, 2021 cash collateral order that Debtor had a practice of leaving some receivables on the AR Aging Report for several months while working out how to properly bill the customer according to the contract.

By his own admission, Mr. Asselin was not knowledgeable about many of Debtor's practices for generating invoices and sending invoices to customers. Mr. Asselin testified that he was the fourth most knowledgeable person at the company regarding Debtor's receivables and

invoicing practices and that Debtor's bookkeeper or general manager were in the best position to answer questions about the receivables. Nevertheless, with that caveat, Mr. Asselin was willing to speculate as to why certain receivables appeared as they did on A/R Aging Reports. The Court finds that Mr. Asselin's testimony that receivables on A/R Aging Reports typically reflect invoices to customers, even if misleading if considered in isolation, was not willfully false.

### E.  The Dispute Between Debtor and Salls Brothers

Salls Brothers notified Debtor in June 2020 that an alleged error in Debtor's survey work had caused a water pipe to be installed too high and that Salls Brothers had incurred costs to move the pipe. Ex. 10, pg. 377, 379; Ex. C, pg. 16; Ex. S, pg. 1434-35. In July 2020, Mr. Asselin sent an email to Salls Brothers stating that Debtor had made a mistake on the "water line elevation" for Salls Brothers and suggesting that Debtor and Salls Brothers "get together to figure out how to make this right." After an internal review, Debtor determined that Debtor, contrary to Salls Brothers' assertion, had not made a mistake in the initial construction staking of the water pipe site and that Debtor "had nothing to do with [the water pipe] being three feet high." Ex. 10, pg. 381. Instead, Debtor determined that it had made an error in the "as built" survey which was conducted after the water pipe was incorrectly installed by Salls Brothers. *Id.* In short, Debtor and Salls Brothers disagreed about whether Debtor's initial staking caused the water line to be placed at the incorrect height.

At a meeting with Mr. Asselin in August 2020, Rich Salls, vice president of Salls Brothers, informed Mr. Asselin that the costs to move the water pipe were approximately $58,000 to $60,000 and Mr. Asselin requested "proof and documentation" that its survey work had caused the error in the water pipe elevation. Ex. 10, pg. 379. Although he had some documents with him at that meeting, Mr. Salls did not give them to Mr. Asselin, instead stating

-13-

that he wanted to review the costs more before giving Debtor the documentation requested. Ex. 10, pg. 379.

Mr. Asselin emailed Salls Brothers several times asking for proof that Debtor's error caused the incorrect placement of the water pipe that could be submitted to Debtor's insurance company but Salls Brothers did not respond until, in February 2021, Salls Brothers sent Debtor a demand letter requesting payment of $66,000 within 15 days. Ex. 10, pg. 380. Mr. Asselin testified that the letter had "no substantiation. No files. No math. No [inaudible] files." *Id.* The February 2021 letter is not in the record.

In March 2021, Salls Brothers sent a letter to Debtor in response to Mr. Asselin's request, purportedly showing "charges [that] resulted directly from the inaccurate grades provided by [Debtor]." Ex. S, pg. 1434. The letter includes narrative descriptions of the costs being charged to Salls Brothers to move the water pipe. Attached to the letter is a breakdown of the Salls Brothers direct costs related to relocation of the water pipe and invoices from subcontractors. *Id.* Although the letter states that the costs shown on the invoices resulted from Debtor's errors, nothing in the attached invoices shows that the water pipe was placed too high *because of* Debtor's initial staking. Debtor's initial survey of the water pipe elevation and the as built survey are not in the record. In addition, there are no documents in the record showing whether Salls Brothers followed Debtor's initial staking when it built the trench for the water pipe.

## DISCUSSION

Surv-Tek seeks dismissal of Debtor's bankruptcy case under § 1112(b) for three reasons. First, Surv-Tek argues that Debtor commenced its chapter 11 bankruptcy case "not for any valid bankruptcy purpose, but rather to gain a strategic litigation advantage in its State Court dispute with" Surv-Tek, and "to seek a new forum for its litigation and to evade the orders of the State

Court." Surv-Tek maintains that, because this matter "is essentially nothing more than . . . a two-party dispute" that should be resolved in the State Court, Debtor commenced its chapter 11 bankruptcy case in bad faith, which is cause for dismissal under § 1112(b). Second, Surv-Tek argues that this case should be dismissed because Debtor's proposed plan is unconfirmable on its face. Finally, Surv-Tek argues that Debtor's principal, Mr. Asselin, made false representations to the Court and false statements in testimony, which also constitute cause for dismissal.

