UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:   S-Tek 1, LLC,                                      No. 20-12241-j11

Debtor.

**MEMORANDUM OPINION**

The matter before the Court is the Motion to Value Collateral of Surv-Tek, Inc. Pursuant

to 11 U.S.C. § 506(a) ("Motion to Value" - Doc. 259), filed by the Debtor, S-Tek 1, LLC

("Debtor") on October 26, 2021. By the Motion to Value, the Debtor asks the Court to value the

assets Debtor pledged to Surv-Tek, Inc. ("Surv-Tek") as collateral to secure payment of

indebtedness owed by Debtor to Surv-Tek. Having reviewed the evidence in light of applicable

caselaw, the Court concludes that, for confirmation purposes, the total value of the collateral

pledged to Surv-Tek is $499,709.54.

A.     **PROCEDURAL HISTORY**

Debtor owns and operates a surveying company that it purchased from Surv-Tek in 2019,

before the filing of this bankruptcy case. Debtor's chapter 11 case is pending under subchapter

V. Surv-Tek filed a proof of claim in which it asserts a claim secured by all or substantially all of

Debtor's assets, including accounts, accounts receivable, contract rights, equipment, general

intangibles, goods, and inventory (the "Collateral"). Debtor filed a subchapter V plan and a plan

modification (Doc. 96 and Doc. 257–the plan, as modified, hereafter is called the "Plan")

separately classifying Surv-Tek's secured claim. The Plan proposes that Debtor will retain the

Collateral and use it in the operation of its post-confirmation business. Under the Plan, Debtor

proposes to pay Surv-Tek's claim, if and to the extent the claim is allowed as a secured claim, in

deferred cash payments between the Initial Distribution Date (as defined in the Plan) and April 1,

2029 unless Surv-Tek makes the election described under 11 U.S.C. § 1111(b).[1] The Plan provides that if Surv-Tek makes the § 1111(b) election, Debtor intends to file another pre-confirmation plan modification.

The Motion to Value asks the Court to value the Collateral pursuant to § 506(a)(1) for purposes of confirmation of the Plan. Prior to the hearing on the Motion to Value, Debtor filed a motion asking the Court to rule that Surv-Tek's security interest did not extend to any after-acquired assets or to $30,000 Mr. Dennis Smigiel paid Debtor in settlement of a commercial tort claim. The Court entered an order (Doc. 300) and supporting Memorandum Opinion (Doc. 299) ruling that, with the sole exception of $30,000 in settlement funds, Surv-Tek's security interest extends to after-acquired assets, subject to § 552, which governs the post-petition effect of security interests. *Id.* The Court determined further that under § 552(b)(1), the Collateral includes accounts receivable Debtor acquires post-petition under the conditions set forth in cash collateral orders entered by the Court. *Id.*

The Motion to Value also requested valuation of Surv-Tek's Collateral as of the date Debtor commenced its chapter 11 case. By a Memorandum Opinion entered December 9, 2021 (Doc. 286), the Court determined that that for plan confirmation purposes, Collateral that Debtor will retain for its post-confirmation business operations should be valued as of or near the date of the confirmation hearing rather than as of the petition date.

## B.    FINDINGS OF FACT[2]

*Jeremiah Grant's Opinions of Value.*

---

[1] All future references to "Code," "Section," and "§" are to Title 11 of the United States Code, unless otherwise indicated.

[2] The parties agreed that all evidence admitted at the trial on the merits of Adversary Proceeding No. 20-1074-j is admitted for purposes of the Motion to Value. The Court incorporates herein by reference all findings of fact contained in its Memorandum Opinion (Doc. 132) entered in Adversary Proceeding No. 20-1074-j as fact findings made with respect to the Motion to Value..

-2-

The Court qualified Jeramiah Grant as an expert to testify about the value of Debtor's assets and admitted his expert report in evidence as Exhibit 1 (the "Grant Report"). Mr. Grant opined on the fair market value of Debtor's salable assets as of November 30, 2021. In reaching his opinions of value, Mr. Grant took and compared three valuation approaches: 1) an income approach, which he described as a forward-looking approach that determines what an investor would pay today for the right to future cash flows from the business, adjusted for time and risk; 2) a market approach, which Mr. Grant described as a backward looking approach that bases valuation on past performance and compares the business to transactions involving reasonably similar companies whose values are known; and 3) a cost/asset approach, which Mr. Grant described as a balance sheet approach that determines the cost to replace the assets of the business.

Mr. Grant concluded that the fair market value of Debtor's salable assets as of November 30, 2021 is $174,000 (using a combination of the market approach and the income approach and assuming a going concern value for the business) but also opined that $225,000 is a reasonable estimate of the fair market value of Debtor's salable assets (using a cost approach that assumes the business is shut down and the individual assts of the business are sold in an orderly liquidation).[3]

*Mr. Grant's valuation using a weighted market and income approach resulting in a total fair market value of salable assets in the amount of $174,000*

Using a market approach, Mr. Grant determined that the fair market value of Debtor's business is $486,956.[4] Using an income approach, Mr. Grant determined that the fair market value of Debtor's business is $258,615.[5] The $258,615 estimate of value under the income

---

[3] Grant Report, Schedule 1, p.32.
[4] Grant Report, Schedule 4, p.35.
[5] Grant Report, Schedule 5, p. 39.

approach was net of a $100,572 deduction for lack of marketability.[6] To arrive at a total fair market value of $174,000 for Debtor's salable assets as a going concern, Mr. Grant weighted the market and income approach at 50%, resulting in a business enterprise value of $372,785, and made the following adjustments: 1) added $30,000 in settlement proceeds held in Debtor's attorney trust account; 2) added excess cash of $41,686, and 3) subtracted $270,396, representing a deficiency of working capital.[7]

> *Mr. Grant's valuation using the Asset/Cost Approach resulting in a fair market value of salable assets in the amount of $225,000*

Mr. Grant opined further that $225,294.00 is a reasonable alternative estimate of the fair market value of Debtor's salable assets, using the asset/cost approach.[8] To determine the estimated salable value of assets under that approach, Mr. Grant used a liquidation value, also known as "the adjusted net asset method."[9]

The estimated value of $225,294.00 summarized on Schedule 13 of the Grant Report is presented in three columns.[10] The first column lists the book value of Debtor's assets categorized as the assets are presented on Debtor's balance sheet.[11] All of the book values were based entirely on values provided by Debtor's management, namely, Randy Asselin, one of Debtor's two principals. Book value is reported by asset category, such as accounts receivable, computers and printers, furniture and fixtures, and inventory.[12] The third column is an adjusted value that represents the estimated salable value of each asset category.[13] The middle column

---

[6] *Id.*
[7] Grant Report, Schedule 1, p.32.
[8] Grant Report, Schedule 1, n.2, p. 32.
[9] Grant Report, p.12.
[10] Grant Report, Schedule 13, p. 48.
[11] *Id.*
[12] *Id.*
[13] *Id.*

-4-

adjusts book value to the estimated salable value.[14] The adjustment amounts were based entirely on amounts provided by Debtor's management. Mr. Grant performed no analysis regarding the accuracy of the adjustments.

