UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:   S-Tek 1, LLC, a
New Mexico limited liability corporation,                    No. 20-12241-j11

Debtor.

## **MEMORANDUM OPINION**

This matter comes before the Court on Debtor's third plan of reorganization (the "Third Plan" – Doc. 420).[1] The Court held a hearing on plan confirmation on November 8 and 9, 2022. The Third Plan proposes to surrender all, or mostly all, of the collateral securing Surv-Tek, Inc.'s claim. However, Debtor has not shown how it can feasibly replace the collateral to be surrendered that Debtor would need to replace and continue its business operations. The Court will deny plan confirmation for failure to satisfy the feasibility requirements of § 1129(a)(11) and § 1191(c)(3), made applicable by § 1191(b) for confirmation of a non-consensual plan in a subchapter V chapter 11 case.[2]

PROCEDURAL HISTORY

Debtor filed this bankruptcy case under subchapter V of chapter 11 of the Bankruptcy Code on December 2, 2020. Debtor is a land surveying company. Debtor conducts surveys of real property that, among other things, define boundaries, divide property, and identify improvements, easements, and topographical features. Debtor was formed in late 2018 by its two principals, Randy Asselin and Christopher Castillo, in order to purchase a surveying business from Surv-Tek, Inc. ("Surv-Tek").

---

[1] References to "Doc. __" are to the docket in the bankruptcy case, Case No. 20-12241. References to "AP Doc. __" are to the docket in the Surv-Tek Litigation (defined below), Adv. Proc. No. 20-1074.
[2] Unless otherwise specified, references to "section __" or "§__" are to sections of the Bankruptcy Code, found at 11 U.S.C. § 101, *et seq.*

Case 20-12241-j11    Doc 525    Filed 02/06/23    Entered 02/06/23 13:50:20 Page 1 of 24

The Surv-Tek Litigation

At the time of its bankruptcy filing, Debtor was involved in unresolved state court litigation with Surv-Tek; STIF, LLC ("STIF"); Robbie Hugg; and Russ Hugg (collectively, the "Surv-Tek Parties"), which arose out of Debtor's purchase of the surveying business from Surv-Tek. Debtor removed the state court litigation to bankruptcy court following the filing of its chapter 11 case, which initiated Adversary Proceeding No. 20-1074 (the "Surv-Tek Litigation"). All parties participating in the bankruptcy case agreed that the Surv-Tek Litigation needed to be resolved before Debtor would be able to formulate a plan of reorganization. After a 9-day trial, the Court denied all claims by Debtor against the Surv-Tek Parties, awarded Surv-Tek $1,567,454.77 against Debtor, and awarded STIF $82,998.30 against Debtor (subject to a $5,800 security deposit setoff). *See* AP Docs. 132 & 133.

Filing the Plan of Reorganization

On July 25, 2022, Debtor filed its second plan of reorganization (the "Second Plan" – Doc. 399). As a result of a preliminary hearing on plan confirmation, Debtor filed the Third Plan to address certain relatively minor issues. The Court determined that the Third Plan did not need to be mailed to the entire mailing list in the case, since it did not change treatment of creditors generally and the changes were discrete. Instead, as the Court permitted, Debtor sent (1) a summary of the changes in the Third Plan together with (2) a notice that objections to the Second Plan would be deemed objections to the Third Plan and votes with respect to the Second Plan would be deemed votes with respect to the Third Plan.

Objections to Confirmation of the Plan

Surv-Tek, STIF, the U.S. Trustee (the "UST"), and the Subchapter V Trustee filed objections to the Third Plan. Among other things, Surv-Tek and STIF objected that the Third

Plan is not: (i) feasible under § 1129(a)(11), (ii) proposed in good faith as required by § 1129(a)(3),[3] and (iii) fair and equitable with respect to their claims as required by § 1191(b). Surv-Tek further objected that Option A for the treatment of Surv-Tek's Class 1 claim improperly attempts to manufacture inconsequential value in order to defeat Surv-Tek's election under § 1111(b) to have its entire claim treated as a secured claim. With respect to Options A and B, Surv-Tek also objected to the length of the period for surrender of the collateral securing Surv-Tek's claim (the "Collateral") that Debtor would surrender to Surv-Tek. Doc. 407.

Among other things, the UST objected that the Third Plan does not comply with the following confirmation requirements: § 1191(b) (that the plan does not discriminate unfairly and is fair and equitable with respect to non-consenting impaired creditors), § 1191(c)(2) (projected disposable income requirement), and § 1191(c)(3) (ability to make subchapter V plan payments). *See* Doc. 404.

The Subchapter V Trustee objected that the amount of attorney's fees incurred to litigate the dispute with the Surv-Tek Parties is antithetical to the purpose of subchapter V, since unpaid attorney's fees are sought in an amount over $200,000, and the Third Plan proposes only a nominal payment to non-priority, unsecured claimholders. The Subchapter V Trustee further objected that the Plan Projections (defined below) lacked a factual basis, were inconsistent with the history of the case, and failed to address the cost of replacing surrendered Collateral. Doc. 405.

