UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:   S-Tek 1, LLC, a                                                    No. 20-12241-j11
New Mexico limited liability company,

Debtor.

## **<u>MEMORANDUM OPINION</u>**

Following a two-day joint hearing on confirmation of Debtor's third plan of

reorganization (the "Third Plan" – Doc. 420)[1] and on the motion to convert or dismiss ("Motion

to Convert or Dismiss" – Doc. 406) filed by Surv-Tek, Inc. ("Surv-Tek") and STIF, LLC

("STIF" and together, the "Surv-Tek Parties"), the Court denied confirmation of the Third Plan

and set a status conference on the Motion to Convert or Dismiss.[2] Two days before the scheduled

status conference on the Motion to Convert or Dismiss, Debtor filed a fourth plan of

reorganization (the "Fourth Plan" – Doc. 533) and, on the day before the status conference,

Debtor filed a motion (Docs. 534 & 535) asking the Court to (i) set voting deadlines and

confirmation procedures for the Fourth Plan ("Request to Establish Confirmation Procedures")

and (ii) in the alternative, to establish a procedure for a structured dismissal that would include a

sale of assets free and clear of liens under 11 U.S.C. § 363(f)[3] ("Request for Structured

Dismissal"). For the reasons explained below, the Court will deny Debtor's Request to Establish

Confirmation Procedures and its alternative Request for Structured Dismissal and will convert

Debtor's chapter 11 case to a case under chapter 7.

---

[1] References to "Doc. __" are to the docket in the bankruptcy case, Case No. 20-12241-j11. References to
"AP Doc. __" are to the docket in the Surv-Tek AP (defined below), Adv. Proc. No. 20-1074-j.
[2] *See* Docs. 525, 526 & 530.
[3] Unless otherwise specified, references to "section __" or "§__" are to title 11 of the United States Code.

Bankruptcy Filing and Surv-Tek Litigation

Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code on December 2, 2020 and elected treatment under subchapter V.[6] Debtor's bankruptcy filing was precipitated by litigation between Debtor and the Surv-Tek Parties (and their respective principals) in state court, arising out of Debtor's purchase of a surveying business from Surv-Tek. The purchase price was $1.8 million, with a down payment of $250,000, and the remaining $1.55 million was seller-financed.[7] Shortly after the deal closed in December 2018, the relationship among the parties soured, and without a successful transition process, the business began to struggle.

Debtor filed a complaint initiating litigation with the Surv-Tek Parties, alleging fraud and breach of contract during the sale process and numerous other claims. The Surv-Tek Parties asserted counterclaims based on Debtor's failure to make payments under the purchase agreement, among other things. Before Debtor filed its subchapter V case, the state court had entered an order—based on limited evidence—that would give effect to a non-compete provision requiring Debtor to cease its operations if Debtor did not bring the indebtedness owed to

---

[4] Any factual findings made in the Discussion section of this opinion are incorporated by reference.

[5] The Court takes judicial notice of the docket and claims register, and the documents thereon, in the main bankruptcy case (Case No. 20-12241-j11) and the dockets and documents on each docket in all related adversary proceedings (Adv. Proc. Nos. 20-1074-j & 22-1017-j). *See* Fed. R. Evid. 201(b)(2) & (c); *St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may *sua sponte* take judicial notice of its own docket), *abrogated on other grounds by McGregor v. Gibson*, 248 F.3d 946 (10th Cir. 2001); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) ("The bankruptcy court appropriately took judicial notice of its own docket[.]"). The Court also relies on facts it found after a trial on the merits in the Surv-Tek AP (defined below), Adv. Proc. No. 20-1074. *See* AP Doc. 132.

[6] *See* Doc. 1.

[7] *See* AP Doc. 132 at p. 32.

Surv-Tek current by a fixed deadline.[8] Debtor did not have the financial ability to bring the indebtedness current. By filing the bankruptcy case, Debtor received the benefit of the automatic stay, which stayed the enforceability of the state court's order and allowed Debtor to continue to operate its business.[9]

Debtor removed the state court action to this Court, initiating Adversary Proceeding No. 20-1074-j (the "Surv-Tek AP"). Debtor asserted claims in the Surv-Tek AP, which, if successful, would have resulted in eliminating the Surv-Tek Parties' claims and generating substantial money for the estate. Instead, after a 9-day trial, the Court issued its 127-page opinion in the Surv-Tek AP on June 13, 2022, denying Debtor's claims and fixing the amount of the Surv-Tek Parties' claims.[10] The Court ruled that Debtor owed Surv-Tek over $1.5 million and owed STIF over $80,000.[11]

The Court also determined that Surv-Tek has a perfected security interest in virtually all of Debtor's assets, including accounts receivable (the "Collateral").[12] The Court specifically analyzed whether Surv-Tek's security interest extends to after-acquired accounts receivable and other after-acquired property, and held that it does.[13]

<u>Filing the Plan and Pre-Confirmation Modifications Through the Third Plan</u>

On March 2, 2021, the ninetieth day after the order for relief, Debtor filed Debtor's Plan of Reorganization (the "First Plan" – Doc. 96), and on October 26, 2021, Debtor filed a

---

[8] *See* AP Doc. 13-127. AP Doc. 13 attaches documents filed in the underlying state court action, which was removed to this Court initiating the Surv-Tek AP.

[9] *See* AP Doc. 17.

[10] *See* AP Docs. 132 & 133.

[11] *Id*.

[12] *See* AP Doc. 132 at pp. 33-35. However, the Court made no finding regarding whether Surv-Tek perfected its lien in Debtor's motor vehicles.

[13] *See* Doc. 299 at pp. 5-6; AP Doc. 132 at p. 7.

-3-

modification to the First Plan (the "Modification" – Doc. 257). However, because the outcome of the Surv-Tek AP would establish the amount of the Surv-Tek Parties' claims, which were in substantial dispute, the Surv-Tek AP required resolution before Debtor could move forward with confirmation. Further, after the trial in the Surv-Tek AP, the Court held a two-day hearing on valuation of Surv-Tek's Collateral, and entered its order valuing the Collateral.[14] Because resolution of the Surv-Tek AP and valuation of Surv-Tek's Collateral was key to the formulation of a plan, this subchapter V case was atypical of a "normal" subchapter V case that has greater expediency and cost efficiencies.