"Section 1112(b) provides a nonexhaustive list of grounds upon which a bankruptcy court may dismiss a [c]hapter 11 case for 'cause.' " *Frieouf v. United States (In re Frieouf),* 938 F.2d 1099, 1102 (10th Cir.1991). Dismissal for "cause" under § 1112(b)[8] can be based on a debtor's lack of good faith in filing a chapter 11 case. *In re Sandia Resorts, Inc.*, No. 11-15-11532 JA, 2016 WL 489992, at *5 (Bankr. D.N.M. Feb. 5, 2016). It can also be based on inability of the Debtor to confirm a plan. *In re Vincens*, 287 F. App'x 686, 688 (10th Cir. 2008) ("Dismissal ... is appropriate where the debtor's failure to file an acceptable plan after a reasonable time indicates its inability to do so whether the reason for the debtor's inability to file is its poor financial condition, the structure of the claims against it, or some other reason." (quoting *SBA v. Preferred Door Co., Inc.* (*In re Preferred Door Co., Inc.*), 990 F.2d 547, 549 (10th Cir.1993)). The moving party bears the initial burden to show cause for dismissal due to the debtor's lack of good faith. *In re Reg'l Evangelical All. of Churches, Inc.,* 592 B.R. 375, 384–85 (Bankr. D. Kan. 2018). If the movant meets its burden, "[t]he burden then shifts to the debtor to show good faith." *Id.*

---

[8] With certain exceptions not applicable here, Section 1112(b) provides:

Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.

## A. Debtor's Bankruptcy Case Was Not Filed in Bad Faith

This Court considers eight non-exclusive factors to assess whether a chapter 11 case was filed in bad faith, including:

(i) whether the petition serves a valid bankruptcy purpose such as by preserving a going concern or maximizing the value of the debtor's estate;

(ii) whether the petition is filed merely to obtain a tactical litigation advantage;

(iii) whether the debtor's financial problems involve essentially a dispute between the debtor and secured creditors that can be resolved in the pending state court litigation;

(iv) whether it is a single asset case,

(v) whether there are one or a very few unsecured creditors,

(vi) whether there is [an] ongoing business or employees;

(vii) whether the pre-petition conduct of the debtor has been improper; and

(viii) whether the case is filed to evade one or more court orders.

*In re Melendez Concrete Inc.*, No. 11-09-12334 JA, 2009 WL 2997920, at *4 (Bankr. D.N.M. Sept. 15, 2009).[9] "No single factor is determinative, and the weight given each factor will necessarily vary with the facts and circumstances of each case." *Id.* The Court will address each factor, grouped as relevant to the facts of this case.

### 1. Factors (i), (ii), (vi), and (viii)

Factors (i), (ii), (vi) and (viii) pertain to whether the petition serves a valid bankruptcy purpose, whether the petition was filed merely to obtain a tactical litigation advantage, whether there is an ongoing business or employees, and whether the case was filed to evade one or more court orders.

---

[9] Citing *In re Integrated Telecom Express, Inc.,* 384 F.3d 108, (3rd Cir.2004); *In re Nursery Land Development, Inc.,* 91 F .3d 1414, 1415 (10th Cir.1996); *In re Trident Associates Ltd. Partnership,* 52 F.3d 127,130 (6th Cir.1995); *In re Phoenix Piccadilly, Ltd.,* 849 F.2d 1393, 1394 (11th Cir.1988).