Schedule 13 reflects a total fair market value of Debtor's salable assets in the amount of $312,909.00, which consisted of current assets (the $30,000.00 in settlement funds held in Debtor's counsel's trust account,[15] accounts receivable, cash and checking, security deposits, and loans to Randy Asselin and Christopher Castillo payable to Debtor) and fixed assets (computers and printers, customer database, furniture and fixtures, inventory, a Non-Compete Agreement, GPS and Surveying Equipment, and Accumulated Depreciation).[16] Mr. Grant then applied a discount of $87,614.00 for lack of marketability, for a net asset value of $225,294.[17]

*Value of Debtor's Fixed Assets in the Grant Report*

Mr. Grant valued Debtor's fixed assets using an adjusted cost approach. The summary of the calculation of asset values is contained in Schedule 13 of the Grant Report.[18] Mr. Grant estimated, based entirely on values and adjustments supplied by Debtor's management, that the value of Debtor's fixed assets (prior to the discount for lack of marketability) is $96,528, which includes an adjusted value of $7,000 for furniture and fixtures.[19] Mr. Grant did not appraise any of Debtor's individual assets and offered no opinion based on his own analysis of the value of Debtor's individual assets. The value of the fixed assets was determined making an adjustment

---

[14] *Id.*
[15] The settlement funds were paid to the Debtor by Dennis Smigiel in exchange for Debtor's release of all claims asserted against him arising from the sale of the business to Debtor. *See* Memorandum Opinion Regarding Motion to Determine Scope of Security Interest of Surv-Tek, Inc.
[16] Grant Report, Schedule 13, p. 48.
[17] *Id.*
[18] *Id.* .
[19] *Id.* The adjusted value for furniture and fixtures was determined by deducting $193,000 from the $ 200,000 book value. *Id.*

to the book value of each category of fixed assets on Debtor's November 30, 2021 balance sheet. Randy Asselin made the adjustments to book value in each fixed asset category reflected in the Grant Report. Mr. Grant used those adjustments to book value to determine an adjusted balance for each fixed asset category presented in the Grant Report as representing fair market value for each fixed asset category.

Mr. Grant understood that the only remaining asset in the furniture and fixtures category was a "plotter" that management estimated to have a value of $7,000.[20] Mr. Asselin testified that the $200,000 starting book value used in column 1 of Schedule 13 in the Grant Report for furniture and fixtures resulted from a miscommunication with Mr. Grant and that Mr. Asselin intended the line item for furniture and fixtures to include only $7,000 for furniture.[21] Mr. Asselin testified further that the $200,000 book value for furniture and fixtures also included vehicles, equipment, and customer goodwill. There is no line item in Schedule 13 of the Grant Report that expressly includes vehicles, equipment, or goodwill.[22] Mr. Grant did not assign any value to vehicles, equipment, or goodwill apart from the $200,000 book value for furniture and fixtures reduced to an adjusted value of $7,000.[23]

The total estimated value of the fixed assets in Schedule 13 of the Grant Report also included a book value for "Customer Database" in the amount of $1,418,015 reduced to an adjusted value of $30,000.[24] The Grant Report includes an explanation that "Customer Database"

---

[20] Grant Report, p. 12.
[21] Exhibit 12 includes a document titled, Sale of Surv-Tek, Inc.–Allocation of Purchase Price that ascribes $200,000 to Furniture, Fixtures, Equipment, & Vehicles. Mr. Asselin testified that these figures reflected how the Huggs wanted to allocate the purchase price to the assets.
[22] Grant Report, Schedule 13, p. 48.
[23] *Id.*
[24] *Id.*

-6-

"includes the trade name, web domain, phone number, microfiche files, and archived surveys (paper and digital)."[25]

The archived surveys included in the asset category for Customer Database consists of information from prior surveys completed while Surv-Tek ran the business and other information. Surv-Tek created an archived survey database by digitizing substantially all of the archived surveys in paper form or on microfiche, and other information, and created a digital directory to make the database usable. The archived survey database is an asset of the Debtor. Mr. Grant based the $30,000 adjusted value of the Customer Database entirely on Mr. Asselin's opinion of value. Although the $30,000 total estimated value for "Customer Database" identified in the Grant Report included Debtor's archived survey database,[26] Mr. Asselin assigned no value to it. Mr. Asselin testified that he allocated value to the archived database in the Grant Report, but he also testified at length about the formula he applied to arrive at a $30,000 value for the Customer Database, which was tied solely to the business's telephone number, the number of calls needed to obtain job orders, and how many "clicks" on Debtor's website are needed before business is generated.

Mr. Asselin testified further that the archived survey database in reality has little value to Debtor because a licensed surveyor other than Robbie Hugg or Russ Hugg would need to verify the work performed by the Huggs on past surveys. For that reason, Mr. Asselin believes that the archived surveys do not make Debtor's surveying work more efficient, though they might provide some benefit in estimating the cost of jobs. Although Mr. Asselin recognizes that the archived surveys have some value, he does not believe they are marketable. Based on Mr. Asselin's testimony, and the fact that the figures in the Grant Report are based on Debtor's

---

[25] Grant Report, Schedule 13, n.5, p. 48.
[26] *Id.*

-7-

balance sheets and input from management, the Court is convinced that the $30,000 value attributed to the Customer Database in the Grant Report does not include any value for the archived survey database.

No party presented any expert testimony regarding the value of the archived survey database. Mr. Asselin's lay opinion of its value is unreliable.[27]

Debtor did not present expert testimony regarding the value of its hard assets (furniture; fixtures; vehicles; office, computer, surveying equipment; supplies) or its customer data base other than Mr. Grant's opinion of the value of the assets based on entirely on management's lay opinions of value. Mr. Grant was not asked to, and did not, inspect or appraise any of the hard assets or make his own assessment of the value of those assets or the archived survey database. No inventory was taken of the hard assets and there is no list of the individual assets in evidence apart from the list of assets attached to the Bill of Sale made and delivered in late December 2018 when Debtor purchased the business from Surv-Tek. There is no evidence indicating whether that list is complete.

The Court does not place any weight on Mr. Grant's opinion of the value of Debtor's fixed assets separate from the weight the Court places on the values assigned to those assets by Debtor's management and Mr. Asselin's testimony of value. Mr. Grant's opinion does not reflect his own evaluation of the hard asset values or archived survey database.

---

[27] In Adversary Proceeding No. 20-1074-j Debtor asserted it was damaged as a result of Surv-Tek's alleged conversion of the archived surveys because Debtor lost a competitive advantage by losing access to the archived surveys.