<u>Motion for Declaratory Ruling on Inconsequential Value Under § 1111(b)</u>

On July 8, 2022, Debtor filed its *Motion for Declaratory Ruling That Certain Collateral Has Inconsequential Value Under § 1111(b)(1)(B)(i)* (the "Motion on Inconsequential Value" –

---

[3] Sections 1129(a)(3) and 1129(a)(11) are made applicable to this case by § 1191(b).

Doc. 387). In the Motion on Inconsequential Value, Debtor asked the Court for a declaratory ruling that its tradename, web domain, and phone number (the "Customer Database")—which are part of Surv-Tek's Collateral—have inconsequential value for purposes of § 1111(b)(1)(B)(i). Under § 1111(b), a class of secured claims may elect to have each claim in the class have its full allowed claim amount treated as secured. However, the § 1111(b) election is not available where the interest on account of such claims in property of the estate is of "inconsequential value." § 1111(b)(1)(B)(i). Surv-Tek filed an objection (Doc. 394) to the Motion on Inconsequential Value, and the Court held oral argument on the matter. *See* Doc. 395. The Court took the matter under advisement and indicated that it would decide the matter in conjunction with plan confirmation. *See id.*

FINDINGS OF FACT

The Court makes the following findings of fact.[4],[5]

<u>Summary of the Third Plan, Including Surrender of Collateral, and of Votes Cast</u>

The concept behind the Third Plan, in light of the Court having ruled in favor of the Surv-Tek Parties in the Surv-Tek Litigation, is for Debtor to surrender to Surv-Tek the Collateral securing its claim while retaining limited Collateral only if such retention is consistent with disqualifying Surv-Tek from making the election under § 1111(b). Surv-Tek would have 90-100 days to surrender Collateral to give it time to replace surrendered tangible assets, and it could use the proceeds of accounts receivable pledged to Surv-Tek during that same period. Debtor thereafter would collect receivables pledged to Surv-Tek and remit the collected proceeds to

---

[4] Any factual findings made in the Discussion section of this opinion are incorporated by reference.
[5] The Court took judicial notice of the docket and the documents on the docket in the main bankruptcy case (Case No. 20-12241) and the dockets and documents on each docket in all related adversary proceedings (Adv. Proc. Nos. 20-1074 & 22-1017).

Surv-Tek monthly. Debtor would pay all administrative claims and priority unsecured claims in full and would pay non-priority unsecured claims over a period of five years.

The Third Plan contains and treats unclassified claims and classifies and treats four classes of claims and interests, as follows.

The Third Plan treats as unclassified claims, to be paid in full, both (1) administrative claims in an estimated amount of $220,000 (of which $210,000 is payable to Debtor's counsel to the extent the Court approves the attorney's fees) and (2) pre-petition priority unsecured tax claims in an estimated amount of $80,973.01.

The Third Plan provides that the "Effective Date" of the plan is the 30th day after the date that an order confirming the Third Plan is entered, but if a stay of the confirmation order is in effect on that date, the Effective Date will be the first business day after that date on which no stay of the confirmation order is in effect, provided that the confirmation order has not been vacated. Third Plan, §§ 11.01(d) and 11.02. "Confirmation Date" is defined as the date the Bankruptcy Court enters a confirmation order confirming the Third Plan. Third Plan, § 11.01(a)

There are three classes of claims and one class of interests under the Third Plan. Class 1 consists of Surv-Tek's allowed secured claim. The Third Plan sets forth two options for the treatment of Surv-Tek's Class 1 secured claim, both of which contemplate Debtor surrendering to Surv-Tek all or substantially all of the Collateral. Options A and B are described in detail in Exhibit C to the Third Plan.

Under Option A, Debtor would surrender all of the Collateral to Surv-Tek except Debtor would retain the Customer Database (*i.e.*, its tradename, web domain, and phone number). Further, under Option A, Debtor would pay Surv-Tek $30,000 for the Customer Database, in installments over a period of approximately six years, with interest. Surv-Tek would have a

non-priority unsecured Class 2 deficiency claim in the amount of the difference between its total allowed claim and the sum of (i) the value of the surrendered Collateral and (ii) $30,000. Under Option B, Debtor would surrender all of the Collateral to Surv-Tek including the Customer Database. Debtor would proceed under Option A if the Court determines that the Customer Database is of "inconsequential value" thereby making Surv-Tek's § 1111(b) election ineffective pursuant to § 1111(b)(1)(B)(i) even if Debtor were to retain such collateral.

Under Option B, there are two sub-options. First, Debtor would surrender all of the Collateral to Surv-Tek in full satisfaction of its secured claim. Under this sub-option, Surv-Tek would not have a non-priority unsecured claim if the Court determined that surrender of all of the Collateral satisfied its entire claim in full in light of Surv-Tek having made the § 1111(b) election. Alternatively, if the Court were to determine that surrender of all of the Collateral would not effect a total satisfaction of Surv-Tek's claim, Surv-Tek would have an unsecured Class 2 deficiency claim. Debtor would surrender the Customer Database (*i.e.*, tradename, web domain, and phone number) within 90 days after the Confirmation Date.