After resolution of the Surv-Tek AP and the motion to value Surv-Tek's Collateral, Debtor filed what it styled its "second plan" (the "Second Plan" – Doc. 399), and, after the Surv-Tek Parties filed their Motion to Convert or Dismiss, Debtor filed the Third Plan. While the Second Plan and Third Plan were not labeled as such, both were "amended" versions of the First Plan rather than entirely new plans of reorganization—although the Second Plan necessarily contained material changes from the First Plan based on the Court's ruling in the Surv-Tek AP.

The Court held a joint hearing on confirmation of the Third Plan and on the Motion to Convert or Dismiss on November 8-9, 2022 (the "Joint Final Hearing"). The Court denied confirmation of the Third Plan on February 6, 2023[15] based on Debtor's failure to satisfy the feasibility requirements of § 1129(a)(11) and § 1191(c)(3), made applicable by § 1191(b) for confirmation of a non-consensual plan in a subchapter V chapter 11 case.

The Third Plan proposed to surrender and replace Surv-Tek's Collateral (*i.e.*, virtually all of Debtor's assets, including cash and accounts receivable) using loan proceeds from the New

---

[14] *See* Docs. 370 & 372.
[15] Docs. 525 & 526.

Mexico Community Development Loan Fund (the "Loan Fund"). However, the financial projections submitted in support of the Third Plan did not include the loan proceeds nor the projected replacement costs for Debtor's assets.[16] In analyzing the financial projections, replacement costs for Debtor's surveying equipment and other tangible assets, and surrender of cash and accounts receivable, the Court determined that Debtor had a shortfall in exit financing of at least $150,000.[17] The Court further determined that since the financial projections were done on an annual basis, they were insufficient to show that Debtor would be able to maintain positive cash flow during the first six months under the Third Plan, which encompassed the surrender and replacement of the Collateral.[18] In concluding that Debtor failed to establish that its Third Plan was feasible, the Court noted additional concerns with Debtor's financial projections supporting its Third Plan. The Court found it unnecessary to address other objections to plan confirmation because Debtor had not shown the Third Plan was feasible.[19]

The Fourth Plan

After denying confirmation of the Third Plan, rather than immediately ruling on the Motion to Convert or Dismiss, the Court set a status conference to discuss with the parties whether conversion or dismissal was more appropriate. Two days before the status conference, Debtor filed the Fourth Plan. The Fourth Plan is substantially the same as the Third Plan, except it includes financial projections on a monthly basis for the first eight months after plan confirmation and proposes to purchase replacement vehicles through vendor financing in the amount of $146,600, attempting to address the Third Plan's shortfall in exit financing.[20]

---

[16] *See* Doc. 525.
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *See* Doc. 533 at p. 15 & Ex. A-1.

The Fourth Plan, like the Third Plan, contains alternative treatment of Surv-Tek's claim, with Option A providing for the surrender of all Collateral to Surv-Tek, except for the tradename, web domain and phone number; and Option B providing for a surrender of all of the Collateral to Surv-Tek, including the tradename, web domain and phone number.[21] The Fourth Plan, also like the Third Plan, provides for payment of priority taxes, professional fees, and other administrative expenses, and provides for payment of $45,000 over five years from Debtor's projected disposable income to the holders of non-insider allowed non-priority unsecured claims.[22] Debtor proposes to fund the Fourth Plan with future income from the reorganized Debtor's business operations and a line of credit of up to $350,000 from the Loan Fund,[23] which is also what Debtor proposed in the Third Plan.[24]

Unlike the Third Plan, which included annual projections,[25] the Fourth Plan includes monthly surrender and recapitalization stage projections.[26] In addition, the Fourth Plan contemplates Debtor obtaining vendor financing to purchase replacements for the vehicles surrendered to Surv-Tek. The evidence Debtor offered in support of confirmation of the Third Plan did not establish that Debtor would be able to obtain vendor financing to purchase replacement vehicles, which could free up funds available under the line of credit with the Loan Fund to recapitalize Debtor's business operations.

---

[21] Compare Doc. 420 with Doc. 533.

[22] *Id.*

[23] *See* Doc. 533 at ¶¶ 10.02 and 10.03.

[24] *See* Doc. 420 at ¶¶ 10.02 and 10.03

[25] *See* Doc. 420 at Exs. A-1 & A-2

[26] *See* Doc. 533 at Ex. A-1.

-6-

<u>Debtor's Alternative Request for Structured Dismissal</u>

As an alternative to its Request to Establish Confirmation Procedures for the Fourth Plan, Debtor made its Request for Structured Dismissal in the event the Court did not allow Debtor to proceed with the Fourth Plan. The Request for Structured Dismissal makes a proposal similar to the terms of the Fourth Plan, except without many of the procedural safeguards of the chapter 11 plan process. The Request for Structured Dismissal proposes that Debtor will sell the Collateral through a § 363(f) sale, obtain financing from vendors and the Loan Fund, have thirty (30) days to redeem any or all of the Collateral, and continue to operate its business.[27] Details regarding the proposed structured dismissal are set forth in Part D of the Discussion section.

<u>Debtor's Unpaid Chapter 11 Administrative Expenses</u>

At this time, Debtor's outstanding chapter 11 administrative expenses are over $280,000—although this finding does not indicate allowance nor approval of any of the component amounts as administrative expenses, and any such allowance and approval would have to be sought separately. Per Debtor's Monthly Operating Report for January 2023,[28] the unpaid attorney's fees and costs of Nephi D. Hardman Attorney at Law, LLC are $236,147.67 and other unpaid professional fees total $8,168.72.[29] This is comprised of $4,022.22 owed to FPM & Associates, Inc. and $4,146.50 owed to Arrowfish Consulting.[30] Further, the Internal Revenue Service has claimed unpaid post-petition taxes in the amount of $37,541.08.[31] Finally, there is an unknown amount of Subchapter V Trustee's fees owed.

---

[27] *See* Doc. 534.
[28] Doc. 539.
[29] *Id.* at Ex. E.
[30] *Id.* at Ex. E.
[31] *See* Claim 8-11.