"[T]he mere fact that the chapter 11 filing was triggered by state court proceedings adverse to the debtor [does not] constitute[] by itself, bad faith." *In re Clinton Centrifuge, Inc.*, 72 B.R. 900, 908 (Bankr. E.D. Pa. 1987). "Giving debtors the opportunity to reorganize in response to impending financial distress is the purpose of chapter 11. The fact that this financial distress was brought on by litigation rather than borrowing is not dispositive." *In re Hyatt*, 479 B.R. 880, 895 (Bankr. D.N.M. 2012) (quoting *In re Marshall,* 403 B.R. 668, 690 (C.D. Cal. 2009), *aff'd,* 721 F.3d 1032 (9th Cir. 2013)).[10] Businesses that file chapter 11 commonly do so to restructure obligations to one or more creditors who obtained a judgment or ruling adverse to the debtor in state court. Rather, the Court must look at the totality of the circumstances to determine if the bankruptcy case was filed for a legitimate bankruptcy purpose. *In re Pomodoro Rest.*, 251 B.R. 441 (stating that the courts look at the "circumstances of the case").

Debtor's bankruptcy serves a valid bankruptcy purpose, namely, to restructure its obligations to Surv-Tek to enable Debtor to preserve its business operations, continue to pay its employees, satisfy its ongoing contracts with customers, restructure debt owed to other creditors,

---

[10] *See, e.g.*, *In re Pomodoro Rest.*, 251 B.R. 441 (10th Cir. BAP 1999) (unpublished) (stating that the courts look at the "circumstances of the case, including whether or not the debtor could afford to post a supersedeas bond without losing the ability to stay in business"); *In re Neilson*, No. 17-10631, 2018 WL 6982228, at *3 (Bankr. N.D.N.Y. Aug. 31, 2018) ("[I]t is well settled law that filing for chapter 11 relief to stay state court litigation is not *per se* bad faith. When a court determines that a debtor filed for a proper bankruptcy purpose, the court will generally not dismiss those cases, absent other indicia of bad faith, even though the filings may largely be designed to frustrate one creditor's efforts in state court." (citations omitted) *aff'd sub nom. Neilson v. Est. of Benedict*, No. 1:18-CV-1101, 2020 WL 1140493 (N.D.N.Y. Mar. 9, 2020); *In re Spoverlook, LLC*, 560 B.R. 358, 365 (Bankr. D.N.M. 2016) ("[I]f filing a bankruptcy petition after entry of an adverse state court ruling automatically constitutes bad faith, many cases would have to be dismissed. Consumer debtors regularly file bankruptcy petitions after the entry of foreclosure judgments. Retailers and restaurateurs file petitions after litigation with vendors, landlords, franchisors, etc."); *In re Gremillion*, 547 B.R. 196, 198 (Bankr. E.D. La. 2016) ("Virtually every debtor files bankruptcy to prevent the immediate collection of debt. Bankruptcy's purpose is to impose a respite from the actions of creditors . . . Thus, a debtor's effort to avail himself of the benefits of bankruptcy, without more, cannot be bad faith."); *In re Sletteland,* 260 B.R. 657, 661(Bankr.S.D.N.Y.2001) (stating that "[t]he filing of a voluntary bankruptcy case to avoid an unfavorable [s]tate court judgment, in and of itself, does not necessarily justify dismissal for bad faith").

and preserve value in the company for equity. On the Petition Date, Debtor had $33,013.58 in cash and $203,429.01 in accounts receivable. The State Court had ordered Debtor to pay $180,841.70 to Surv-Tek by November 2, 2020 and thereafter to pay Surv-Tek $16,440.15 per month or cease operations. Debtor did not have the financial ability to make the payments, as required by the order. Without seeking bankruptcy relief, Debtor would have to stop operating pursuant to the State Court order.

Seeking refuge in chapter 11 to enable it to continue to operate its business without making the payments required by the State Court order, which Debtor was unable to make, was a legitimate reason for Debtor to file for bankruptcy protection. *See In re Clinton Centrifuge, Inc.*, 72 B.R. at 908 (finding no bad faith where, "[p]rior to the filing, the debtor had an ongoing business, with several employees and several creditors other than the movants [and t]he debtor's continued viability has been threatened by the claim successfully asserted in state court by [a creditor]").