-8-

*Asset Values in Debtor's Bankruptcy Schedules*[28]

Debtor's bankruptcy schedules list office equipment, including all computer equipment, communication systems equipment and software, valued at $47,145,[29] vehicles valued at $75,800,[30] and other machinery, fixtures and equipment valued at $51,400, for a total of $174,345.[31] Debtor valued the vehicles on its bankruptcy schedules as of the petition date using Kelly Blue Book values. Debtor valued the equipment in its bankruptcy schedules by looking at sales prices on eBay. There are no documents in evidence supporting the values listed in Debtor's Schedules. The scheduled value for the equipment does not include any post-petition depreciation in that value. The scheduled value for vehicles does not include any post-petition appreciation in that value, which may have occurred since early 2021 because of a shortage in used vehicles due to the COVID pandemic. Debtor's Schedules did not identify any inventory.[32]

*Other Assets/Asset Values Identified in Marketing Package and Bill of Sale*

The Marketing Package[33] Dennis Smigiel prepared in connection with the sale of Surv-Tek's business to Debtor in late December 2018 listed a total asset value of $505,000, consisting of $500,000 for furniture, fixtures, equipment, and vehicles, and $5,000 for

---

[28] Debtor filed amended schedules on June 11, 2021 (Doc. 159), admitted into evidence as Exhibit C.
[29] This figure includes the "plotter" valued in Debtor's Schedules at $3,200. Exhibit C, p. 45.
[30] The vehicles identified in Debtor's Schedule A/B are:

| | | |
|---|---|---|
| Silverado 2500 | 2013 | $14,000 |
| Silverado | 2013 | $14,400 |
| Trailer | 2006 | $ 2,400 |
| Silverado 1500LS | 2017 | $20,000 |
| Silverado 1500LS | 2017 | $20,000 |
| Cruze LS | 2015 | $ 5,000 |

Exhibit C, p. 46.
[31] *See* Exhibit C–Schedules A/B, Parts 7 and 8.
[32] *See* Exhibit C–Schedules A/B, Part 5.
[33] Exhibit 9 admitted into evidence in the trial of Adversary Proceeding No. 20-1074-j.

inventory. However, the figures disclosed on the itemized list of assets attached to the

Marketing Package totals only $246,000.[34] A summary of those assets is as follows:

| Asset | Value |
|---|---|
| Survey field equipment | $161,000.00 |
| Office equipment (including computer equipment) | $26,500.00 |
| Vehicles | $86,000.00 |
| **TOTAL** | $246,000.00 |

The field equipment identified in the exhibit to the Marketing Package identifies eleven Trimble

receivers, including three Trimble R6-4 receivers valued at $18,000 each; a Trimble S6 robotic

DR station valued at $40,000; a geodimeter valued at $10,000; and other equipment.[35]

In contrast, Debtor's Schedules identify a total of only six Trimble receivers, including

three Trimble R6-4 receivers valued at $4,000 each, and a Trimble S6 robotic DR station valued

at $10,000. Randy Asselin testified that some of the equipment stopped working after Debtor

purchased the business, some equipment may have been decommissioned, and some items were

replaced. He testified further that since the Debtor purchased the business from Surv-Tek, the

Debtor purchased $20,000 in new equipment from Bob Green to replace certain items,

including a Trimble Robotic and Trimble controller. However, Mr. Asselin could not explain

with any specificity why the Debtor's bankruptcy Schedules listed fewer Trimble receivers and

fewer Trimble controllers than identified in the Closing Statement.[36]

---

[34] *Id.*

[35] *Id.* at p. 13.

[36] *Compare* Exhibit C, p. 47 listing 6 Trimble receivers, 4 Trimble controllers, 5 Trimble radios and 1 Trimble station *with* Exhibit A, p. 18-19, identifying 12 Trimble receivers, 10 Trimble controllers, 6 Trimble radios and 1 Trimble station.

-10-

The vehicles identified in the exhibit to the Marketing Package include two Polaris 450 Sportsman ATVs valued at $5,000 each, four Chevys valued at $11,000 each and two Chevys valued at $18,000 each, and a Polaris Haulright trailer valued at $2,000.[37] The list of assets with assigned values attached to the Marketing Package did not include accounts receivable, cash, or the archived survey database.[38] It also did not separately list any fixtures or furniture.[39] Debtor's Schedules included the ATVs with a value of $5,000 each, but included them in the aggregate value of $51,400 for machinery and equipment.[40]

Attached to the Bill of Sale[41] executed and delivered at the closing of the sale of the business is a more detailed listing of transferred assets but does not assign any values to the assets. For example, the Bill of Sale lists twelve Trimble receivers, including two R8 Trimble receivers and five Trimble R6 receivers whereas the Marketing Package lists no R8 Trimble receivers and only three Trimble R6 receivers.[42] Although the archived survey database and hard copies of the archived surveys were included in the sale, they are not included in the list of assets in either the Marketing Package or attached to the Bill of Sale.

The purchase price of $1.8 million the Debtor agreed to pay for the Surv-Tek business was not based on asset value. The listing price for the business of $2.2 million was based on enterprise value that the business broker determined by applying a multiplier to a computed adjusted net profit. That calculation is set forth in the Marketing Package. Negotiations resulted in a purchase price of $1,800,000.

---

[37] Exhibit 9 (admitted into evidence in the trial of Adversary Proceeding No. 20-1074-j), p. 14.

[38] *Id.*
[39] *Id.*
[40] Exhibit C, p. 47.
[41] Exhibit 21 (pages 024–028) admitted into evidence at the trial in Adversary Proceeding No. 20-1074j.
[42] *Compare* Marketing Package (Exhibit 9 admitted at trial of Adversary Proceeding No. 20-1074j) *with* Bill of Sale (pages 024–048 of Exhibit 21 admitted at trial of Adversary Proceeding No. 20-1074j).

-11-

*Cash Collateral Orders and the Value of Debtor's Cash and Accounts Receivable*[43]

As a condition to Debtor's continued use of cash collateral, the Court granted Surv-Tek a post-petition lien in accounts receivable and cash so that Surv-Tek will maintain a lien against cash and accounts receivable in at least the minimum required amount (the "Cash Collateral Base Amount").[44] The Cash Collateral Base Amount includes cash on deposit, cash on hand, and other cash equivalents, and includes certain accounts receivable as of the date Debtor filed its voluntary bankruptcy petition.[45] The most recent cash collateral order requires Debtor to maintain a minimum Cash Collateral Base Amount of $181,764.54 less the amount of any adequate protection payments made by Debtor to Surv-Tek.[46] Adequate protection payments are not required unless the minimum Cash Collateral Base Amount is not maintained.[47] The Debtor has made no adequate protection payments to Surv-Tek.