Under either Option A or Option B, Debtor would make monthly adequate protection payments to Surv-Tek for its use of the Collateral prior to its surrender. Debtor would surrender the tangible Collateral to Debtor (machinery and equipment including surveying equipment; vehicles; all-terrain vehicles; computers and printers; office furniture; and inventory) within 90 days after the Confirmation Date. Debtor would surrender the archived survey database within 30 days after the Effective Date.

In addition, under either Option A or Option B, Debtor must surrender the Eligible

Receivables and cash portions of the Collateral[6] to Surv-Tek under the following protocol:

(a)  Debtor will make a list of Eligible Receivables existing as of the Confirmation Date and a list of Surrendered Receivables—"Surrendered Receivables" are Eligible Receivables existing as of close of business on the 90th day after the Confirmation Date.

(b)  Debtor will deposit all proceeds of Surrendered Receivables in a separate bank account and remit the balance in that bank account to Surv-Tek monthly (less the minimum balance necessary to avoid banking fees).

(c)  By the 100th day after the Confirmation Date, Debtor will remit to Surv-Tek an amount equal to the sum of:

(i)  the balance in Debtor's bank accounts that are part of Surv-Tek's Collateral, and
(ii)  the difference between the face amounts of the Eligible Receivables as of the Confirmation Date and the Surrendered Receivables as of close of business on the 90th day after the Confirmation Date (defined in the Third Plan as the "Surrendered Receivables Shortfall").

For its Class 1 claim, Surv-Tek voted to reject the Third Plan. *See* Tally of Ballots,

Doc. 490. Debtor asserts that Class 1 is not impaired under the Third Plan and therefore the

Class 1 claim is not entitled to vote. Surv-Tek asserts that Class 1 is impaired.

Class 2 consists of all allowed non-priority, non-insider, unsecured claims. Holders of

allowed non-priority, Class 2 unsecured claims would receive a total of $45,000 over five years,

which is the remainder of Debtor's projected disposable income after other creditors are paid.

If the Court approved the treatment of Surv-Tek's Class 1 claim under Option A, holders

of allowed non-priority, unsecured Class 2 claims would receive approximately 2.9% of the

amount of their allowed claims. On the other hand, if the Court approved the treatment of

---

[6] "Eligible Receivables" consist of:

i.  Receivables (x) for which Debtor has issued an invoice to the customer, and (y) for amounts due to be paid by the customer to Debtor for work Debtor has performed, excluding Salls Brothers Construction receivables; and

ii.  In the case of Customer Portal Receivables, (x) 95% of the amount of purchase orders issued by the customer to Debtor, (y) for which the customer has not disputed the quality of the work performed, and (z) is less than 60 days since the purchase order was submitted.

Surv-Tek's Class 1 claim under Option B, holders of allowed non-priority, unsecured Class 2 claims would receive either approximately 3.0% or 27.6% of their allowed claims depending on whether Surv-Tek is allowed an unsecured deficiency claim.

Class 2 voted to reject the Third Plan. Class 2 creditors voting to reject the Third Plan consist of Surv-Tek (if it holds an allowed non-priority unsecured deficiency claim); STIF; Guebert, Gentile, & Piazza, P.C. and Salls Brothers Construction, Inc.[7] Class 2 creditor the New Mexico Community Development Loan Fund voted to accept the Third Plan. Class 2 voted to reject the Third Plan because more than half in number did not vote to accept the plan. In fact, a majority of Class 2 claimants voted to reject the Third Plan.

Class 3 is the non-priority, unsecured claim of Ready Capital for a Paycheck Protection Program (PPP) loan. Class 3 is unimpaired under the Third Plan. No Class 3 ballots were cast.

Class 4 is the equity interest of Debtor's owners. Class 4 is unimpaired under the Third Plan, and no Class 4 ballots were cast.

Surv-Tek's § 1111(b) Election

Section 1111(b) elections typically are made in connection with a specific already-proposed plan. Debtor filed the Second Plan on July 25, 2022, further amended by the Third Plan filed on August 19, 2022. Surv-Tek elected to have its entire claim treated as a secured claim pursuant to § 1111(b) on June 21, 2022, before either plan was filed. However, Surv-Tek ratified its § 1111(b) election as applying to treatment of its secured claim under the Third Plan by its actions subsequent to the filing of the Second Plan and Third Plan. *See, e.g.*, Doc. 407.

---

[7] Debtor has since reached a settlement with Salls Brothers Construction, Inc.

Third-Party Plan Injunction

The Third Plan includes a third-party injunction for the benefit of Debtor's principals, Randy Asselin and Christopher Castillo. In its *Memorandum Opinion and Order Denying Motion to Enjoin Collection Efforts Against Debtor's Principals* (AP Doc. 160), the Court evaluated a request for a pre-confirmation injunction to "bridge" from the date of the injunction until plan confirmation, in light of the third-party injunction included in the Third Plan. The Court denied that request because it concluded that the third-party injunction in the Third Plan was impermissible. The Third Plan includes a provision that "[t]his third-party injunction is deemed severable if it renders the Plan unconfirmable." Third Plan, § 12.04. Because the Court has already determined that the third-party injunction is impermissible, the Court considers the third-party injunction severed from the Third Plan.