<u>Attorney's Fees for the Surv-Tek Parties</u>

This bankruptcy case largely has been a two-party dispute between Debtor and the Surv-Tek Parties and their respective principals. The bankruptcy case and the Surv-Tek AP have been enormously expensive for both sides. In seeking recovery of their attorney's fees and costs in the Surv-Tek AP, the Surv-Tek Parties asserted that they paid almost $500,000 in attorney's fees and costs in the Surv-Tek AP and underlying state court litigation, through June 30, 2022.[32] That does not include attorney's fees and costs of the Surv-Tek Parties incurred after June 30, 2022.

<u>Surv-Tek's Carve-Out Offer and Preferences for Conversion or Dismissal</u>

At the final hearing on the Motion to Convert or Dismiss and at the status conference held following the Court's denial of confirmation of the Third Plan, the Surv-Tek Parties urged the Court to convert Debtor's case to one under chapter 7 rather than to dismiss the case. Surv-Tek indicated that it would have substantially more confidence in a chapter 7 trustee marshalling the Collateral and conducting a sale of the Collateral, rather than Debtor being in charge of a sale. If the case were dismissed without court approval of the Request for Structured Dismissal, Surv-Tek very well may have to spend additional time and money returning to state court to foreclose its security interest in the Collateral.

In support of conversion of this chapter 11 case to a case under chapter 7, Surv-Tek offered a 25% carve-out for the estate from the net proceeds of a chapter 7 trustee's liquidation of the Collateral, after payment of the costs of sale and the chapter 7 trustee's fees[33]

---

[32] Surv-Tek asserted that it should recover $160,725.65 for pre-petition attorney's fees and costs, and $324,947.54 for post-petition attorney's fees and costs. STIF asserted that it should recover $4,350.33 for pre-petition attorney's fees and costs, and $1,661.28 for post-petition attorney's fees and costs. *See* AP Doc. 139. These amounts total $491,684.80.

[33] The Court notes that chapter 7 trustee compensation is limited by § 326.

-8-

(the "Carve-Out"). The Carve-Out would allow a distribution to creditors in a converted chapter 7 case, most likely a *pro rata* distribution for unpaid chapter 11 administrative expenses.

The United States Trustee did not take a position as to whether the chapter 11 case should be dismissed versus converted in the event the Motion to Convert or Dismiss is granted. Given Surv-Tek's offer of the Carve-Out, the Subchapter V Trustee indicated that he supported conversion as the most appropriate option.

## DISCUSSION

### A. *The Fourth Plan and the Request to Establish Confirmation Procedures Regarding the Fourth Plan*

Although Debtor describes the Fourth Plan as substantively different from the Third Plan because it provides different funding sources for replacement of Debtor's vehicles, the Fourth Plan is essentially the same as the Third Plan. It attempts to fill the evidentiary gaps regarding feasibility that Debtor failed to sufficiently demonstrate at the final hearing on confirmation of the Third Plan.

By the Request to Establish Confirmation Procedures for the Fourth Plan, Debtor asks the Court to adopt procedures and deadlines so that the Court will consider confirming the Fourth Plan instead of dismissing this chapter 11 case or converting it to a case under chapter 7. The Court declines Debtor's request to move the Fourth Plan to a confirmation hearing. Under the circumstances of this case and given the nature of the Fourth Plan, the Court declines to grant Debtor additional time to file another plan.

### B. *The Fourth Plan is time barred*

Under § 1189(b), a subchapter V debtor must file a plan within 90 days after the order for relief, except the court may extend that time if the need for the extension is attributable to

-9-

circumstances for which the debtor should not justly be held accountable. Section 1189(b) provides:

> The debtor shall file a plan not later than 90 days after the order for relief under this chapter, except that the court may extend the period if the need for the extension is attributable to circumstances for which the debtor should not justly be held accountable.

Debtor filed the First Plan within the 90-day period fixed in § 1189(b) for filing a plan. Prior to a confirmation hearing on the First Plan, Debtor filed the Second Plan and Third Plan. Although called the Second Plan and Third Plan, those plans in substance are preconfirmation plan modifications made pursuant to § 1193(a).

This Court has noted that in chapter 13 cases filed in this district preconfirmation plan modifications typically are effectuated by filing an amended plan. *In re Esquibel*, No. 21-10804-J13, 2022 WL 607922, at *5 (Bankr. D.N.M. Mar. 1, 2022) (citing cases which state that preconfirmation modified plans filed pursuant to § 1323(a) are often referred to as amended plans in other jurisdictions). Here, Debtor followed that protocol in its subchapter V case. Debtor filed preconfirmation modifications in the form of self-contained amended plans that included the modifications rather than filing modifications that simply state the changes to the plan. Under § 1193(a), after modification "the plan as modified becomes the plan."

The Second Plan amended (modified) the First Plan (as modified by a separately filed plan modification), and the Third Plan amended (modified) the Second Plan.[34] After the Court denied confirmation of the Third Plan, Debtor filed its Fourth Plan. However, once the Court

---

[34] On June 22, 2022 and July 8, 2022, the Court entered an order and amended order, respectively, fixing a deadline for Debtor to file an amended plan (Docs. 384 & 392). Debtor filed the Second Plan by the deadline, which amended the original plan. By an order entered August 18, 2022, the Court fixed a deadline for Debtor to file a third amended plan, which limited the modifications to the Second Plan that could be made in the third amended plan and provided that all objections to and votes cast on the Second Plan are deemed objections to and votes cast on the third amended plan. Doc. 419. Debtor filed the Third Plan by the deadline.