Since there is a legitimate bankruptcy purpose served by Debtor's Petition, it follows that Debtor did not file the Petition merely to obtain a litigation advantage. The facts here are unlike those in cases, cited by Surv-Tek, where courts have determined that a case was filed only as a litigation tactic. For example, in *In re 15375 Memorial Corporation*, the debtors did not have a business or employees and had the wherewithal to pay the claims in the state court action in the form of insurance policies that covered the claims. 589 F.3d 605, 621 (3d Cir. 2009). Similarly, in *In re Marsch*, the court stated that filing "a [c]hapter 11 petition to avoid posting an appeal bond" is not in good faith if "the debtor can satisfy the judgment with nonbusiness assets." 36 F.3d 825, 828–29 (9th Cir. 1994). In *In re SGL Carbon Corporation*, the court found that the debtor filed a bankruptcy petition in bad faith where the "company was financially healthy at the

time of the filing" and observed that the debtor's bankruptcy petition was filed prematurely because, if a judgment "causing financial and operational ruin" were entered against the debtor at the conclusion of litigation, the debtor could file a bankruptcy petition at that time rather than in anticipation of such a judgment. 200 F.3d 154, 163 (3d Cir. 1999).

Unlike the debtors in *15375 Memorial Corporation* and *In re SGL Carbon Corporation,* Debtor has an ongoing business and employees and had no other assets from which to pay the amounts required under the State Court order for Debtor to stay in business. Moreover, unlike *In re SGL Corporation*, Debtor filed its chapter 11 case after entry of the State Court order to pay a substantial sum or cease operating, not to avoid litigation in state court leading to a possible future judgment that may or may not have necessitated bankruptcy protection.

### 2. Factors (iii), (iv), (v), and (vii)

Factors (iii), (iv), (v) and (vii) pertain to whether a debtor's problems can be resolved in the state court litigation; whether the bankruptcy case is a single asset case, whether there are one or a very few unsecured creditors, and whether the pre-petition conduct of the debtor has been improper.

Factors (iii), (iv), and (v) do not support dismissal of this bankruptcy case based on a bad faith filing. Debtor's financial problems could not have been resolved in the state court litigation (Factor iii). The State Court's order, as a practical matter, did not allow Debtor to continue to operate its business while the parties litigated their disputes in state court. This is not a single asset case (Factor iv). Debtor listed seven unsecured non-priority creditors with total claims of $644,481 and two priority creditors with total claims of $71,402 (Factor v).

Likewise, whether the pre-petition conduct of the debtor has been improper (Factor vii) does not support dismissal of this bankruptcy case. Surv-Tek argues that Debtor's failure to

comply with the State Court's orders, which resulted in sanctions by the State Court, constitutes improper conduct supporting dismissal. Debtor's failure to comply with the State Court's orders weighs against Debtor but is not determinative under the facts of this case.

Considering these factors and the totality of the circumstances, the Court has determined that Debtor did not commence its bankruptcy case in bad faith. Debtor's bankruptcy petition was filed for a legitimate bankruptcy purpose and not solely to obtain a tactical litigation advantage. This is not a single asset case and Debtor listed nine priority or non-priority unsecured creditors with total claims of over $700,000. Debtor has an ongoing business and employees. The State Court's order required Debtor to close its business unless it paid over $180,000 to Surv-Tek within a short time to bring the Note current and thereafter kept the Note current. Debtor did not have the financial ability to make the payments. The impetus for commencement of the chapter 11 case was to preserve the ongoing business, obtain a decision on the merits after trial in the removed State Court Action, and pay restructured debt as permitted by the Bankruptcy Code.

### B. The Subordination Provision in Debtor's Plan is Not a Reason to Dismiss this Case as Having Been filed in Bad Faith

In the Plan, Debtor proposes to treat the secured portion of Surv-Tek's claim under Class 3 and the unsecured portion of Surv-Tek's claims under Class 5. The Plan states that "[i]f the Court rules that the claim of Surv-Tek exceeds the value of the collateral pledged to secure such claim, then the remaining claim of Surv-Tek shall [be treated in Class 5 and will] be subordinated pursuant to . . . § 510(b) and shall receive no distribution." Ex. 1.