*Surv-Tek's Expert on Valuation*

The Court qualified Surv-Tek's expert witness, Sam Baca, as an expert in accounting and business valuation. The Court limited Mr. Baca's testimony to the opinions contained in his expert report[48] and as a rebuttal witness to the Grant Report. He did not offer his own opinion of

---

[43] The Court takes judicial notice of the orders entered in this bankruptcy case.

[44] *See, e.g.,* Order Authorizing Use of Cash Collateral from June 1, 2021 through August 31, 2021 (Doc. 152).

[45] *Id.*

[46] *See* Stipulated Order Granting Debtor Authority to Use Cash Collateral for the Period from April 1, 2022 through June 30, 2022 (Doc. 345). Debtor has not made any adequate protection payments to Surv-Tek because Debtor has been able to maintain the minimum Cash Collateral Base Amount. The Cash Collateral Base Amount does not include the $30,000 in settlement proceeds. *Compare* Order Authorizing Use of Cash Collateral From June 1, 2021 through August 3, 2021 (Doc. 152), which provides for a Cash Collateral Base Amount of $211,764.54 *with* Stipulated Order Granting Debtor Authority to Use Cash Collateral for the Period from April 1, 2022 through June 30, 2022 (Doc. 345), which reflects a $30,000 deduction, resulting in a Cash Collateral Base Amount of $181,764.54. The Court determined in December of 2021 that Surv-Tek does not have a security interest in the $30,000 in settlement proceeds. *See* Doc. 299 and Doc. 300.

[47] *Id.*

[48] Mr. Baca's report was marked as Exhibit Q, but not admitted into evidence.

-12-

the fair market value of Debtor's salable assets, did not appraise any of Debtor's individual assets, and offered no opinion on the value of the Debtor's individual assets. In Mr. Baca's view, Mr. Grant's application of a discount for lack of marketability is not appropriate because it conflates methodologies; it is not the equivalent of deducting the cost to dispose of assets in a liquidation analysis; and should not be applied at all in an income valuation approach. Mr. Baca opined further that it was not appropriate for Mr. Grant to rely on the client's balance sheets as a basis for fixing asset values. Finally, Mr. Baca pointed out that some of the assets listed in the Grant Report, Schedule 13, such as the loan to Debtor's principal, Randy Asselin, and the $30,000 deposit in the attorney trust account, are not really salable assets.

*Robbie Hugg's Estimate of Value*

Robbie Hugg, one of the two principals of Surv-Tek, testified that in his opinion, the archived survey database is worth $1,000,000. He explained that the archived surveys are stored in an electronic database that contains .pdf files of all of Surv-Tek's surveys and AutoCAD drawings from 1979 to 2018 (which includes as many as 40,000 surveys taken throughout New Mexico), along with drawings, legal descriptions, GPS calibrations, photos, boilerplate proposals, certifications, and data sheets from zone atlases from the City of Albuquerque and the City of Rio Rancho. The archived survey database is organized with a directory. He constantly used the archived survey database to estimate jobs and to establish surveying control points and GPS calibrations from various public sources and from nonpublic information, which gave Surv-Tek a substantial advantage over other surveying competitors in the marketplace on many jobs, increasing profit by as much as 20% or more and sometimes by as much as 50%. Robbie Hugg recognizes that a large portion of the $1,495,000 allocated to the total purchase price of $1,800,000 as reflected in Exhibit 12 is attributable to the goodwill of the company at

the time of sale, which encompasses the value of the archived survey database, but in his view, it is difficult to separate the value of the archived survey database from the value of the company's goodwill. The allocation of the purchase price to different asset categories in Exhibit 12 was created for tax purposes. The purchase price was fixed based on past income and expenses, not individual asset values. Further, the total value of the business included the workforce of skilled employees and the customer base.

Robbie Hugg also testified that he believes the vehicles have appreciated in value post-petition, and that the values Debtor placed on equipment are too low. In his experience, eBay values are not reliable to value survey equipment because all of the equipment needs to work together and a dealer code is required to get the equipment running with the dealer's software. In other words, because the software must run on the equipment, it is impractical for a surveying company to purchase used surveying equipment on eBay. Robbie Hugg opined that value of the Trimble equipment alone is $150,000, although he did not place a value on any individual item of equipment.

*Other Evidence Regarding the Value of the Archived Survey Database*

Kent Holland, Debtor's current general manager, explained that the archived survey database contains .pdf files of old surveys as well as CAD files. Those images can be used to give an idea of what is on the site when Debtor is asked to do a survey that involves the same site. He testified further that he seldomly uses the archived survey database because most survey jobs are new jobs. He testified that the archived database could be used to get a basic start on a new survey job, but the information would require verification. He estimated that S-Tek uses the archived survey database on only 10% of its new survey jobs. Based on this

-14-

testimony, Robbie Hugg believes that Mr. Holland does not really understand the extent of the archived survey database or how it remains useful for new survey projects.

*Surv-Tek's Proof of Claim*

Surv-Tek filed a proof of claim for $1,768,941.83 based on breach of contract for the purchase of its business. *See* Claim 6-1. Its original claim asserted that it has a secured claim of $355,177.49 based on a Security Agreement and UCC-1 filing statement granting Surv-Tek a security interest in all of the Debtor's assets. *Id.* Surv-Tek later filed an amended proof of claim for the same amount, asserting that the value of its collateral is $1,800,000 making the full amount of its $1,768,941.83 claim a secured claim. *See* Claim 6-2. The amended claim contains no information about the asserted value of any of Debtor assets by individual asset or asset category. The Security Agreement, attached as Exhibit E to Surv-Tek's Claim 6-2, grants Surv-Tek a security interest in the following collateral:

> All Goods Furniture Equipment, Inventory, Accounts, Account Receivables, General Intangibles, Contract Rights and other personal property owned by Debtor as of the effective date of this Agreement and all proceeds and products of the foregoing including replacements thereof acquired with proceeds or by trade or exchange of property of the Debtor owned as of the Effective Date hereof.

Claim 6-2, Exhibit E.

"Collateral" as defined in the Security Agreement, includes

> (A) All products and proceeds of any of the Collateral described in this Collateral section.
> (B) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the Collateral described in this Collateral Section.
> (C) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the Collateral described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.
> (D) All records and data relating to any of the Collateral described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Debtor's right, title and interest in and to all

computer software required to utilize, create, maintain, and process any such records or data on electronic media.

*Id.*

The UCC-1 Financing Statement in favor of Surv-Tek dated January 2, 2019, covers the following collateral:

> All Goods, Furniture, Equipment, Inventory, Accounts, Account Receivables, General Intangibles Contract Rights , and other personal property owned by Debtor as of January 1,2 019, and all proceeds and products of the foregoing including replacements thereof acquired with proceeds or by trade or exchange of property of the Debtor owned as of January 1, 2019.

Claim 6-2, Exhibit F.