Loan Commitment from the Loan Fund

Debtor received a loan commitment from the New Mexico Community Development Loan Fund (the "Loan Fund") to loan Debtor up to $350,000.00 (the "Loan"). The loan commitment provides that Debtor may use Loan proceeds for recapitalization of Debtor following surrender of the Collateral or for settlement purposes with the Surv-Tek Parties. Debtor may borrow funds as a lump-sum loan or pursuant to a line of credit. Although Debtor may not be able to satisfy certain borrowing conditions set forth in the loan commitment, such as granting the Loan Fund security interests at a certain level of lien priority, Leroy Pacheco, the president and CEO of the Loan Fund, testified that the Loan Fund is willing to make the Loan to Debtor anyway.

<u>Replacement of Surv-Tek's Collateral</u>

Because it proposes to surrender all of the Collateral (or all of the Collateral except the Customer Database under Option A for treating Surv-Tek's Class 1 secured claim), Debtor must replace the Collateral in order to continue its operations. The Collateral encompasses all of Debtor's machinery and equipment including surveying equipment, and all vehicles, all-terrain vehicles, computers and printers, office furniture, and inventory, and the archived survey database, as well as substantially all of Debtor's accounts receivable and operating capital. With the exception of one truck and a passenger car, as described below, Debtor did not identify any specific items of the Collateral it would not need to replace for it to continue its operations; nor did Debtor demonstrate how it could continue to perform its work for its customers without replacing any specific items of Collateral. Mr. Asselin testified that Debtor might utilize the services of runners instead of replacing the passenger vehicle, that Debtor might not replace one of the four trucks, and it would not be necessary for Debtor to replace the two all-terrain vehicles right away because Debtor uses them infrequently. Mr. Asselin did not provide further details regarding how the purchase of all-terrain vehicles, or any other Collateral, would be phased in over a longer timeframe.

<u>Cost to Replace Surv-Tek's Collateral</u>[8]

The Eligible Receives and cash portions of the Collateral total $181,764.54. As outlined below in the section on Plan Projections, because Debtor has operated on an essentially break-even basis, it needs to replace the Eligible Receivables and cash portions of the Collateral in order to have sufficient cash to pay its expenses.

---

[8] The Court entered an opinion regarding valuation of the Collateral (Doc. 370), after a valuation hearing held February 22-23, 2022. Because updated information was provided at the confirmation hearing and no party asked the Court to rely on the valuation opinion, the Court will disregard it.

With respect to surveying equipment, it would cost Debtor $139,055.96 to replace surveying equipment to be surrendered to Surv-Tek under the Third Plan as set forth in a quote from Frontier Precision. There was no evidence that the estimate encompassed all the surveying equipment that Debtor would need to replace.

Debtor has four trucks, one passenger car, two all-terrain vehicles, and one trailer that are Collateral for Surv-Tek. *See* Doc. 370 at p. 9. Mr. Asselin's testimony confirmed that Debtor still has the five vehicles. Mr. Asselin testified that it would cost approximately $150,000 to purchase three new replacement trucks and that Debtor would explore the possibility of buying used vehicles. There was no evidence of the cost to buy replacement used vehicles. In addition, there was no evidence of what it would cost Debtor to replace the fourth truck or passenger car, although replacement of those two vehicles may not be necessary. The Court finds that it would cost Debtor approximately $150,000 to purchase three new replacement trucks.

Debtor provided an estimate to replace computer equipment in the amount of $33,719.27. Debtor provided quotes to replace computer equipment in amounts of $27,575.38 for various Dell computer equipment, $4,995.00 for HP large-format printer, $399.99 for Brother color printer, $599.90 for Brother black-and-white printers (five printers at $119.98 each), and $149.00 for UniFi wireless access point. There was no evidence that the estimates encompassed all the computer equipment that Debtor would need to replace.

Debtor would also surrender inventory consisting of surveying field supplies. *See* Third Plan, Exhibit C. Mr. Asselin testified that Debtor would pass the cost of purchasing inventory on to Debtor's customers. However, there was no evidence that Debtor would be able to pass on the cost before purchasing replacement inventory. If Debtor sends invoices to customers for reimbursement of actual costs for inventory, Debtor would need to be able to front the cost of the

inventory. Although there was no evidence of the cost to replace inventory, presumably it would not be a significant cost.

The total estimated cost for Debtor to replace the Collateral it needs to replace is $505,539.77 (consisting of $323,775 to replace the tangible Collateral and $181,764.54 to replace the intangible Collateral) plus the cost to replace the two all-terrain vehicles, inventory, and any other Collateral for which no replacement cost information is in evidence.