-10-

denied confirmation of the Third Plan, there was no pending plan that Debtor could modify by filing a preconfirmation plan modification. Consequently, unlike the Second Plan and Third Plan, the Fourth Plan is not a preconfirmation plan modification. It is a new plan.[35,36]

The Fourth Plan was filed more than two years after Debtor filed its voluntary petition under subchapter V commencing this chapter 11 case, which is well after the 90-day period fixed in § 1189(b) for filing a plan. Debtor neither sought nor obtained an extension of the 90-day period to file a plan. Debtor argues that because § 1189(b) only requires a debtor to file "a" plan not later than 90 days after the order for relief, which Debtor did by filing the First Plan, § 1189(b) does not limit a debtor's right to file another plan after the court denies confirmation of a timely-filed plan. Although the Court believes Debtor's position likely is incorrect, the Court need not decide the issue because even under a more liberal discretionary standard for granting Debtor additional time to file a new plan, the Court will not grant Debtor additional time to file the Fourth Plan.[37]

---

[35] If instead of filing a self-contained plan called the Fourth Plan following denial of confirmation of the Third Plan, Debtor had filed a plan modification that incorporated the terms of the Third Plan with modifications, the resulting plan (as modified) would have been a new plan not a preconfirmation modification filed pursuant to § 1193(a).

[36] *But see Novak v. DeRosa*, 934 F.2d 401, 403-04 (2d Cir. 1991) (providing that a chapter 12 plan may still be modified after denial of confirmation); *In re Mortellite*, No. 17-21818-ABA, 2018 WL 388966, at *1 n.3 (Bankr. D.N.J. Jan. 11, 2018) (same).

[37] The time limit for filing a plan under § 1189(b) is an important part of subchapter V's streamlined process designed to create, in many cases, a more expeditious, economical process for small businesses to reorganize under chapter 11. Filing a plan sooner typically means a quicker confirmation hearing in the case, which often translates into less expense. If the court denies confirmation of a timely-filed plan, there is no pending plan for the debtor to amend or modify. Instead, the debtor must begin anew by filing a new plan if it wishes to confirm a plan in the case. It appears to the Court that § 1189(b), which specifies the time for a debtor to file a plan, does so without regard to whether the court denied confirmation of a prior timely-filed plan, and therefore § 1189(b)'s 90-day deadline should apply to any subsequent plan as well. A court may grant a retroactive extension of the § 1189(b) deadline to file a plan, *In re Majestic Gardens Condo. C Ass'n*, 637 B.R. 755, 757 (Bankr. S.D. Fla. 2022), including to file another plan after denial of confirmation of an earlier plan.

-11-

*i. Debtor would not satisfy the § 1189(b) extension standard, if it applies*

Debtor in this case did not make a request to extend the 90-day deadline under § 1189 so it could file the Fourth Plan. Even if Debtor had made such a request, the Court would have declined to grant it, because the need for the extension is not "attributable to circumstances for which the debtor should not justly be held accountable." § 1189(b). A confirmation hearing on the Fourth Plan essentially would be a do-over of the confirmation hearing on the Third Plan. The Court denied confirmation of the Third Plan in part because Debtor's exit financing was at least $150,000 short of that needed to make the plan feasible, and Debtor's plan projections with accompanying testimony did not establish that Debtor would have positive cash flow in the first plan year during and after the surrender of all or substantially all of Surv-Tek's Collateral. The Fourth Plan is substantially the same as the Third Plan, except Debtor explains that it has now obtained vendor financing to remedy the shortfall in exit financing. Debtor has also now prepared monthly cash flow plan projections in support of the Fourth Plan to meet the Court's concerns about the annual cash flow projection for the first year of the Third Plan. These are not circumstances for which the Debtor "should not justly be held accountable." § 1189(b).[38] If the § 1189(b) extension standard applies, Debtor has failed to meet it and the filing of the Fourth Plan is time-barred by § 1189(b).

---

[38] Even if the § 1189(b) applied and its extension standard was met, the Court would also have denied a requested extension of the 90-day deadline so it could file the Fourth Plan in the exercise of the Court's reasonable discretion pursuant to § 1189(b). Section 1189(b) provides that the "court *may* extend the [90-day] period." (Emphasis added). Use of the term "may" instead of "shall" gives the court some discretion to deny a request to extend the time even if the stated standard is met. *See* discussion below of the Court's exercise of its discretion.

*ii. The Court declines to grant Debtor additional time to file the Fourth Plan*

Even if the extension standard in § 1189(b) does not apply, Debtor needs court approval for additional time to file another plan following denial of confirmation of a timely-filed plan, and in the exercise of its discretion, the Court declines to grant such additional time. The language of § 1189(b) is taken from § 1221, applicable in chapter 12 cases. Section 1189(b) is subchapter V's counterpart to § 1221, and the language of §§ 1189(b) and 1221 are identical. Section 1208(c)(5) recognizes that a chapter 12 debtor may file another plan after denial of confirmation of a plan if the court grants the debtor additional time to file another plan.[39] The same is true in subchapter V.

While it seems to this Court that § 1189(b)'s extension standard likely applies to the filing of another plan following denial of confirmation of a timely-filed plan, there is a line of cases in chapter 12 that do not apply § 1221 (which contains the same language as § 1189(b)), in analyzing whether to grant additional time for another plan to be filed following denial of confirmation of a chapter 12 debtor's initial plan—although the cases all agree that court approval of an extension is required. *See Akers v. Micale*, 609 B.R. 175, 183-84 (W.D. Va. 2019) (without discussing the applicability of § 1221, the court does not apply the § 1221 standard to decide whether to extend the time to file another chapter 12 plan following denial of plan confirmation); *In re Mortellite*, No. 17-21818-ABA, 2018 WL 388966, at *1 n.3 (Bankr. D.N.J. Jan. 11, 2018) (same); *In re Bentson*, 74 B.R. 56, 58 (Bankr. D. Minn. 1987) (same).

---

[39] *See* § 1208(c)(5) (stating that grounds to convert or dismiss a chapter 12 case includes "denial of confirmation of a plan . . . and denial of a request made for additional time for filing another plan or a modification of a plan").

-13-

In exercising reasonable discretion on whether to grant the debtor an extension of time to file another plan after denial of confirmation of a prior plan, courts consider, among other things:

(1) when the first plan was filed,
(2) how comprehensive and complete the first plan was,
(3) the reasons for denial of confirmation of the first plan,
(4) the likelihood of successful confirmation of a new plan,
(5) how long of an extension is requested, and
(6) whether the debtor has proposed its prior plan(s) in good faith.