Referencing § 1112(b)(4), Surv-Tek argues that § 510(b) does not apply to Surv-Tek's claim as a matter of law and that, if Surv-Tek's claim is not subordinated under § 510(b), Debtor's Plan "does not propose a realistic treatment of Surv-Tek's claim." Surv-Tek further maintains that Debtor's proposal to subordinate its claim under § 510(b) is evidence that Debtor

cannot propose a confirmable Plan and therefore filed its Petition in bad faith. *See* § 1112(b)(4) (stating that "cause" for dismissal includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation").

S-Tek argues that § 510(b) applies to Surv-Tek's claim because the Closing Agreement under which S-Tek acquired Serv-Tek's business was in reality a stock purchase and sale transaction even though it was structured as a purchase and sale of substantially all of Surv-Tek's assets. That argument is without merit.

Section 510(b) provides,

> For the purpose of distribution under this title, a claim arising from rescission of a *purchase or sale of a security of the debtor* or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security . . . shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock. (Emphasis added.)

Section 510(b) applies to "(1) an actual attempt to rescind a purchase or sale of a security *issued by the debtor* or one of its affiliates; [and] (2) a claim for damages arising from a purchase or sale of such a security . . . ." *In re Geneva Steel Co.*, 281 F.3d 1173, 1177 (10th Cir. 2002) (emphasis added); *see also In re Am. Wagering, Inc.*, 493 F.3d 1067, 1073 (9th Cir. 2007) (holding that § 510(b) was inapplicable where the claimant had "never been a shareholder" of the debtor). "The clear mandate of section 510(b) is that shareholder claimants will not be permitted to elevate their interests from the level of equity to general claims." 4 Collier on Bankruptcy P 510.04.[11]

---

[11] *See also In re Blondheim Real Est., Inc.*, 91 B.R. 639, 640 (Bankr. D.N.H. 1988) ("The legislative history makes it clear that § 510(b) was enacted as a result of the thorny question which had caused conflicts in the courts as to whether an equity security-holder alleging fraud in the purchase of the security could share on the resulting fraud claim on an equal basis with general unsecured creditors—as opposed to the inferior position of equity holders.").

Surv-Tek's claim does not arise from the purchase or sale of a security of Debtor. Surv-Tek has never been a shareholder of Debtor or an affiliate of the Debtor, and Surv-Tek's claim does not arise from its purchase or sale of a security of Debtor or an affiliate of Debtor. S-Tek is arguing that its purchase of Surv-Tek's business, although structured as an asset sale, in reality was a purchase by Debtor of a security of Surv-Tek. While the Court does not agree with that characterization, even if it were true it would not constitute "a purchase or sale of a security of the debtor or of an affiliate of the debtor" to which § 510(b) might apply. Therefore, Surv-Tek's claim against Debtor is not subject to subordination under § 510(b).

Debtor argues in the alternative that Surv-Tek's objection to treatment of its claim in the Plan under § 510(b) is simply a legal dispute that does not demonstrate Debtor's bad faith. Debtor argues that if the Court were to determine that § 510(b) does not apply to Surv-Tek's claim, Debtor's ability to propose a feasible plan is not dependent on subordination under § 510(b). Although the proposed Plan does not deal with how Surv-Tek's claim will be treated if the claim is bifurcated under § 506(a) and § 510(b) subordination is not permitted, counsel for Debtor represented at the hearing on the Motion to Dismiss that if Surv-Tek's claim exceeded the value of its collateral and the Court disallows subordination under § 510(b), S-Tek would amend its Plan to treat the unsecured portion of Surv-Tek's claim as a general non-priority unsecured claim.

Even though the Court has determined that Debtor may not rely on § 510(b) to subordinate any part of Surv-Tek's claim, Debtor's proposed Plan does not show that Debtor commenced or has prosecuted this bankruptcy case in bad faith. In addition, the Court will not dismiss Debtor's bankruptcy case on the ground that the Plan is patently unconfirmable because it is predicated on subordination under § 510(b). Debtor may amend the Plan to attempt to

address treatment of Surv-Tek's claim other than through § 510(b) subordination and to treat Surv-Tek's secured claim further if Surv-Tek elects treatment of its claim under § 1111(b).