## C.    CONCLUSIONS OF LAW[49]

*Surv-Tek's Security Interest and Appropriate Valuation Date*

The Court previously determined that Surv-Tek has a security interest in substantially all of the Debtor's assets, including collateral acquired after the effective date of the Security Agreement, which includes post-petition accounts receivable (defined earlier as "Collateral"), but that its security interest does not extend to the $30,000 in settlement funds held in Debtor's counsel's attorney trust account.[50] The Court also determined that the Collateral will be valued as of the confirmation hearing or a date close to the confirmation hearing.[51] In addition, with respect to property acquired post-petition, the extent of the security interest is subject to the limitations in § 552.

---

[49] To the extent this Section D contains facts not enumerated in Subsection C, the Court adopts them as additional fact findings.

[50] *See* Memorandum Opinion Regarding Motion to Determine Scope of Security Interest of Surv-Tek, Inc. (Doc. 299), published as *In re S-Tek 1, LLC*, 635 B.R. 860 (Bankr. D.N.M. 2021), and Order Granting, in Part and Denying in Part Debtor's Motion to Determine Scope of Security Interest of Surv-Tek, Inc. (Doc. 300).

[51] *See* Memorandum Opinion and Order on Valuation Date (Doc. 286), published as *In re S-Tek 1, LLC*, No. 20-12241-J11, 2021 WL 5860020 (Bankr. D.N.M. Dec. 9, 2021).

-16-

*Burden of Proof*

Debtor asks the Court to determine the amount of Surv-Tek's secured claim under

11 U.S.C. § 506(a) [52] by valuing the Collateral that secures the claim. Section 506(a) provides,

in relevant part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . .

In some contexts the Bankruptcy Code assigns the burden of proof on valuation of a

secured creditor's collateral. Under § 362(g)(1), a party requesting relief from the automatic stay

(generally a creditor) has the burden of proof regarding the debtor's equity in property. By

contrast, under § 363(p)(1), the debtor has the burden of proof to show a creditor is adequately

protected under § 363(e) by an equity cushion with respect to the use, sale or lease of its

collateral.

Section  506(a) does not expressly assign the burden of proof to establish value on a

motion to value a creditor's collateral to determine the amount of its secured claim, and courts

are split on which party bears the burden of proof. The Third Circuit identified three possible

approaches to burden of proof for determining the amount of a secured claim under 11 U.S.C.

§ 506(a). *In re Heritage Highgate, Inc.*, 679 F.3d 132, 139 (3d Cir. 2012) ("Three approaches to

the burden of proof in proceedings to value secured claims under § 506(a) have predominated in

bankruptcy cases."). One approach places the burden of proof on the secured creditor to establish

the amount and extent of its lien. *Id.* at 139 (citing *In re Sneijder*, 407 B.R. 46, 55 (Bankr.

S.D.N.Y. 2009)); *see also In re Montreal, Main & Atl. Ry., Ltd.,* 956 F.3d 1, 8 (1st Cir. 2020)

("The secured creditor must demonstrate this value [under § 506(a)] by a preponderance of the

---

[52] All future references to "Code", "Section," and § are to the Bankruptcy Code, Title 11 of the United States Code, unless otherwise indicated.

evidence."); *In re Panther Mountain Land Dev., LLC*, 438 B.R. 169, 193 (Bankr. E.D. Ark. 2010) (same). A second approach places the burden of proof on the party seeking to value the claim, which, in most cases, is the debtor. *Heritage Highgate*, 679 F.3d at 140 (citing *In re Weichey*, 405 B.R. 158, 164 (Bankr. W.D. Pa. 2009)); *see also In re Henry*, 457 B.R. 402, 405 (Bankr. E.D. Pa. 2011) (the party challenging the claim bears the burden of proof of collateral value under § 506(a)); *Miller v. Citibank, N.A. (In re Miller)*, 558 B.R. 146, 154 (Bankr. E.D. Pa. 2016) ("In the context of a valuation under § 506(a), 'the Debtor bears the burden of proof.'" (quoting *Hamilton v. Partners for Payment Relief De III, LLC (In re Hamilton)*, No. 12-19762 ELF, 2013 WL 1819546, at *3 (Bankr. E.D. Pa. Apr. 22, 2013))). The third approach, and the approach ultimately adopted by the Third Circuit given the circumstances of the case before it, is a burden-shifting approach that places the initial burden on the debtor to present evidence sufficient "to overcome the presumed validity and amount of the creditor's secured claim," which, once met, shifts the ultimate burden of persuasion to the creditor to establish both the extent of its lien and the value of the collateral securing its claim by a preponderance of the evidence. *Heritage Highgate*, 679 F.3d at 140 (citing *In re Robertson*, 135 B.R. 350, 352 (Bankr. E.D. Ark. 1992)).

There are drawbacks to all three approaches. The first approach, which places the burden solely on the creditor, overlooks typical motions practice, which generally contemplates that the moving party bears the burden of proving entitlement to the relief requested. *See, e.g.*, *In re Henkel*, 408 B.R. 699, 701 (Bankr. N.D. Ohio 2009) ("Generally, the burden of proof . . . is upon the movant . . . ."); *In re Irwin,* 558 B.R. 743, 750 (Bankr. E.D. Pa. 2016) (the moving party in a contested matter bears the burden of proof); *In re Maylin*, 155 B.R. 605, 614 (Bankr. D. Me. 1993) ("Generally, a movant bears the burden of proof on the elements necessary to

warrant the relief he or she seeks."). Here, the debtor, not the creditor, is the movant. Placing the burden of proof solely on the creditor also appears to deem inapplicable Fed.R.Bankr.P. 3001(f), which provides that a properly filed proof of claim is entitled to prima facie evidence of the validity and amount of the claim. The second approach, which places the burden solely on the debtor, ignores the general rule that a creditor has the burden of proof on the extent, validity, and priority of its lien. *In re Tex-Gas Holdings*, LLC, No. 21-80092, 2022 WL 569085, at *5 (Bankr. S.D. Tex. Feb. 24, 2022); *Madison Inv. Trust v. The Covenant at S. Hills, Inc. (In re Covenant at S. Hills, Inc.),* 410 B.R. 426, 430 (Bankr. W.D. Pa. 2009).