<u>Profitability During the Pendency of the Bankruptcy Case</u>

This bankruptcy case was pending for about 23 months prior to the hearing on confirmation of the Third Plan. During that time, Debtor utilized the Collateral pledged to Surv-Tek in its business operations, collected its accounts receivable and used the proceeds in its operations. The Court took judicial notice of the documents on the docket in the Debtor's bankruptcy case, which included monthly operating reports. Debtor's monthly operating report for the month of December 2020,[9] which was the first monthly operating report filed in this bankruptcy case, reflects,

|                                        |            |
|----------------------------------------|------------|
| Cash on hand<br>at month end           | 32,224.14  |
| Post-petition payables                 | 16,791.12  |
| Receivables                            | 185,006.02 |
| Professional fees<br>paid post-petition| 00.00      |

The post-petition payables are all or substantially all for unpaid professional fees. Debtor's monthly operating report for the month of September 2022, which was the last monthly operating report filed prior to the hearing on confirmation of the Third Plan and which was admitted into evidence as UST Exhibit 5, reflects,

---

[9] See the Amended Operating Report for December 2020. Doc. 90.

| | |
|---|---|
| Cash on hand | 38,517,04 |
|   at month end | |
| Post-petition payables | 243,434.43 |
| Receivables | 107,838.23 |
| Professional fees | 122,990.72 |
|   paid post-petition | |

The monthly operating reports from December 2020 through September 2022 show that, while using the Eligible Receivables and cash portions of the Collateral as part of its cash flow, Debtor operated on close to a break-even basis.

Financial Projections

Debtor's financial projections to support plan feasibility (the "Plan Projections") are attached to the Third Plan, with separate projections for Option A (which includes payment of $30,000 plus interest to Surv-Tek, monthly over six years, for retention of the Customer Database) and Option B. Third Plan, Exhibits A-1 & A-2. The Plan Projections estimate cash flow stated on an annual basis for a 5-year period. There are no monthly projections or other more granular projections than annual projections, even for the first six months after the Confirmation Date.[10]

The Plan Projections do not include either borrowings from the Loan Fund or the expense Debtor would incur to replace surrendered Collateral. In addition, the Plan Projections do not reflect Debtor's payment of cash and proceeds of Eligible Receivables to Surv-Tek in the amount of $181,764.54[11] but presumably the estimated revenue does not include Eligible Receivables proceeds to be paid to Surv-Tek. Mr. Asselin testified that Debtor possibly could obtain vendor financing for some of the items of Collateral that Debtor would replace. However, there was no

---

[10] The plan provides financial projections from December 2022 through November 2027. Because December is the only month in the projection for 2022, it technically provides a projection for a single month.

[11] The "Payments required under Plan" section of the Plan Projections does not include payment of the $181,764.54.

evidence of the availability of vendor financing, which items could be financed by vendors, or financing terms. The Plan Projections do not include any vendor financing. Mr. Asselin testified that Debtor could phase-in the purchase of some replacement assets, but the evidence did not establish which assets would be phased in or how the phase-in of assets would result in positive cash flow in 2023.

For calendar years 2023-2024, the Plan Projections for Option A (excluding draws on the Loan and expenses to replace the Collateral) show,

| 2023 | | 2024 | |
|---|---|---|---|
| Beginning cash | 23,920 | Beginning cash | 8,120 |
| Cash Receipts | 1,185,000 | Cash Receipts | 1,458,000 |
| Total cash | 1,208,920 | Total cash | 1,466,120 |
| Non-plan expenses | 1,099,300 | Non-plan expenses | 1,357,500 |
| Plan expenses | 101,500 | Plan expenses | 101,500 |
| Total expenses | 1,200,800 | Total expenses | 1,459,000 |
| Net income | -15,800 | Net income | -1,000 |

Third Plan, Exhibit A-1.[12]

Theoretically, Debtor's Plan Projections show that Debtor can feasibly maintain its operations and make its plan payments under the Third Plan in 2023 and 2024, despite the overall operating losses, due to reliance on the beginning cash balance and an increase in revenue and profitability as a result of hiring a full-time licensed surveyor. However, there are multiple problems with the Plan Projections.

First, Debtor's cost to replace the surrendered tangible Collateral that Debtor will need to replace plus the cost of surrendering cash to Surv-Tek likely will require use of the entire proceeds of the Loan to be made by the Loan Fund, if not more. The Plan Projections do not show the expense of purchasing assets to replace the surrendered tangible Collateral that Debtor

---

[12] The Plan Projections for Option B are substantially similar. For 2023, they show net income of -$10,400 on total revenue of $1,185,000. For 2024, they show net income of -$1,000 on total revenue of $1,458,000. Third Plan, Exhibit A-2.

will need to replace at an estimated cost of $322,775 plus the cost to replace two all-terrain vehicles, inventory, and any other tangible Collateral for which no replacement cost estimates were provided. Further, Debtor will need to make a payment to Surv-Tek for the amount of cash on deposit as of the Confirmation Date plus the Surrendered Receivables Shortfall—essentially, Debtor will need to pay $181,764.54 minus the amount of the Surrendered Receivables as of the date that is 90 days after the Confirmation Date (the "Cash Payment"). The Plan Projections do not include any estimate of the amount of the Cash Payment and there is no other evidence of such amount.