*See Bentson*, 74 B.R. at 58 (setting forth the factors and requiring debtor to "make a good faith effort to file a confirmable plan in the first instance").[40,41]

In this case, these factors are mixed regarding whether to grant Debtor additional time to file another plan. However, the factors do not capture the full reasoning on why the Court will not grant Debtor additional time to file another plan. This case largely has been a two-party dispute. The Court gave Debtor the opportunity to fully litigate its more than a dozen claims against the Surv-Tek Parties in a 9-day trial. After the Court decided the claims, the Court gave Debtor a full and fair opportunity to modify its plan twice and take the modified plan to a multi-day contested evidentiary confirmation hearing, which was also a hearing on the Surv-Tek Parties' Motion to Convert or Dismiss. After concluding the hearing, the Court denied confirmation in a reasoned opinion. Instead of ruling on the Surv-Tek Parties' Motion to Convert

---

[40] *Accord Novak v. DeRosa*, 934 F.2d 401, 404 (2d Cir. 1991) (applying the *Bentson* factors); *Akers v. Micale*, 609 B.R. at 183-84 (same); *In re Greseth*, 78 B.R. 936, 944-45 (D. Minn. 1987) (same); *In re Luchenbill*, 112 B.R. 204, 219 (Bankr. E.D. Mich. 1990) (same).

[41] It is unclear why courts do not apply the extension standard set forth in § 1221. The cases discuss granting "additional time" or an "extension of time" to file another plan, but the only time contained in chapter 12 by which a debtor must file a plan is set forth in § 1221. Section 1221 specifies the standard a debtor must satisfy to extend that time to file a plan (requiring a chapter 12 debtor to show that "the need for the extension is attributable to circumstances for which the debtor should not justly be held accountable"). Therefore, under chapter 12, it appears to this Court that in order to extend the time to file another plan after denial of confirmation of a timely-filed plan, the debtor would need to satisfy the extension of time standard set forth in § 1221.

-14-

or Dismiss when the Court denied confirmation of the Third Plan, the Court set a status conference to discuss with the parties whether dismissal or conversion was more appropriate. Debtor filed the Fourth Plan shortly before the status conference.

Both Debtor and Surv-Tek have incurred enormous attorneys' fees while this case has been pending for over two years, during which time Debtor has made little or no payment to Surv-Tek on its secured claim. Notwithstanding a general goal of subchapter V to facilitate a more expeditious, less expensive bankruptcy case, this case has not followed that pattern. While the delay and added expense created by litigation of the Surv-Tek AP was a reasonable and necessary predicate to analyzing plan confirmation, the additional delay and expense of another hearing on confirmation of the Fourth Plan—which essentially would be a do-over of the hearing on confirmation of the Third Plan—is not reasonable. Under the circumstances of this case, granting Debtor additional time to file another plan following denial of confirmation of the Third Plan is not appropriate. Therefore, the Fourth Plan is time-barred.

### C.  Cause exists under § 1112(b) to convert or dismiss

The Court closed evidence on the Motion to Convert or Dismiss at the end of the Joint Final Hearing. Subsequently, the Court denied confirmation of the Third Plan and determined that Debtor is not permitted to file another plan, *see* Part B above. Surv-Tek asserts that "cause" exists to dismiss this bankruptcy case or convert it to one under chapter 7 on the basis that Debtor cannot propose a confirmable plan. The Court agrees.

Section 1112(b) governs dismissal and conversion of chapter 11 cases and provides a non-exhaustive list of grounds that constitute "cause" for dismissal or conversion. *Frieouf v. United States (In re Frieouf)*, 938 F.2d 1099, 1102 (10th Cir. 1991); *In re Jacobs*, 644 B.R. 883, 893 (Bankr. D.N.M. 2022). The party requesting dismissal or conversion bears the burden of

-15-

demonstrating "cause" by a preponderance of the evidence. *Jacobs*, 644 B.R. at 893; *In re Sunnyland Farms, Inc.*, 517 B.R. 263, 266 (Bankr. D.N.M. 2014).

Once "cause" is demonstrated, the Court must dismiss or convert the case to one under chapter 7, "whichever is in the best interests of creditors and the estate," unless (1) the Court "finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate" and (2) "there is a reasonable likelihood that a plan will be confirmed . . . within a reasonable period of time." § 1112(b)(2).[42]

Although not specifically enumerated, a debtor's inability to file a confirmable plan constitutes "cause" under § 1112(b). *Jacobs*, 644 B.R. at 894 (finding "cause" to dismiss chapter 11 case based on debtor's "inability to effectuate a plan"); *Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir. 1989) ("Dismissal under § 1112(b) is appropriate where debtor's failure to file an acceptable plan after a reasonable time indicates its inability to do so[.]").[43]

Here, Debtor's inability to propose a confirmable plan is stark. Not only did the Court deny confirmation of the Third Plan, but Debtor also has no ability to file another plan that it can take to a confirmation hearing, *see* Part B above. Thus, dismissing or converting this case are the only options left.[44] The Court therefore finds that "cause" exists pursuant to § 1112(b) to dismiss

---

[42] *In re ARS Analytical, LLC,* 433 B.R. 848, 861 (Bankr. D.N.M. 2010) ("[I]f cause has been demonstrated, the court must ascertain whether unusual circumstances exist to prevent conversion or dismissal. If no such unusual circumstances exist, the court must convert or dismiss." (quoting *In re Modanlo*, 413 B.R. 262, 271 (Bankr. D. Md. 2009))).

[43] *See also In re Autterson*, 547 B.R. 372 (Bankr. D. Colo. 2016) (debtor's failure to confirm plan during two years of bankruptcy filing constituted cause to dismiss or convert debtor's chapter 11 under § 1112(b)); *Cantu v. Romero Gonzalez Benavidez L.L.P (In re Cantu)*, 398 F. App'x 76 (5th Cir. 2010) (bankruptcy court did not abuse its discretion in converting individual chapter 11 debtor's case where plan was not feasible and could not be confirmed).

[44] The Court is aware that in some chapter 11 cases a debtor may propose selling all or substantially all of its assets through a § 363 sale outside of a plan; for example, if there is an emergency that necessitates the sale, such as wasting assets. *See, e.g., In re Gulf Coast Oil Corp.*, 404 B.R. 407, 428 (Bankr. S.D. Tex.