Dismissal of Debtor's bankruptcy case at this point because the Plan must be amended would not further the purposes of § 1112(b), one of which permits dismissal of a chapter 11 case where there is no reasonable possibility a debtor can confirm a plan or maximize value for creditors in the case. *See Matter of Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994) (a purpose of § 1112(b)(4) "is to cut short [a debtor's] plan and confirmation process where it is pointless.").[12] The total amount of Surv-Tek's allowed claim, its treatment under an amended plan, and the feasibility of such an amended plan depend on the outcome of Adversary Proceeding 20-1074, which involves adjudication of Surv-Tek's claims against Debtor and Debtor's claims against Surv-Tek.

### C. Debtor's Principal did not Testify in Bad Faith

Surv-Tek argues that "false testimony provided by the Debtor's principals constitutes cause for conversion or dismissal . . . ." Surv-Tek alleges that Mr. Asselin gave false testimony about Debtor's invoicing processes and accounts receivables related to Enterprise Builders, QA Engineering, and Hakes Brothers.

The Court has found that Mr. Asselin's testimony about Debtor's invoicing practices and accounts receivables was not willfully false and, therefore, concludes that his testimony was not given in bad faith.[13]

---

[12] *See Muth v. Muth* (*In re Muth*), 514 B.R. 719 (10th Cir. BAP 2014) (table opinion) ("Dismissal under § 1112(b)[] is appropriate where the debtor's failure to file an acceptable plan after a reasonable time indicates its inability to do so whether the reason for the debtor's inability to file is its poor financial condition, the structure of the claims against it, or some other reason." (quoting *Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir. 1989)); *In re Autterson*, 547 B.R. 372, 409 (Bankr. D. Colo. 2016) (same).

[13] While Mr. Asselin's testimony may have shown that Debtor did not have appropriate procedures in place to track compliance with the adequate protection the Court granted Surv-Tek as a condition to Debtor's use of cash collateral, the Court is satisfied that S-Tek has improved its procedures.

Surv-Tek also asserts that Mr. Asselin's testimony about requiring "substantiation" from Salls Brothers to validate its claim was false because Salls Brothers had provided invoices showing the amount allegedly owed to Salls Brothers. After careful review, the Court has determined that there is no inconsistency between Mr. Asselin's testimony about requiring substantiation of Salls Brothers claim and the fact that Salls Brothers had already provided invoices to substantiate the amount of its claim. Mr. Asselin wanted substantiation that Debtor made the mistake necessitating Salls Brothers moving the water pipe, not substantiation of the cost to move the pipe. Thus, while Mr. Asselin was provided documents to substantiate the cost to move the pipe, the Court concludes that he neither testified falsely on this issue nor acted in bad faith by seeking additional evidence from Salls Brothers of the cause of the mistake.[14]

## CONCLUSION

Because cause does not exist for dismissal of this case at this time, the Court will deny the Motion to Dismiss. The Court will enter a separate order to that effect.

Robert H. Jacobvitz
United States Bankruptcy Judge

Date Entered on Docket: September 2, 2021
Copy To:

Nephi Hardman
Attorney for S-Tek
Nephi D. Hardman Attorney at Law, LLC
9400 Holly Ave NE Bldg 4
Albuquerque, NM 87122

---

The Court addressed the adequate protection issue in cash collateral orders entered June 4, 2021 and August 31, 2021. Docs. 152 and 233.

[14] Further, to the extent that Surv-Tek argued at the final hearing that Debtor misrepresented Mr. Asselin's 2019 compensation or failed to provide in discovery a 2019 W-2 form reflecting Mr. Asselin's salary, the evidence shows that Debtor properly accounted for Mr. Asselin's compensation and that such compensation was not required to be reported on a W-2 form.

Christopher M Gatton
Attorney for Surv-Tek
Giddens, Gatton & Jacobus, P.C.
10400 Academy Rd., #350
Albuquerque, NM 87111

Patrick Malloy, III
Patrick J. Malloy, III, Subchapter V Trustee
401 S. Boston Ave, Ste 500
Tulsa, OK 74103

Jaime A. Pena
Office of the U.S. Trustee
P.O. Box 608
Albuquerque, NM 87103-0608