The burden-shifting approach applies the rules governing objections to proofs of claim to motions to value collateral under § 506(a) to determine the amount of an allowed claim that is a secured claim. This appears to make sense because a proof of claim filed by a secured creditor includes a total amount claimed and the portion claimed as a secured claim. The definition of "claim" in § 101(5) includes a secured claim. However, it is not entirely clear that Fed.R.Bankr.P. 3001(f) (which imposes the presumption of validity for properly filed proofs of claim) applies to a valuation motion governed by § 506(a) to which Fed.R.Bankr.P. 3012 (establishing the procedure for determining the amount of a secured claim) applies. A motion to value a secured creditor's collateral under § 506(a) for purposes of plan confirmation is not the equivalent of an objection to a secured claim under § 502(a). Claims for which proofs of claim are filed are claims arising from conduct that occurred prepetition,[53] whereas the value of the secured creditor's interest in collateral under § 506(a) is determined at or near the plan confirmation date because that is the purpose for which the collateral is being valued. *See In re S-Tek 1, LLC*, No. 20-12241-J11, 2021 WL 5860020, at *2 (Bankr. D.N.M. Dec. 9, 2021) and

---

[53] The Tenth Circuit has adopted the "conduct" theory to determine when a claim arises. *In re Parker,* 313 F.3d 1267, 1269 (10th Cir. 2002).

cases cited therein. The bankruptcy court in *In re Bassett*, No. 18-25410-B-13, 2019 WL 993302, at *4 (Bankr. E.D. Cal. Feb. 26, 2019) explained:

> This court's concern with the [burden-shifting] approach . . . is that [it] appear[s] to conflate, and therefore do[es] not recognize, the distinction between the claims *allowance* process under § 502(a) and Bankruptcy Rule 3001(f) and the claims *bifurcation and valuation* process under § 506(a) and Bankruptcy Rule 3012.

Surv-Tek urges the Court to apply the burden-shifting approach, which this Court has previously applied, *see In re Twin Pines. LLC*, No. 19-10295-J11, 2021 WL 312674, at *7 (Bankr. D.N.M. Jan. 29, 2021), arguing that Debtor has failed to satisfy its initial burden of demonstrating that Surv-Tek's claim set forth in its proof of claim is not entitled to prima facie evidence of the validity and amount of its claim. Based on the Debtor's failure to meet its initial burden, Surv-Tek would have the Court value the Collateral in the full $1,800,000 amount asserted in its amended proof of claim. Debtor asserts that it has met its burden of proving that the value of Surv-Tek's Collateral is less than the amount asserted in its amended proof of claim, and that the Debtor has provided other evidence of the value of the Collateral in the form of a) the values listed in its bankruptcy schedules, even though those values give a value as of the petition date not a date at or near confirmation, and b) the values in the Grant Report, with reported adjustments.

Under the burden shifting approach applicable to proofs of claim, the party filing the claim has the ultimate burden of persuasion. But a properly filed proof of claim has a presumption of validity, requiring the party objecting to the claim to come forward with sufficient evidence to rebut the presumption of validly of the claim. This requires the objecting party to come forward with evidence "of probative force equal to that of the allegations contained in the proof of claim." *In re Geneva Steel Co.,* 260 B.R. 517, 524 (10th Cir. BAP 2001), *aff'd*, 281 F.3d 1173 (10th Cir. 2002). Expressed slightly differently, it requires the

-20-

objecting party to come forward with evidence "equal in force to the *prima facie* case." *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992). In practice, that means that "the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *Id*. at 173-74.

The valuation evidence presented at the hearing left many unanswered questions. Neither party presented a comprehensive itemized list of Debtor's presently owned assets with associated values for each asset. The Debtor's Grant Report is flawed in several respects. Mr. Grant's opinion of value based on the income and market approaches is less than the estimated value using an asset approach even though Debtor proposes to continue operating the business as a going concern rather than sell the business assets in an orderly liquidation. The asset values contained in the Grant Report were pulled from the Debtor's balance sheets, with adjustments to arrive at liquidation value (not replacement value), based on discussions with management and without any effort to independently value the assets. Surv-Tek's expert was not asked to give an opinion of the total value of the Collateral, and his opinion was limited to a critique of the Grant Report. Other evidence of value, consisting of the values listed in Debtor's Schedules, were as of the petition date, rather than at or near the confirmation date, and were unsupported by any documentary evidence. The bankruptcy case had been pending for more than a year prior to the date of the final hearing on the Motion to Value.

Nevertheless, sufficient evidence was presented at the hearing to demonstrate that the value of Surv-Tek's Collateral is less than the $1,800,000 value asserted in its amended proof of claim. The $1,800,000 value asserted in the amended proof of claim is equal to the sales price Debtor agreed to pay for the Surv-Tek business, which was based on a multiplier applied to projected adjusted net profits independent from the value of the underlying assets, then reduced

-21-

through negotiations. Debtor's profits have declined considerably since the sale took place in late 2019. The Court is also convinced that Debtor's enterprise value is less than the value of its underlying assets determined on a replacement cost basis, making it inappropriate to use enterprise value to determine the value of the property securing Surv-Tek's claim for the reasons discussed below.

Under the circumstances of this case, the Court declines to decide Collateral value under § 506(a) based on one party's failure to meet its burden of proof, especially where the caselaw regarding the applicable burden of proof is not uniform. The Court, as fact-finder, will exercise its sound discretion based on the best evidence presented, to fix the value of the Collateral subject to Surv-Tek's security interest.[54]

*Replacement Value vs. Going Concern*

Section 506(a) provides that "value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property . . . . " Section 506(a) does not, however, "specify the appropriate valuation standard." *Heritage Highgate*, 679 F.3d at 141. Instead, "Congress envisioned a flexible approach to valuation whereby bankruptcy courts would choose the standard that best fits the circumstances of a particular case." *Id.*

In *Assocs. Com. Corp. v. Rash,* 520 U.S. 953, 963 (1997), the Supreme Court adopted a replacement value standard rather than foreclosure value for valuation of collateral under § 506(a) in chapter 13 cases where the debtor intends to retain and use the collateral (usually a vehicle) and seeks to "cram down" the value of the secured creditor's claim to the value of its

---

[54] *Cf. Bassett*, 2019 WL 993302 at *4 (determining that the evidentiary presumption of Bankruptcy Rule 3001(f) does not apply to motions to value collateral under § 506(a) so as to "preserve[ ] the court's fact-finding function in the valuation process . . . . [t]hat necessarily includes assessing and weighing evidence of a collateral's condition and value  . . . ."). As section 506(a) contemplates, the Court enjoys some flexibility in the valuation process. *Id.*

-22-

collateral under § 1325(a)(5)(B). Replacement value for purposes of § 506(a) "is the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." *Rash*, 520 U.S. at 960. Although the replacement value standard has been applied to value collateral under § 506(a) outside the chapter 13 context,[55] "[n]owhere in [*Rash*] does the Supreme Court hold that *all* valuations under § 506(a) must be based on a replacement value standard." *In re Weber*, 332 B.R. 432, 436 (10th Cir. BAP 2005).