Second, it is not entirely clear whether the Plan Projections account for loss of cash receipts as a result of Debtor not being able to use the proceeds of the Surrendered Receivables starting 90 days after the Confirmation Date, since amounts collected on those receivables beginning on the 90th day after plan confirmation must be turned over to Surv-Tek. But even if the Plan Projections account for loss of cash receipts as a result of Debtor not being able to use the proceeds of the Surrendered Receivables starting 90 days after the Confirmation Date, the evidence does not show that Debtor will be able to pay its projected expenses necessary for it to continue to operate in the second and third quarters of 2023 without use of those proceeds.[13] There was no evidence regarding how quickly Debtor would be able to generate new receivables and collect on such new receivables to replace the lost cash flow from Debtor turning over all proceeds from collection of the Surrendered Receivables. Based on the A/R Aging Summary attached to the September 2022 monthly operating report, roughly half of Debtor's accounts

_____

[13] Debtor did not provide an estimate of the amount of Surrendered Receivables and Surrendered Receivables Shortfall as of the 90th day after the Confirmation Date. Debtor's cash collateral report filed September 21, 2022 (Doc. 439) reflects Eligible Receivables of $151,875.49 and cash pledged to Surv-Tek of $39,555.70 as of September 16, 2022, for a total of $191,431.19. There is no evidence that establishes that the amount of Surrendered Receivables and Surrendered Receivables Shortfall (if any) is likely to be less than $151,875.49.

receivable were in the "older than 60 days" category. *See* Doc. 477 at pp. 5-12. The only evidence regarding short-term recapitalization to purchase assets to replace surrendered tangible Collateral, and to obtain cash for operations due to the turnover of cash to Surv-Tek and loss of use of proceeds of all Surrendered Receivables beginning 90 days after the Confirmation Date, is from the Loan proceeds. However, the amount of Loan proceeds appears to fall well short of the amount needed for Debtor to buy replacement assets and pay its expenses that are necessary for it to continue to operate in the second and third quarters of 2023 without the benefit of the proceeds of the Surrendered Receivables and the Cash Payment portions of the Collateral. The are no monthly plan projections or other evidence that shows otherwise.

Third, Debtor projects increased revenue from hiring a full-time licensed surveyor. Debtor currently utilizes a part-time independent contractor to stamp surveys but plans to hire a headhunter in 2023 to recruit a full-time licensed surveyor. Beyond this general proposition that revenue will increase as a result of hiring a full-time licensed surveyor, no evidence was provided regarding the details of how the licensed surveyor will be able to increase Debtor's revenue with existing staff and equipment (as replaced). Further, in the absence of monthly Plan Projections in 2023, there was no evidence regarding when in 2023 Debtor expects the increased revenue to begin or how it is projected to ramp up given the need to replace lost cash flow when Debtor could no longer use the proceeds of the Surrendered Receivables and must surrender the Cash Payment.

Fourth, the Plan Projections include a beginning cash balance in January 2023 of approximately $24,000. Even though the annual projections in the Plan Projections show that by the end of calendar year 2023 Debtor will have generated enough revenue to pay its expenses for the year, the Plan Projections show an operating loss for 2023, and that Debtor will rely on the

beginning cash balance in order to pay its expenses in 2023. However, the projected 2023 beginning cash balance was calculated when the Plan Projections were created in August 2022 and were not updated prior to the confirmation hearing in November 2022.[14]

Fifth, Mr. Asselin testified that Debtor has reduced expenses by eliminating overtime and unnecessary staff members. However, despite the personnel changes, Debtor's monthly operating reports do not show reduced expenses nor increased profit. *See* UST Exhibits 2-5. Further, Mr. Asselin testified that training on new surveying equipment would take place on the weekends so that employees could continue working during the week, which presumably would generate overtime expense in the short term while such training took place. It is not clear that the Plan Projections include this additional expense. It is also not clear whether the learning curve to use the new surveying equipment would disrupt operations.

Without monthly cash flow projections, and credible supporting testimony and other evidence, the Court is unable to determine whether Debtor would be able to maintain its operations in the second and third quarters of 2023 if the Third Plan is confirmed. Debtor has not shown that the Third Plan has a reasonable assurance of success to avoid liquidation or the need for further financial reorganization.

<u>Summary</u>

Below is a chart showing each category of the Collateral that Debtor would need to surrender if the Third Plan is confirmed and the estimated replacement cost. The chart also includes related findings.