-16-

or convert the case. Further, there are no unusual circumstances establishing that converting or dismissing the case is not in the best interest of creditors and the estate. Even if there were, Debtor certainly could not demonstrate that there is a reasonable likelihood of plan confirmation within a reasonable time since it has no ability to file another plan at all.

### D. The Request for Structured Dismissal

Having determined that "cause" exists to dismiss or convert the case to one under chapter 7, the Court must next consider which option is "in the best interests of creditors and the estate." § 1112(b)(1). The decision between conversion or dismissal falls within the sound discretion of the court. *In re Sandia Resorts, Inc.*, 562 B.R. 490, 495 (Bankr. D.N.M. 2016) ("The bankruptcy court has broad discretion in deciding whether to dismiss or convert a Chapter 11 case." (quoting *Loop Corp. v. U.S. Trustee*, 379 F.3d 511, 515 (8th Cir. 2004))). In weighing dismissal versus conversion, the Court first considers Debtor's proposed structured dismissal.

The bankruptcy court has the authority to approve a structured dismissal in certain circumstances. *See Czyewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017); *In re Naartjie Custom Kids, Inc.*, 534 B.R. 416, 421 (Bankr. D. Utah 2015) ("[T]he bankruptcy court can grant a structured dismissal in appropriate circumstances."). As the Supreme Court explained in *Jevic*, when conditions have changed that make restoration of the status quo following dismissal difficult or impossible, "the Code permits the bankruptcy court 'for cause' to alter a Chapter 11 dismissal's ordinary restorative consequences" through a structured dismissal. 534 U.S. at 456.

---

2009) ("The movant must show that there is a need to sell prior to the plan confirmation hearing."). Here, Debtor has proposed a § 363(f) sale of all of its assets as part of a structured dismissal designed to allow it to continue its business operations. The Court will address the proposed § 363(f) sale in connection with its discussion of the proposed structured dismissal. Section 1112(b) also provides the option to appoint a chapter 11 trustee or examiner, but no party has requested such appointment in this case.

However, the Court may not "approve a structured dismissal that provides for distributions that do not follow ordinary priority rules without the affected creditors' consent." *Id.* at 464.

Given the circumstances of this case and the substance of the requested structured dismissal, the Court will deny the Request for Structured Dismissal. The proposed structured dismissal is designed to achieve much of the same result after the bankruptcy case is dismissed as Debtor proposed in the Third Plan and Fourth Plan: namely, to enable Debtor to continue its business operations by giving Debtor time to recapitalize its business and replace the Collateral pledged to Surv-Tek before such Collateral is sold and delivered to a third party or surrendered. Under Debtor's proposed structured dismissal, Debtor would offer for sale at an auction all of its assets free and clear of liens under a § 363(f) sale conducted by a special master.[45] The sale would be advertised for three consecutive weeks. The notice of sale would state that S-Tek 1, LLC is not going out of business. Surv-Tek would be allowed to credit bid all or any portion of its judgment against Debtor at the sale. Items sold would be surrendered to the buyer between 30 and 35 days following the sale subject to Debtor's right of redemption. Any assets not sold would be deemed abandoned to the Debtor. Debtor would be permitted to redeem sold assets, including accounts receivable, and to enter into borrowing agreements with the Loan Fund and other vendors to enable Debtor to recapitalize its business.

Under the proposed structured dismissal, Debtor's ultimate goal would be for Surv-Tek to realize as much or more from the sale of its Collateral as it would receive from a sale in a converted chapter 7 case while at the same time enabling Debtor to remain in business and not lay off its employees. Surv-Tek opposes the proposed structured dismissal, stating that it would

---

[45] Docs. 534 & 535.

have much more confidence in a chapter 7 trustee marshalling its Collateral and conducting a sale than in Debtor controlling the process.

The present circumstances do not establish that a structured dismissal is appropriate. Debtor's continued business operations as contemplated by the structured dismissal is not feasible. Surv-Tek holds a blanket security interest in Debtor's assets, including a perfected security interest in its existing and after-acquired accounts receivable. Debtor argued to the Court that Surv-Tek's security interest would not prevent Debtor from operating its business after dismissal of the bankruptcy case because Debtor would surrender or sell all of its assets following case dismissal and use purchase-money financing to acquire replacement assets. The problem with this strategy is that after case dismissal the purchase-money security interests would not protect accounts receivable Debtor generates to replace the accounts receivable that Debtor sold or surrendered as part of the structured dismissal, nor would it protect any receivables Debtor acquired thereafter or any amounts Debtor received from the collection of any those receivables. Upon Surv-Tek foreclosing its security interest in Debtor's newly generated accounts receivable and proceeds thereof, Debtor would not be able to continue its operations.

During the pendency of the bankruptcy case, absent a court order to the contrary, §§ 552(a) and (b) cut off the attachment of a creditor's security interest in after-acquired accounts receivable that are not proceeds, products, offspring, or profits of property in which the creditor had a prepetition security interest. *See In re Cafeteria Operators, L.P.*, 299 B.R. 400, 405 (Bankr. N.D. Tex. 2003) (discussing the effect of § 552). Section 552 cuts off the attachment of Surv-Tek's security interest in after-acquired accounts receivable because S-Tek's post-petition accounts receivable are not proceeds, products, offspring, or profits of its pre-petition

accounts receivable. *See In re Premier Golf Props., LP*, 477 B.R. 767, 776 (9th Cir. BAP 2012) ("Revenue generated post-petition solely as a result of a debtor's labor is not subject to a creditor's pre-petition interest. Section 552(b) is intended to cover after-acquired property that is directly attributable to prepetition collateral, *without addition of estate resources*." (internal citations and quotation marks omitted) (emphasis in the original)).