For profitable, operating companies, the ongoing concern value of the business is usually greater than the cost to replace the individual assets of the business. For this reason, when a creditor holds a lien in all or substantially all of the debtor's assets, courts may use an ongoing concern value, also known as the "enterprise value" of a business, to value a secured creditor's collateral when the debtor intends to reorganize and continue to operate the business. *See, e.g., In re Hawaiian Telcom Commc'ns, Inc.*, 430 B.R. 564, 602 (Bankr. D. Haw. 2009) ("Where debtors intend to reorganize and continue to operate their business, and prospects for reorganization appear favorable, collateral should be valued using the going concern value for purposes of determining the extent of the creditor's secured claim under 506(a)."); *In re Nellson Nutraceutical, Inc.,* No. 06-10072 (CSS), 2007 WL 201134 (Bankr. D. Del. Jan. 18, 2007) (using enterprise value to value secured claim under § 506(a)); *In re Savannah Gardens-Oaktree*, 146 B.R. 306 (Bankr. S.D. Ga. 1992) (applying a going concern valuation standard to

---

[55] *See Heritage Highgate,* 679 F.3d at 141 ("Courts have recognized that [*Rash's*] similar reasoning applies with equal force in the Chapter 11 reorganization context."); *In re Creekside Senior Apartments, LP*, 477 B.R. 40, 55 (6th Cir. BAP 2012) ("Although *Rash* was decided in the context of Chapter 13, its holding applies equally to valuation of secured claims in Chapter 11."); *In re Adam Aircraft Indus.*, *Inc.*, No. 12-cv-01573-CMA, 2013 WL 773044, at *6 (D. Colo. Feb. 28, 2013) ("Although *Rash* was decided in the narrow context of an individual debtor's Chapter 13 reorganization, courts have recognized that the logic of *Rash* applies with equal force in other contexts.").

-23-

determine the amount of the creditor's secured claim under § 506(a) where debtor intended to retain the collateral under chapter 11 plan).

Here, Debtor intends to reorganize the business and continue to operate it as a surveying company. Yet, Jeremiah Grant's opinion of the value of the Collateral as part of an ongoing concern was significantly less than his estimate of the fair market value of the individual salable assets of the company. Under these circumstances, it is not appropriate to fix the value of the Collateral based on enterprise value. Rather, the Court will value the Collateral using a replacement value standard, determined from the totality of the evidence presented at the final hearing, including testimony, Debtor's scheduled asset values, the Marketing Package, the Bill of Sale, portions of the Grant Report, and the cash collateral orders. *See In re Rozinski*, 487 B.R. 549, 553 (Bankr. D. Colo. 2013) ("The Supreme Court left 'to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented.'" (quoting *Rash*, 520 U.S. at 965 n. 6)).

D.    **VALUATION CONCLUSIONS**

Based on the foregoing findings of fact and conclusions of law, the Court determines that, for purposes of confirmation, the total value of the Collateral pledged to secure Surv-Tek's claim is $499,709.54. The expert testimony of Jeremiah Grant as supported by the Grant Report is, for the most part, not useful to determine replacement cost asset value because he inappropriately used a liquidation value and applied a discount for lack of marketability, omitted Debtor's vehicles and surveying equipment from the valuation calculation, and based other values on figures lifted from the Debtor's own balance sheet and discussions with management without performing an independent evaluation. It is appropriate for the Court to rely in part on the Debtor's scheduled values in fixing the Collateral value, especially for assets

-24-

that reflect a value greater than the value reported by Debtor's expert and where the expert's valuation was flawed in several respects.

The Court has made additional valuation adjustments based on other evidence. For example, Debtor's Bankruptcy Schedules did not include several items that were itemized in the Marketing Package and the Bill of Sale. The items that appear in both places show much higher values in the Marketing Package than in the Debtor's Bankruptcy Schedules. Debtor testified that he valued the surveying equipment based on prices he found for similar equipment on eBay. Robbie Hugg credibly testified that eBay values are not a good indicator of value because a surveying company would not buy equipment from eBay. The Court agrees that the scheduled values for the surveying equipment are too low and that eBay valuations are not a good indication of actual fair market replacement values for that equipment where the debtor is an operating surveying company. Debtor also included the two ATVs as part of the $51,400 in equipment value, even though the ATVs are more properly characterized as vehicles.

Having considered and weighed the evidence the Court concludes that Debtor has undervalued the surveying equipment. Even if the Court accepts that the Debtor no longer owns all of the surveying equipment identified in the Bill of Sale and the Marketing Package, the surveying equipment that is identified in the Debtor's Schedules has a significantly lower value than the value assigned to the same equipment in the Marketing Package. The Court is convinced that the surveying equipment in Debtor's Schedules is significantly undervalued. Based on the figures in the Marketing Package (which give a total value of $161,000, but includes equipment Debtor did not list in his Bankruptcy Schedules and may no longer own and may exclude surveying equipment Debtor does own), and Robbie Hugg's testimony that the Trimble equipment alone is worth $150,000, the Court concludes that the total value of the

-25-

equipment should be increased from $51,400, as listed in Debtor's Bankruptcy Schedules, to $100,000, and that $10,000 attributable to the two ATVs should be added to the total vehicle value.

Assigning a value to the archived survey database is more problematic. Debtor's principal, Mr. Asselin, acknowledged that it has some value but believes that the archived survey database is currently unmarketable and, at this time, he would not pay anything for it. He reasoned further that because all current surveys must be certified and stamped by a licensed surveyor, another surveyor would not rely on an archived survey completed by someone else. The Court gives that testimony little weight. No foundation was laid to support the reliability of those conclusions. Based on trial evidence admitted in Adversary No. 20-1074, the Court has concluded that Mr. Asselin's personal knowledge of the surveying process renders unreliable his opinion that the archived survey database has no value. On the other hand, Robbie Hugg, one of the principals of the business before it was sold to Debtor, testified that he constantly used the archived survey database to assist with bidding on surveying jobs and that, even though all new surveys must be verified, the archived survey database enabled Surv-Tek achieve considerable costs savings for new survey jobs.[56] In his opinion, the archived survey database is

---

[56] Based on evidence admitted at trial in Adversary No. 20-1074, the Court has found that use of the archived survey database gave Surv-Tek a substantial competitive advantage on many jobs, increasing profitably by as much as 20% or more and sometimes by as much as 50%. Use of the archived survey database enabled Surv-Tek to underbid competitors and still make a good profit. The information in the archived survey database was also helpful in formulating job proposals more quickly and efficiently to obtain work and in preparing Surv-Tek's final work product. The archived survey database could enable Surv-Tek to put together a proposal in a day that might take a competitor several days. S-Tek acquired the archived survey database and the backup hard copies and microfiche as part of its purchase of Surv-Tek's business. John Montoya, who S-Tek promoted to general manager, similarly used the archived survey database when employed by Surv-Tek for the approximate one year period that Robbie Hugg took a leave of absence following a back surgery.

worth $1,000,000. Robbie Hugg gave no testimony to explain or support how he arrived at this opinion of value nor is that valuation supported by any expert testimony.

Given this large discrepancy in value, it is difficult for the Court to assign a value to the archived survey database. Clearly, it is worth substantially more than zero. Based on the testimony, the Court is also persuaded that Debtor is not using the archived survey database to its full potential. In weighing all of the evidence, including the evidence from the trial of Adversary Proceeding No. 20-1074, but arriving at what the Court believes is a very conservative value given the state of the evidence, the Court concludes that the reasonable fair market value of the archived survey database is at least $50,000.00 and assigns a $50,000.00 value to the archived survey database for purposes of deciding the Motion to Value.