---

[14] The September monthly operating report reflects a balance of $38,517.04 of "Cash on hand at the end of the month." Doc. 477. The September 2022 Cash Collateral Report shows the "cash on deposit" portion of Cash Collateral as the same amount. Doc. 476. There is a conflicting fact in the report that an additional $30,000 excluded from cash collateral is maintained in a separate account. This at least raises a question as to Debtor's beginning cash balance, which is a critical part of Debtor having sufficient funds to pay its expenses in 2023.

| Collateral | Estimate/Quote of Cost to Replace | Related Findings |
|---|---|---|
| Eligible Receivables or proceeds thereof and cash on deposit | $181,764.54 | Debtor has not proven that it can maintain positive cash flow in the second and third quarters of 2023 without the benefit of the Eligible Receivables and cash portions of the Collateral to fund its ongoing operations and remain in business while at the same time replacing the surrendered tangible assets it would need to replace. Mr. Asselin testified that Debtor could phase in the purchase of some of the replacement assets and might be able to obtain some vendor financing. But there was no evidence of what replacement assets could be phased in or of the cost of those assets; or whether vendor financing would actually be available or for what assets, in what amounts, and on what terms. In addition, Debtor did not prove it would have sufficient cash flow in 2023 to continue to operate after surrendering the Collateral even with some vendor financing or a phased-in purchase of some of the replacement assets. |
| Three Vehicles | $150,000 | Mr. Asselin testified that Debtor could purchase three new replacement trucks for $150,000. He also testified Debtor might instead buy used trucks. There was no evidence regarding the cost of buying used trucks. |
| Two Additional Vehicles | No evidence of the replacement cost | Mr. Asselin testified that Debtor (1) would not need to replace the fourth truck but did not explain why and (2) could use a "runner" whom Debtor would pay "mileage" instead of replacing the passenger car. Mr. Asselin testified that alternatively Debtor could buy a used car. There was no evidence regarding the cost of using a runner or the cost of buying a used car. |
| Two All-Terrain Vehicles | No evidence | Mr. Asselin testified that the two all-terrain vehicles would not need to be replaced right away. There was no evidence presented at the hearing as to the replacement cost of the all-terrain vehicles. |

| | | |
|---|---|---|
| Trailer | No evidence | There was no evidence presented during the hearing regarding whether Debtor would need to replace the trailer, and if so, how much it would cost. |
| Survey Equipment | $139,055.96 | The Court assumes that the quote in evidence of the cost to replace the survey equipment would cover all survey equipment that Debtor would need to replace. If there is any additional survey equipment that Debtor would need to replace, there is no evidence of the replacement cost. |
| Computer Equipment | $33,719.27 | The Court assumes that the quote in evidence of the cost to replace the computer equipment would cover all computer equipment that Debtor would need to replace. If there is any additional computer equipment that Debtor would need to replace, there is no evidence of the replacement cost. |
| Inventory | No evidence | There is no evidence presented regarding the cost to replace Debtor's inventory. |
| Total: | $504,539.77 | This total replacement cost estimate does not include replacement of the fourth truck, the car, the all-terrain vehicles, the inventory, and any other Collateral for which no replacement cost estimate was provided. |
| Shortfall: | $154,539.77 | This shortfall is a minimum, and could be higher based on the unknown variables. |

DISCUSSION

A.  Legal Standard

To be confirmable, a subchapter V plan must comply with all applicable provisions of §§ 1129 and 1191. *In re Lost Cajun Enters., LLC*, 634 B.R. 1063, 1072 (Bankr. D. Colo. 2021). To confirm a plan, the proponent of the plan must demonstrate compliance with these requirements by a preponderance of the evidence. *Id. See also In re Paige*, 685 F.3d 1160, 1177

(10th Cir. 2012) (addressing the chapter 11 plan proponent's burden of proof); *In re Vaughan Co., Realtors*, 543 B.R. 325, 334 (Bankr. D.N.M. 2015) (same).

Section 1191(a) provides that the court shall confirm a plan under subchapter V only if all requirements of § 1129(a) other than those in subparagraph (15) are met. Section 1191(b) creates a special subchapter V cramdown exception to the requirement that all requirements of § 1129(a) are satisfied if all § 1129(a) requirements are satisfied other than those set forth in subparagraphs (8), (10) and (15) and the other requirements of § 1191(b) are met.

In a corporate chapter 11 case, the § 1191(b) subchapter V cramdown exception applies if there is an impaired class of claim or interests that has voted to reject the plan (*see* § 1129(a)(8)) and/or if there is at least one class of impaired claims and no class of impaired claims has voted to accept the plan excluding the votes of insiders (*see* § 1129(a)(10)). By its terms, § 1129(a)(15) applies only when the debtor is an individual. A plan confirmed under § 1191(a) is known as a consensual plan, because no class of impaired claims voted to reject the plan. A plan confirmed under § 1191(b) is known as a nonconsensual plan.

B.  Debtor has not satisfied the feasibility requirement set forth in § 1129(a)(11)

In all subchapter V cases, to confirm a plan the plan proponent must prove that the requirement set forth in § 1129(a)(11), commonly known as a feasibility requirement, has been satisfied. Section 1129(a)(11) provides,

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

The Third Plan does not propose liquidation or further financial reorganization of the Debtor. The Tenth Circuit has explained that under § 1129(a)(11), "[p]ut differently, a feasible plan is

not a guarantee of success but rather offers a reasonable assurance of success." *In re Gentry*, 807 F.3d 1222, 1225 (10th Cir. 2015).