A court can grant a creditor a lien against after-acquired property, which commonly is done by granting a creditor a security interest in post-petition after-acquired accounts receivable as adequate protection for the debtor's use of the proceeds of accounts receivable in which the creditor had a security interest as of the petition date.[46] In cash collateral orders, this Court granted Surv-Tek a security interest in after-acquired accounts receivable and proceeds thereof up to a dollar limit as adequate protection for Debtor's use of Surv-Tek's cash collateral.[47]

If this bankruptcy case is dismissed, even if Debtor sells or surrenders all of Surv-Tek's Collateral as part of a structured dismissal, Surv-Tek still will have an unpaid claim against Debtor in excess of $1 million. Upon case dismissal, § 552(a) no longer would cut off or limit Surv-Tek's security interest from attaching to after-acquired accounts receivable and the proceeds thereof as collateral securing Surv-Tek's remaining unpaid claim. Nor would Debtor granting purchase-money security interests in its assets to secure new financing after case dismissal protect its receivables or bank accounts containing proceeds of receivables from Surv-Tek's foreclosure of its security interest.

---

[46] *Cf. In re Cantu*, No. 08-70260, 2011 WL 160563, at *2 (Bankr. S.D. Tex. Jan. 18, 2011*)* ("[The] Bank could have sought an order continuing its lien on after-acquired receivables and such order would trump § 552."), *aff'd sub nom. Cantu v. Int'l Bank of Com*., No. CIV.A. M-11-28, 2011 WL 10620314 (S.D. Tex. Aug. 5, 2011), *aff'd sub nom. In re Cantu*, 464 F. App'x 385 (5th Cir. 2012).

[47] *See* Docs. 152 & 300, and other cash collateral orders.

-20-

Under the Uniform Commercial Code, as adopted in New Mexico (the "UCC"), a creditor cannot obtain a purchase-money security interest in accounts receivable as original collateral. The UCC defines "purchase-money collateral" as "goods or software that secures a purchase-money obligation incurred with respect to that collateral." N.M.S.A. 1978 § 55-9-103(a)(1).[48] "'[G]oods' means all things that are movable when a security interest attaches[.]" N.M.S.A. 1978 § 55-9-102(a)(44). Under the UCC, an "account" is a "right to payment of a monetary obligation," and an account receivable is a type of such a monetary obligation. N.M.S.A. 1978 § 55-9-102(a)(2). An "account" is not a "good." N.M.S.A. 1978 § 55-9-102(44)(2)(B)(ii).

Further, although it may be possible to obtain a purchase-money security interest in accounts receivable as *proceeds* of collateral in which a creditor holds a purchase-money security interest, this principle would not help Debtor protect its accounts receivable from Surv-Tek's security interest after dismissal of the bankruptcy case. Proceeds of collateral include "(A) whatever is acquired upon the sale, lease, license, exchange or other disposition of collateral; (B) whatever is collected on, or distributed on account of, collateral; [and] (C) rights arising out of collateral[.]" N.M.S.A. 1978 § 55-9-102(a)(64)(A), (B) & (C). With certain exceptions, a security interest attaches to identifiable proceeds of collateral. N.M.S.A. 1978 § 55-9-315(a)(2).

However, Debtor does not acquire its accounts receivable as a result of the sale, lease, license, exchange or other disposition of any goods or software to which a purchase-money security interest may attach as proceeds. Debtor is a service business that generates its accounts

---

[48] A "purchase-money obligation" is "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." N.M.S.A. 1978 § 55-9-103(a)(2).

receivable from performing surveying work. Therefore, a new lender could not a have purchase-money security interest in Debtor's accounts receivable as proceeds of goods or software. For these same reasons, a purchase-money security interest would not protect Debtor from Surv-Tek garnishing its cash on deposit generated from the collection of accounts receivable.

If the Court were to approve the proposed structured dismissal, following dismissal of the case, after Debtor sold or surrendered Surv-Tek's Collateral, Surv-Tek's remaining unpaid claim in excess of $1 million would be secured by a first priority security interest in Debtor's accounts receivable and after-acquired accounts receivable and the funds generated by Debtor's collection of the accounts receivable. Further, the automatic stay no longer would protect Debtor from Surv-Tek's collection efforts. Surv-Tek's enforcement of its security interests against the accounts receivable and cash proceeds of the receivables would put Debtor out of business.

Additionally, the Court has not found any caselaw in which a court authorized a structured dismissal through the sale of a debtor's assets, where the intended purpose of the structured dismissal is to allow the debtor to reorganize and continue business operations. Regardless of whether such a structured dismissal might be appropriate in some circumstances, this case is not one of those circumstances. The Court concludes that the Request for Structured Dismissal should be denied.

E.  *Whether to dismiss (without a structured dismissal) or convert to chapter 7*

Having determined that Debtor's proposal for structured dismissal is not feasible, the Court next considers whether to convert the case to one under chapter 7 or dismiss without a structured dismissal.

-22-

Drawing upon the guidance of other courts, this Court has previously considered the following non-exhaustive list of factors when deciding whether dismissal or conversion is in the best interest of creditors and the estate:

(1) whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal;

(2) whether there would be a loss of rights granted in the case if it were dismissed rather than converted;

(3) whether the debtor would simply file a further case upon dismissal;

(4) the ability of the trustee in a chapter 7 case to reach assets for the benefit of the creditors;

(5) in assessing the interests of the estate, whether conversion or dismissal would maximize the estate's value as an economic enterprise;

(6) whether any remaining issues would be better resolved outside the bankruptcy forum;

(7) whether the estate consists of a "single asset;"

(8) whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests;

(9) whether a plan had been confirmed and whether any property remains in the estate to be administered;

(10) whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns;

(11) the prospect of payment of any unpaid secured claims, chapter 11 administrative claims, priority claims and nonpriority unsecured claims in a converted chapter 7 case or after dismissal;

(12) whether conversion to chapter 7 would result in bankruptcy powers and procedures being used to benefit secured creditors without providing a material benefit to other creditors; and

(13) any other prejudice to parties in interest resulting from conversion or dismissal.

*Sandia Resorts*, 562 B.R. at 495-96 (citing cases for the first ten factors and adding factors (11)-(13)). "The Court may also consider the preferences expressed by the parties in interest, especially neutral third-parties such as the United States Trustee." *Id.* at 496; *see also Gollaher v. U.S. Trustee (In re Gollaher)*, 463 B.R. 142 (Table), 2011 WL 6176074, *4 (10th Cir. BAP Dec. 13, 2011) ("Courts also consider the preferences expressed by creditors for either dismissal

-23-

or conversion as they are the best judge of their own best interests."). In considering these factors, "[n]o factor is necessarily determinative, and the court need not give the same weight to each factor." *Sandia Resorts,* 562 B.R. at 496.