Surv-Tek's security interest includes a security interest in general intangibles, such as goodwill, and contract rights, which would include S-Tek's rights under the Non-Compete Agreement. Exhibit 12 allocated $100,000 to the Non-Compete Agreement for tax purposes. This figure was imported into the Grant Report, and then adjusted to zero. No other evidence to support the value of the Non-Compete Agreement was presented by either party. The Court has found that Surv-Tek no longer is bound by its obligations under the Non-Compete Agreement. The Court assigns no value to the Non-Compete Agreement. Nor does the Court assign any value to goodwill apart from the $30,000 value placed on the Customer Database, which was based on Mr. Asselin's testimony.

In sum, based on the totality of the evidence, the Court finds and concludes that the total value of the Collateral pledged to Surv-Tek for purposes of confirmation is $499,709.54, consisting of the following:

| Collateral Description | Value | Explanation |
|---|---|---|
| Collateral Base Amount (cash and accounts receivable) | $181,764.54 | This figure is from the most recent stipulated order authorizing use of cash collateral (Doc. 345) and does not include the $30,000 in settlement proceeds that the Court determined is not subject to Surv-Tek's security interest. *See* Doc. 300. |
| Machinery and equipment, including GPS and Surveying Equipment | $100,000.00 | The figure on Debtor's Schedule A/B under the heading "other machinery fixtures and equipment (excluding farm machinery and equipment)" is $51,400, and matches the figure listed on Schedule 13 of the Grant Report as the adjusted balance for GPS and Surveying Equipment. That figure includes 2 ATVs valued together at $10,000, which should not be included in equipment. The Marketing Package valued the survey field equipment at $161,000, including three Trimble receivers valued at $18,000 each, a Trimble station valued at $40,000, and a geodimeter valued at $10,000, which together total $104,000, and do not include all of the items included in the itemized list of equipment on the Bill of Sale. Robbie Hugg testified that the Trimble equipment alone is worth $150,000. All this valuation evidence, taken as a whole, leads the Court to conclude that the total value of the machinery and equipment including GPS and surveying equipment, but not including the ATVs, is $100,000. |
| Vehicles[57] | $75,800.00 | This figure is from Debtor's Schedule A/B. The Grant Report excluded |

---

[57] New Mexico's Uniform Commercial Code regarding security interests applies to security interests in vehicles. *In re Elkins Welding & Constr., Inc.*, 251 B.R. 441m *3 (10th Cir. BAP 2000) (unpublished) ("[B]oth the provisions of New Mexico's Commercial Code and Motor Vehicle Code make clear that . . . Article 9 applies to security interests in vehicles."). The Security Agreement grants Surv-Tek a security interest the Collateral, which includes "goods." *See* Exhibit E. Under the Uniform Commercial Code, "goods" includes vehicles. *See* N.M.S.A. 1978 § 55-2-105(1) ("'Goods' means all things . . . which are

| | | vehicles by mistake; this figure does not account for post-petition depreciation, but also does not make any adjustment for possible (likely) appreciation in value due to vehicle shortages as a result of the pandemic. |
|---|---|---|
| ATVs | $10,000.00 | The ATVs were included in the Debtor's Schedule A/B as part of machinery and equipment. Debtor did not include these in the vehicle category. Nor were the ATVs separately identified or valued in the Grant Report. The Marketing Package identified two Polaris 450 Sportsman ATVs valued at $5,000 each. The Bill of Sale also included the two ATVs. |
| Computers and Printers, including office furniture | $47,145.00 | This figure is from Debtor's Schedule A/B, which includes an itemized attachment identifying scanners, printers, and includes the "plotter" valued at $3,200; The Grant Report valued computers and printers at $3,128, and separately valued the "plotter" at $7,000. |
| Archived Survey Database | $50,000.00 | The Grant Report included the archived survey database as part of the Customer Database, with a total value of $30,000. Randy Asselin's testimony revealed that the $30,000 figure was reached based on a formula that values the phone number based on the number of "clicks," and that no portion of the $30,000 figure is attributable to the archived survey database. Robbie Hugg testified that he believes the archived survey database is worth $1MM. The archived survey database is worth more than zero, and less than |

movable . . . . "); *In re Morgan*, 291 B.R. 795, 801 (Bankr. E.D. Tenn. 2003) ("Motor vehicles are goods for the purpose of Article Nine, and therefore, the Uniform Commercial Code applies to transactions intended to create a security interest in automobiles." (quoting *Keep Fresh Filters, Inc. v. Reguli*, 888 S.W. 2d 437, 442 (Tenn. Ct. App. 1994) (applying the Uniform commercial Code as adopted in Tennessee)). Perfection of a creditor's security interest in a vehicle is a separate issue governed by N.M.S.A. 1978 §§ 66-3-201 – 66-3-204 of New Mexico's Motor Vehicle Code. *Elkins Welding*, 251 B.R. at *3. No evidence of a perfected security interest in Debtor's vehicles was presented to the Court.

| | | |
|---|---|---|
| | | $1MM. The Court, in its discretion as fact-finder, assigns a reasonable but conservative value of $50,000 to the archived survey database. |
| Customer Database | $30,000.00 | From Grant Report; corroborated by Randy Asselin's testimony regarding formula applied to value the phone number and name. |
| Inventory | $5,000.00 | From Grant Report and Marketing Package; also matches the figure on Exhibit 12 - Allocation of Purchase Price |
| Non-compete | $0.00 | The Debtor and Surv-Tek executed a Non-Compete Agreement at closing. The Court has found that Surv-Tek is no longer bound by its non-compete obligations under that agreement. Other than Exhibit 12, which allocated a value of $100,000 to the Non-Compete Agreement for tax purposes, and the Grant Report, which simply imported the $100,000 value from the allocation then adjusted its value to zero, no other evidence of the value of the Non-Compete Agreement was presented. |
| Goodwill | $0.00 | Included in value of Customer Database |
| **TOTAL COLLATERAL VALUE** | **$499,709.54** | |

The Court will enter a separate order consistent with this Memorandum Opinion.


ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: June 13, 2022

COPY TO:

Nephi Hardman
Attorney for Debtor
Nephi D. Hardman Attorney at Law, LLC
9400 Holly Ave NE Bldg 4
Albuquerque, NM 87122

Christopher M Gatton
Attorney for Surv-Tek, Inc.
Giddens, Gatton & Jacobus, P.C.
10400 Academy Rd., #350
Albuquerque, NM 87111

Patrick Malloy, III
Patrick J. Malloy, III, Trustee
401 S. Boston Ave, Ste 500
Tulsa, OK 74103

Jaime Pena
Office of the United States Trustee
PO Box 608
Albuquerque, NM 87103