In this case, the Third Plan proposes that Debtor will surrender all or substantially all of the Collateral—which consists of all or substantially all of Debtor's tangible and intangible assets, including cash, Eligible Receivables or the proceeds thereof, machinery and equipment including surveying equipment, computer equipment, four trucks, a trailer, inventory, two all-terrain vehicles, one passenger car, and the archived survey database.[15] To reorganize and continue operating its business, Debtor must replace the surrendered tangible assets, with the possible exception of one truck and the passenger car, and must be able to cash flow without the benefit of the proceeds of the Eligible Receivables and Cash Payment while at the same time buying replacement assets. It would cost Debtor more than $504,500 to replace the surrendered assets it would need to replace (including cash and the proceeds of receivables to be turned over the Surv-Tek). The Loan commitment is only $350,000. The evidence does not establish that Debtor can rely on operating profits or any other source of income to make up the difference and continue to operate in the second and third quarters of 2023. Mr. Asselin testified that replacement of certain items of the Collateral could be phased in, but no further details were provided regarding which items of Collateral, the timing of delayed replacement, and the reasoning behind it. Mr. Asselin testified that vendor financing for some assets might be available but gave no details.

Therefore, Debtor failed to show that the Third Plan has a reasonable assurance of success to avoid liquidation or the need for further financial reorganization.

---

[15] In addition, under Option B of the Third Plan's treatment of Surv-Tek's Class 2 claim, Debtor would surrender the Customer Database (*i.e.*, its tradename, phone number, and website).

C.  Debtor has not satisfied the fair and equitable requirement in § 1191(b)

Among the cramdown requirements in subchapter V, the plan must be "fair and equitable" with respect to each class of claims that is impaired under, and has not accepted, the plan. § 1191(b). Debtor and Surv-Tek dispute whether Surv-Tek's secured claim (Class 1) is impaired. Due to the delay in the surrender of the tangible Collateral (up to 90 days after the date of confirmation of the Third Plan) and intangible Collateral (more than 100 days after the Confirmation Date), the Court determines that Class 1 is impaired. It is undisputed that Class 2 (non-priority unsecured claims) is impaired. Both Class 1 and Class 2 voted to reject the Third Plan.

1. *Fair and Equitable Requirement with Respect to Class 2 – § 1191(c)(3) Feasibility*

Among other things, the requirement that the Third Plan be fair and equitable with respect to Class 2 includes the requirement that:

> (A) The debtor will be able to make all payments under the plan; or
> (B) (i) there is a reasonable likelihood that the debtor will be able to make all payments under the plan; and
> (ii) the plan provides appropriate remedies, which may include the liquidation of nonexempt assets, to protect the holders of claims or interests in the event that the payments are not made.

§ 1191(c)(3).

With respect to Class 2, Debtor has failed to meet this requirement. For the same reasons that the Court found that Debtor has not satisfied the requirement of § 1129(a)(11) that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan", Debtor has also failed to show that it will

be able to make its plan payments or that there is a reasonable likelihood that it will be able to make its plan payments.

    2.   *Fair and Equitable Requirement with Respect to Class 1 - § 1191(c)(1) Standard for Secured Claims*

    With respect to Class 1, which consists entirely of Surv-Tek's secured claim, the requirement that the Third Plan be fair and equitable includes the requirements of § 1129(b)(2)(A). *See* § 1191(c)(1). Section 1129(b)(2)(A) provides three options for treatment of secured claims: (1) retention of the liens securing such claims, plus deferred cash payments totaling at the allowed amount of the claim, (2) sale of the property subject to liens securing the property, with such liens to attach to the proceeds, or (3) realization of the "indubitable equivalent" of such claims. The Third Plan does not propose payment of Surv-Tek's secured claim, nor sale of the Collateral; thus, the question is whether Surv-Tek would realize the indubitable equivalent of its secured claim under the Third Plan.

    Because confirmation of the Third Plan is being denied, based on Debtor's failure to establish feasibility under § 1129(a)(11) and § 1191(c)(3), the Court need not reach the question of whether the Third Plan meets the fair and equitable requirement of § 1191(b), as elucidated by § 1191(c)(1) and § 1129(b)(2)(A), with respect to Class 1.

*[See next page]*

D.  Other Objections and the Motion for Declaratory Ruling on Inconsequential Value

Because plan confirmation is being denied under §§ 1129(a)(11) and 1191(c)(3), made applicable by § 1191(b), the Court need not address the other objections to confirmation of the Third Plan. Further, because plan confirmation is being denied based on Debtor's failure to satisfy feasibility requirements, the Motion for Declaratory Ruling on Inconsequential Value is moot.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: February 6, 2023

COPY TO:

Counsel for Debtor
Nephi Hardman
Nephi D. Hardman Attorney at Law, LLC
9400 Holly Ave. NE, Bldg. 4
Albuquerque, NM 87122

SubV Trustee
Patrick Malloy, III
401 S. Boston Ave, Ste 500
Tulsa, OK 74103

Office of the U.S. Trustee
Jaime A. Pena
P.O. Box 608
Albuquerque, NM 87103-0608

Counsel for Creditors Surv-Tek, Inc. & STIF, LLC
Christopher M. Gatton
Giddens & Gatton Law, P.C.
10400 Academy NE, Suite 350
Albuquerque, NM 87111