In this case, after consideration of the relevant factors and the preferences of the parties, the Court concludes that converting this case to one under chapter 7 is in the best interest of creditors and the estate. The United States Trustee did not express a preference between conversion and dismissal, but Surv-Tek and STIF expressed a strong preference for conversion. The Subchapter V Trustee expressed a preference for conversion as well.

The first, fifth, sixth, seventh, ninth, and tenth factors are neutral. As to the first factor, there is no evidence that conversion or dismissal will alter the equality of distribution. As to the fifth factor, neither conversion nor dismissal is likely to impact the estate's value as an economic enterprise—because it does not appear that Debtor has a viable way to maintain its business operations if the case were dismissed. As to the sixth factor, there are no remaining issues of which the Court is aware that would be better resolved outside the bankruptcy forum. As to the seventh factor, the estate consists of more than a "single asset." As to the ninth factor, no plan has been confirmed. As to the tenth factor, there are no environmental or safety concerns of which the Court is aware.

The second and eleventh factors weigh significantly in favor of conversion. As to the second factor, there are substantial unpaid chapter 11 administrative expenses, totaling over $280,000 if allowed. If the case were dismissed, all holders of chapter 11 administrative expenses would lose their priority rights, and their right to payment would be equal to all other unsecured creditors. Further, after dismissal, there would be a strong likelihood that holders of chapter 11 administrative expense claims, as well holders of prepetition claims, would receive no

payment from the Debtor at all. As to the eleventh factor, there is a greater likelihood of payment of chapter 11 administrative expenses, at least in part, in a converted chapter 7 case than after dismissal, due to the Carve-Out offered by Surv-Tek in a chapter 7. Surv-Tek has a lien on substantially all of Debtor's assets, and thus after dismissal, Surv-Tek would be the only party who would receive any payment from sale of the Collateral. Due to the Carve-Out, in a converted chapter 7 case, the estate will receive from the sale of the Collateral (i) the amount necessary for the chapter 7 trustee to pay the costs of sale; (ii) the amount necessary to pay all chapter 7 trustee fees, and (iii) an additional 25% of the net sale proceeds. Given the Court's conclusions above with respect to Debtor's Request for Structured Dismissal, it is extremely unlikely that Debtor would be able to continue its operations if the case were dismissed, and thus unsecured claimholders would receive nothing or almost nothing from Debtor's assets (which are subject to Surv-Tek's lien) or Debtor's operations (which cannot be maintained).

The third, fourth, eighth, and twelfth factors also weigh in favor of conversion. As to the third factor, it is evident from Debtor's recent filings that Debtor's wishes to continue its business operations, and thus, there is a very real risk that Debtor will simply file another bankruptcy case if the Court dismissed this case. As to the fourth factor, the trustee will be able to reach assets for the benefit of creditors in two ways—first, the trustee will be able to administer the Carve-Out proceeds for the benefit of chapter 11 administrative claimholders, and second, the trustee can sell the Collateral. If the case were dismissed, Surv-Tek would have to return to state court to pursue foreclosure of its security interests in the Collateral. Given the history and expense of this case and the Carve-Out, it is not equitable for this Court to require Surv-Tek to spend additional time and money and suffer delays in state court to recover its Collateral. As to the eighth factor, conversion to chapter 7 will protect Surv-Tek's interest in the

-25-

Collateral by keeping the automatic stay in place and ensuring that assets are not dissipated. The Court makes no findings of misconduct by Debtor; however, there is inherent risk of dissipation of assets outside of bankruptcy after case dismissal, especially given the history of the dispute between Surv-Tek and Debtor. As to the twelfth factor, in exchange for a chapter 7 sale that would significantly aid Surv-Tek in realizing upon its Collateral, Surv-Tek has offered the Carve-Out to benefit other creditors. Thus, while the bankruptcy powers and procedures will be used to benefit Surv-Tek in a chapter 7, it will not be for Surv-Tek's exclusive benefit but will benefit other creditors as well.

The thirteenth factor is mixed. There may be prejudice to Debtor's customers on medium- and long-term jobs in progress, which will require transition to another surveying company to finish, unless the chapter 7 trustee seeks approval to operate the business in order to wind down jobs in progress. However, no evidence was presented as to existing jobs, such as identification of the jobs, how long they will take to complete, and how difficult they would be to transition. There also likely will be a more immediate loss of employment for Debtor's employees. The Court can mitigate these impacts by delaying the conversion of the case for a short time to give Debtor time to complete short term jobs, to give customers time to hire another survey company, and to give employees some notice before they lose their employment.

Surv-Tek's Carve-Out offer weighs heavily in the Court's evaluation of whether conversion or dismissal is in the best interests of creditors and the estate. The Court approves the Carve-Out. It is binding on Surv-Tek in the converted chapter 7 case. The Carve-Out gives an economic recovery to the chapter 7 estate from the Collateral which would otherwise not exist, and will allow for a meaningful distribution to creditors in chapter 7 which they would not receive in a dismissal.

## CONCLUSION

Based on the foregoing, the Court will enter an order denying Debtor's motion with the Request to Establish Confirmation Procedures and the Request for Structured Dismissal, as well as an order converting this chapter 11 case to a case under chapter 7 effective as of the date that is 14 days after entry of the order.

_____
ROBERT H. JACOBVITZ
United States Bankruptcy Judge

Date entered on docket: March 15, 2023

COPY TO:

Counsel for Debtor
Nephi Hardman
Nephi D. Hardman Attorney at Law, LLC
9400 Holly Ave. NE, Bldg. 4
Albuquerque, NM 87122

SubV Trustee
Patrick Malloy, III
401 S. Boston Ave, Ste 500
Tulsa, OK 74103

Office of the U.S. Trustee
Jaime A. Pena
P.O. Box 608
Albuquerque, NM 87103-0608

Counsel for Creditors Surv-Tek, Inc. & STIF, LLC
Christopher M. Gatton
Giddens & Gatton Law, P.C.
10400 Academy NE, Suite 350
Albuquerque, NM 87111